# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN EDISON,

     Plaintiff,

                                 Case No. 22-012358-NI
                                 Hon. Judith E. Levy

Vs.

NORTHVILLE TOWNSHIP, a
municipal corporation,
POLICE OFFICER BEN SELLENRAAD,
in his professional and
individual capacities,

     Defendants.

_____/

DEPOSITION DUCES TECUM OF JONATHAN EDISON

       Taken by counsel for the Defendant, at the law

offices of Randolph Law Group, located at 6330 Jefferson

Avenue, Detroit, Michigan 48207, on Wednesday, December

13, 2023, commencing at 10:03 a.m.

APPEARANCES:

For the Plaintiff:        THOMAS RANDOLPH III (P53563)
                         Randolph Law Firm
                         6330 East Jefferson Highway
                         Detroit, Michigan 48207
                         (248) 851-1222
                         thomas@randolphlawgroup.com

For the Defendant:        MATTHEW C. WAYNE (P80542)
                         Cummings McClorey Davis & Acho
                         17436 College Parkway
                         Third floor
                         Livonia, Michigan 48152
                         (734) 261-2400
                         mwayne@cmda-law.com

Reported by:           MEGAN PRICE, CER 9296



**Page 2**

TABLE OF CONTENTS

WITNESSES                                                          PAGE

Jonathan Edison
        Examination by Mr. Wayne                                      4
        Examination by Mr. Randolph                                 105

EXHIBITS

EX-A    Plaintiffs Complaint for Damages and Jury Demand            21
EX-B    Plaintiff's Answers to Defendants Northville                58
        Township and Police Officer Ben Sellenraad's
        Interrogatories to Plaintiff Pursuant to
        Fed. R. Civ. P. 33
EX-C    Plaintiff's Response to Defendants Northville               85
        Township and Police Officer Ben Sellenraad's
        First Request for Production of Documents to
        Plaintiff Pursuant to Fed. R. Civ. P. 34
EX-D    Register of Actions for 35th District Court                 92
        Case No. 13V4519GC, American Express Centurion
        Bank v. Jonathan Edison
EX-E    Case Details for 35th District Court Case Nos.              95
        2014-14V03448A-OA, 2014-14N00566A-OI, 2012-
        12V01886B-01, 2012-12V01886A-OI, and
        2012-12N00213A-OI
EX-F    Register of Actions for 3rd Third Circuit                  100
        Court Case No. 06-018054-01-FH, State of Michigan
        v. Jonathan Edison
EX-G    Register of Actions for Third Circuit Court Case           103
        No. 08-004933-01-FH, State of Michigan v. Jonathan
        Edison
EX-I    Register of Actions for 35th District Court Case           104
        No. 22V2887, Township of Northville v. Jonathan
        Edward Edison
(Exhibits attached)

**Page 3**

1    Detroit, Michigan
2         Wednesday, December 13, 2023 - 10:03 a.m.
3                      -  -  -
4              JONATHAN EDISON,
5    HAVING BEEN CALLED BY THE DEFENDANT AND SWORN
6              EXAMINATION
7    BY MR. WAYNE:
8  Q    Good morning. Let the record reflect this is the date and
9       time set for the deposition of Jonathan Edward Edison.
10      This deposition is being taken pursuant to notice and
11      pursuant to all applicable Federal Rules of the Civil
12      Procedure and the Federal Rules of Evidence.
13 A    Morning, sir.
14 Q    Please state your full name for the record.
15 A    Jonathan Edward Edison.
16 Q    And that's J-O-N-A-T-H-A-N?
17 A    That is correct.
18 Q    Edward traditionally spelled and then Edison and Thomas
19      Edison?
20 A    That is correct.
21 Q    Okay, thanks.  In the event you're not familiar with how
22      this works, you're going to be asked questions under oath,
23      which you must answer. There's no camera, but everything
24      said on the record is being taken down. So, things we
25      might do otherwise in conversation like shrugging your

**Page 4**

1    shoulders, nodding your heads. Excuse me. Nodding your
2    head. You can't do, it's got to be an oral answer so we
3    can tell what you're saying. Okay? You're permitted to
4    confer with your attorney. You can't do so. Mid question,
5    sir. I don't think that's your understanding. Once a
6    question has been posed.
7         MR. RANDOLPH: Yeah. I've explained that to him.
8    He understands.
9  BY MR. WAYNE:
10 Q    Okay. And if you don't understand a question that's put to
11      you, simply let me know and I'll rephrase or otherwise
12      explain what it is that I'm asking.
13 A    Okay.
14 Q    Also, if I ask a question, you respond, I'll take it that
15      you understood what I asked.
16 A    Okay.
17 Q    If you need to use the bathroom and get a drink of water,
18      let me know. We'll accommodate you. Do you have any
19      questions about this process before we begin?
20 A    I do not.
21 Q    Okay. What's your date of birth?
22 A    ████████.
23 Q    Okay. And where were you born?
24 A    Detroit.
25 Q    Okay. Whereabouts?

**Page 5**

1  A    What do you mean?
2  Q    West side? East side?
3  A    Oh, east.
4  Q    East side.
5  A    Yes.
6  Q    I might ask whereabouts on East Side?
7  A    Born Whereabout on the east side. I was born at Receiving
8       hospital, I believe.
9  Q    Okay. And then where were you raised?
10 A    East, as a matter of fact it's about 10 minutes from here.
11 Q    Okay.
12 A    Which would be Lycaste and Mack.
13 Q    Okay.
14 A    Area.
15 Q    All right. And you live in Northville Township now; is
16      that correct?
17 A    That is correct.
18 Q    Okay. And what address is that?
19 A    ████████████████████████████.
20 Q    How long did you live there?
21 A    I believe this is year 12 or 13.
22 Q    Okay. So what's your highest level of education?
23 A    I have a master's degree and I'm working on another
24      master's degree from Harvard.
25 Q    Okay. What's your master's in?



1  A    Psychology of Human Performance.
2  Q    Okay. And where s that?
3  A    Well, the first Master's, I apologize. First Master's?
4  Q    Yes.
5  A    First that is in leadership and supervision.
6  Q    And where's that from?
7  A    Wayne State University.
8  Q    Okay. I don't believe you have a Master's. You had to get
9       a bachelor's at some point?
10 A    That is correct.
11 Q    And where's your bachelor's from?
12 A    Also Wayne State.
13 Q    Okay. And what is that in?
14 A    That is in education, K through eight, all subjects.
15 Q    Anything before the Bachelor's?
16 A    Associates.
17 Q    Okay. And where's that from?
18 A    Wayne County Community College.
19 Q    Okay. And what's your associates in?
20 A    Urban Teaching.
21 Q    Okay. And you said you're a master's student now?
22 A    That is correct.
23 Q    All right, and that's where?
24 A    Harvard.
25 Q    Okay. What program or school?

1  A    School of Psychology.
2  Q    Is that through Harvard College or is that through another
3       school of program?
4  A    That is through the, I think of the name of it. There's a
5       program they have, it's for busy professionals. It's
6       through that program.  I can think about the name of it
7       and I can get it to you.
8  Q    So by chance commonly referred to as a extension studies
9       or Extension school?
10 A    Yes. Extension School.
11 Q    Okay. Are you married?
12 A    Yes.
13 Q    All right. What's your spouse's name?
14 A    Karen.
15 Q    K-A-R-E-N?
16 A    Correct.
17 Q    Okay. Any prior marriages?
18 A    No.
19 Q    Okay. Do you have any children?
20 A    Yes.
21 Q    How many children do you have?
22 A    Two.
23 Q    What are their ages?
24 A    My youngest, she is 14.
25 Q    Okay.

1  A    And Jonathan? Let's see, his birthday was in July, so he
2       is 16.
3  Q    Okay. Does your spouse work?
4  A    Yes.
5  Q    What does she do?
6  A    Good question. But she works.
7  Q    They're not allowed to say that.
8  A    Right? She works for Discover.
9  Q    Works for Discover?
10 A    Yeah.
11 Q    As in the credit card?
12 A    IT department.
13 Q    Okay. And Discover that means that is a credit card?
14 A    That is correct.
15 Q    Okay. All right. And do you hold any professional
16      licensure permits, certifications or accreditations?
17 A    Licenses, permits, accreditations. My company has the
18      Minority Business Certification.
19 Q    What exactly is that?
20 A    That is.
21 Q    I'm sorry, I can back up for a second. Name of your
22      company is?
23 A    BrainWorks Training.
24 Q    BrainWorks Training?
25 A    That is correct.

1  Q    All right. It s an LLC corporation?
2  A    Yes, LLC.
3  Q    Okay. So I'm sorry, go on. You said you certification is?
4  A    MBE.
5  Q    Okay. And that's a minority?
6  A    Minority Business Enterprise, which is 51% or greater
7       minority owned.
8  Q    Okay. Who or what is that certification through?
9  A    I cannot recall at this moment, but it is through and it
10      has to go through the agency. I can't think of the agency.
11 Q    I mean, is it a governmental agency?
12 A    Yes.
13 Q    A state or federal government agency?
14 A    The current one I have is through a state agency.
15 Q    Okay.
16 A    Yes.
17 Q    What, if anything did you do to prepare for today's
18      deposition?
19 A    What did I do to prepare?
20 Q    Take your time.
21 A    Took a shower.
22 Q    We're all grateful for that.
23 A    What else. Pulled out this suit. That's about it.
24 Q    Okay. To prepare did you talk to anyone for today's
25      deposition?



1  A   I said good morning to my wife. And my daughter asked me
2     what my day was like today, and I said I was going to
3     answer some questions and then I drove here after I
4     dropped her off at school.
5  Q   Okay. So, going back and I'm basing some of this off of
6     some of the parts of your biography that I've read before.
7     You're 14, you had been living with your grandma; is that
8     correct?
9  A   Up until the age of 14.
10 Q   Okay. What happened at age 14?
11 A   She passed away.
12 Q   Okay. What year was that?
13 A   That is a good question.  Let's see if you do the math on
14    that 15, 34. I want to say 1987, 1988, if my memory is
15    right. I'm not a hundred percent, but around that time.
16 Q   Okay. And then when your grandma died, what happened to
17    you? Where did, you know, who did you live with? What did
18    you do?
19 A   I had to live with my, well, initially I lived with my
20    father and his new wife for a period.
21 Q   For how long?
22 A   Less than four months.
23 Q   What happened?
24 A   She was not a fan of Jonathan Edison and I was essentially
25    told to that I had to leave.

1  Q   Okay. Where'd you go?
2  A   Initially, I went to Cass Corridor initially for a few
3     weeks.
4  Q   Where were you staying there?
5  A   Flop house.
6  Q   And you were 14, 15 at this time?
7  A   That is correct.
8  Q   Okay. And then did you leave the flap house eventually?
9  A   I did.
10 Q   How old were you and where'd you go?
11 A   Same age, later that year I went to my aunt's house.
12 Q   Okay. Where'd she live?
13 A   Detroit.
14 Q   Okay. So she took you in?
15 A   That is correct.
16 Q   All right.  And you stayed with her how long?
17 A   If my memory is correct, probably up until the age of 20,
18    so about six years.
19 Q   Okay. And you graduated high school?
20 A   Yes.
21 Q   Okay. And what'd you do after you graduated high school?
22 A   What did I do? I enrolled in community college.
23 Q   Right away?
24 A   No. In between there, I went down to Fort Valley State
25    College.

1  Q   Where is that?
2  A   It's in Georgia.
3  Q   Okay. How'd you happen to choose that school?
4  A   My cousin was a student there.
5  Q   Okay. I'm sorry. So this is the -- did you graduate in May
6     or June when you were?
7  A   June.
8  Q   June, okay. And when did you start at Fort Valley State
9     College?
10 A   I didn't start taking classes until the following year in
11    January, if my memory is right.
12 Q   Okay. And how long were you at Fort Valley State College?
13 A   Less than six months.
14 Q   Okay. Why'd you leave Fort Valley State College?
15 A   I couldn't adjust to the country life.
16 Q   Okay. So after you left at your six months, what'd you do
17    then?
18 A   Returned to Detroit.
19 Q   Okay. And then?
20 A   And then what?
21 Q   When you returned to Detroit, did you seek employment? Did
22    you enroll in school?
23 A   That's when I started taking classes at Wayne County
24    Community College.
25 Q   Okay. And, I know you have your Associates, how long were

1     you at Wayne County Community College?
2  A   I want to say from 1992. Again, that's a little foggy to
3     until I graduated in May of 1995.
4  Q   Okay. So, at that point you have your Associates, and are
5     you working or did you go to work right after graduating?
6  A   I was working at Mobile gas station.
7  Q   Okay. Around here? Metro Detroit?
8  A   Fort Street, Metro Detroit.
9  Q   Okay. And then when did you enroll at Wayne State for your
10    bachelor's?
11 A   I enrolled at Wayne State the last semester of my time
12    during my Associates. So, I was taking classes at both at
13    simultaneously. So I would say January of 1995, maybe.
14 Q   And then when did you graduate?
15 A   Graduated from where?
16 Q   From Wayne State with your bachelor's?
17 A   1996.
18 Q   Okay. And what did you do at that point?
19 A   I'm, I'm sorry.
20 Q   What did you do at that point?
21 A   Walked across the stage.  You mean?
22 Q   After you completed your bachelor's?
23 A   After I completed my bachelor's. Oh, I became a classroom
24    teacher.
25 Q   Where was that?



Page 14

1 A   Detroit Public Schools.
2 Q   You said classroom school. Excuse me. A classroom teacher
3     as opposed to what?
4 A   Well, you got options. You can work for the district and
5     district office or become a classroom teacher.
6 Q   Okay.
7 A   Yeah.
8 Q   Where were you teaching?
9 A   East side of Detroit.
10 Q  Do you remember the school?
11 A  Spain Middle School.
12 Q  And how long were you teaching at Spain?
13 A  Several years, maybe three years. I believe.
14 Q  It was starting in 1996?
15 A  Yes, maybe 1997. I would have to double check that, but
16    1996 or 1997, of those years after I graduated.
17 Q  Okay. 1999 you said?
18 A  I'm sorry.
19 Q  Maybe to 1999. Does that sound about right?
20 A  Yeah, that sounds about right.
21 Q  Okay. And then, employment wise, what did you do after you
22    were at Spain?
23 A  I started applying for leadership in the district and I
24    became an assistant principal.
25 Q  In 1999?

Page 15

1 A   I'm not sure of the year, but my next was after Spain. I
2     did a couple summer schools and then I was hired to be an
3     assistant principal.
4 Q   All right. Where were you hired to be an Assistant
5     Principal?
6 A   Detroit Public Schools.
7 Q   What school?
8 A   Catherine B. White Elementary School.
9 Q   And how long were you Assistant Principal?
10 A  Less than three years.
11 Q  Were those all at White Elementary?
12 A  That is correct.
13 Q  Okay. Did that conclude your employment with Detroit
14    Public Schools?
15 A  At the end of that for a time, and then I did a one stint
16    at another school and then that concluded it.
17 Q  What was that other school?
18 A  I do not recall.
19 Q  And you were assistant principal there as well?
20 A  No, I was, they called it an administrator in charge, so.
21 Q  Going from an assistant principal to administrator in
22    Charge; is that the term?
23 A  Yeah.
24 Q  So a lateral move?
25 A  Yeah, generally how it works is if they already have a

Page 16

1     certain people doing certain things and they hire more
2     staff because of enrollment and they're working some
3     budget numbers, that's kind of how that works.
4 Q   What's the last year you worked with Detroit Public
5     Schools as an employee? As a worker?
6 A   I do not recall the exact year, but it was shortly after
7     that.
8 Q   In ballpark 2003, 2004.
9 A   Ballpark? I would, you can go with ballpark. Sure.
10 Q  One of those years?
11 A  Yeah, one of those years.
12 Q  What brought your employment with Detroit Public Schools
13    to an end?
14 A  The first time was downsizing, district downsizing.
15 Q  What year would this have been?
16 A  Around that time?
17 Q  Three, four or five?
18 A  Yeah.
19 Q  And so you were, so you came back, otherwise invited to
20    come back or reapplied? What happened?
21 A  If I remember, I was invited by a principal to come back
22    to hold that position. So long ago. I don't a 100% recall
23    that, but I was there maybe half semester and then I was
24    done with it. I didn't want to do it anymore.
25 Q  So you left voluntarily?

Page 17

1 A   Yes.
2 Q   Did you ever return to DPS?
3 A   No.
4 Q   So at this point it's what, 2005? Is that fair?
5 A   Around that time, I'm not a hundred percent certain, but
6     around that time, yeah.
7 Q   Is it fair to say 2004, 2005, 2006? One of those years?
8 A   One of those years between 2003, four and five? I'm not a
9     hundred percent certain what the year was.
10 Q  So after your employment concluded with Detroit Public
11    Schools, what did you do for employment?
12 A  I started my own company.
13 Q  Is this the same company that you already referenced?
14 A  I had a company prior to that doing the same thing, but.
15 Q  What was the name of the company?
16 A  I was just operating independently.
17 Q  So no corporate form, is that what I'm asking you? You
18    didn't have an LLC.
19 A  No.
20 Q  Associated with it or?
21 A  No. It was me independently.
22 Q  Was it you doing business just as Jonathan Edison?
23 A  Just Jonathan Edison.
24 Q  Okay. And what was the nature of that business?
25 A  That was motivational speaking.



Page 18

1  Q   Okay. How'd you break into motivational speaking?
2  A   I have a big mouth and I saw some folks on television also
3      with Big Mouth, and I thought, I think I can do that.
4  Q   How'd you go about getting business?
5  A   My big mouth.
6  Q   What exactly does that mean?
7  A   Requesting and or sharing with people that this is what I
8      do and them allowing me to do it.
9  Q   Okay. So, you operated independently as Jonathan Eddison
10     for roughly how many years?
11 A   Maybe two or three. I don't a hundred percent recall the
12     timeline for that.
13 Q   Okay. Then after this period, when you're operating as
14     Jonathan Edison, what do you do next for employment?
15 A   I wrote my first book.
16 Q   And what year was that, approximately?
17 A   So where are we now? So we are 2005, maybe 2006, 2007.
18     Maybe I would've to double check.
19 Q   How did that book do with sales?
20 A   I do not recall exact numbers. But do remember I was
21     able to pay my rent, so I was doing okay.
22 Q   That's my next question. So, you could support yourself?
23 A   Yes.
24 Q   I didn't already ask you. How long have you been married?
25 A   How long have I been married? Would she be mad now? I'll

Page 19

1      see. Trying to think of the date. So I want to say my math
2      is right. 11 years, 12 years?
3  Q   So you wrote your first book before you were married?
4  A   Correct.
5  Q   Okay. Around the time you wrote your first book, where
6      were you living?
7  A   Where was I living? Next door. I was living in Harbor
8      Town.
9  Q   Okay. So in 2006 you write your first book, you're living
10     in Harvard Town. And did you have any other businesses
11     before Brain Works Training?
12 A   Do I have any other businesses? I had Edison Speaks, I
13     think that was the name of it.
14 Q   You had an LLC, corporation. Any corporate form?
15 A   It was a LLC.
16 Q   Okay, It's still in existence?
17 A   No, it was dissolved a long time ago.
18 Q   Okay. And I'm fairly serious and I can tell by the name of
19     it, but Edison speaks, what kind of business was it
20 A   Candy Corn. No, I'm joking. That was me speaking.
21 Q   Okay. Motivational speaking?
22 A   Yes.
23 Q   Okay. And how long were you doing business as Edison
24     speaks?
25 A   I don't remember the exact timeline for that one. More

Page 20

1      than a year. I can say that, definitely.
2  Q   And then when you stopped doing business as Edison speaks,
3      what did you do for a living to make money?
4  A   I continued speaking and selling books.
5  Q   As Jonathan Edison or as a different business?
6  A   Let's see, I believe, I don't remember. I don't remember
7      if under what form, but I do know I was motivational
8      speaking.
9  Q   Let me ask you this way. Since you left Detroit Public
10     Schools, have you done anything else for a living besides
11     write books and de motivational speaking?
12 A   Since I left Detroit Public Schools. Besides write books
13     and motivational speaking? No.
14 Q   Okay. Have you ever been formally diagnosed or treated for
15     any diseases, conditions, or ailments?
16 A   Diseases, conditions or ailments? Would that include the
17     flu or?
18 Q   No, not things like the flu or the cold.
19 A   Oh, no.
20 Q   No. Okay. And you've -- have you ever been prescribed
21     medication for anything other than the flu, the cold?
22 A   No.
23 Q   Anything other than over the counter medication?
24 A   No.
25 Q   Okay. And you're not currently being treated by a medical

Page 21

1      professional for any diseases, conditions, ailments, other
2      than something like getting a vaccine for the flu or covid
3      or something like that?
4  A   No.
5  Q   It's going to be Exhibit A. Just going to take a second to
6      look through that. Familiarize yourself. Let me know when
7      you're set. Take as much time as you need.
8  A   Okay.
9          (Off the record.)
10         (Back on the record)
11         (EX-A marked for identification.)
12 BY MR. WAYNE:
13 Q   Okay. Do you need some more time to look this over?
14 A   No. I'm good.
15 Q   All right. Are you familiar with this?
16 A   I am.
17 Q   Complaint for damages and jury demands?
18 A   Yes.
19 Q   Have you read this complaint before today?
20 A   Yes.
21 Q   Okay. About how many times have you reviewed this?
22 A   I would say at least three.
23 Q   Okay. Are you comfortable with everything in here in terms
24     of being factually accurate?
25 A   Yes.



1  Q   Okay. Did you draft any portion of this complaint?

2  A   No.

3  Q   Okay. So if we can go to page two at the top, paragraph

4      two, it says, defendant Northville Township Prosecution of

5      Edison was prompted in part by persistent complaints by

6      defendant Fadie Jamil Kadaf, who made various untrue

7      statements in furtherance of a quest to target Mr. Edison.

8      Mr. Kadaf also initiated spurious complaints against

9      Edison with the Federal Bureau of Alcohol, tobacco,

10     Firearms and Explosives in the Michigan Department of

11     National Resources for completely illegal behavior and a

12     campaign of harassment and intimidation. These bogus

13     complaints were briefly investigated but abandoned when

14     apparently found to be unmeritorious. Just in your own

15     words here, having just read that so I can see. So Fadie

16     Jamil Kadaf is your next-door neighbor?

17 A   That s correct.

18 Q   Okay. How long have you been neighbors?

19 A   I believe he moved there two summers ago, so he's been my

20     neighbor two years, I believe.

21 Q   Okay. So summer of 2021 is when you came up?

22 A   I'm not a hundred percent certain. But I believe that's

23     about right.

24 Q   Okay. And when was your earliest interaction with him?

25 A   My earliest.

1  Q   With Fadie.

2  A   Earliest?

3  Q   Yes.

4  A   Probably be the month that they moved in.

5  Q   Okay. What kind of interaction was it?

6  A   Spacious. It was covid.

7  Q   Okay. Did you introduce yourself?

8  A   We did, we, our family introduced ourselves to their

9      family.

10 Q   Okay. So, it's fair to say you got off on the right foot

11     with one another.

12 A   That's fair.

13 Q   Okay. And up until, if I go back at page, references that

14     you were charged on October 21st, 2022. But up until that

15     point kind of describe for me your relationship with Fadie

16     Kadaf and your interactions with him.

17 A   And when you say relationship, what do you mean?

18 Q   You are neighbors.

19 A   I would say pretty much cordial was the relationship.

20 Q   Okay. And when exactly did things turn from being cordial?

21 A   That was, I don't recall the date. But it was the day that

22     I asked if he would please park his cars in front of his

23     home. And I left a note on, I believe it was a rental car

24     that he left in front of our home for several days.

25 Q   Okay. All right. Okay. And the street in front of your

1      house?

2  A   Yes.

3  Q   Is that public?

4  A   It is.

5  Q   Okay. And you asked Mr. Kadaf not to park a rental car in

6      front of your house?

7  A   I asked Mr. Kadaf not to park any of his cars in front of

8      the house.

9  Q   Did he have a habit of having a lot of his vehicles or

10     vehicles associated with his household parked in front of

11     your house?

12 A   That is correct.

13 Q   Okay. And what did this note say?

14 A   Please, would you park your cars in front of your house or

15     in your driveway. Thank you.

16 Q   Okay. And you left this note why? I asked that question in

17     context with it being at Public Street.

18 A   The evening prior we were having guests and in my mind it

19     just didn't make sense to, for him to park his vehicles in

20     front of my home. And now my guests have to walk further

21     instead of just being able to park in front of my home. So

22     I just thought it would be neighborly for him to take his

23     vehicles and either put them in front of his own home or

24     in his own driveway. So that's.

25 Q   So you wrote a note and you left it affixed to one of his

1      vehicles or a vehicle associated with him? And what did he

2      do?

3  A   I would assume when they returned, he took the note and he

4      initially moved both of the vehicles and put them in his

5      driveway. That's what he did.

6  Q   And then you had further issue with him parking vehicles?

7  A   No, not after that.

8  Q   So you asked him to move his vehicles and he did.

9  A   He did.

10 Q   And you had no more problems.

11 A   You said that I have further issues with the vehicles. I

12     did not have further issues with him parking.

13 Q   Okay. In terms of your relationship, what happened next?

14 A   He wrote me a letter.

15 Q   Okay.

16 A   And left it, if I remember correctly, he left that letter

17     in my mailbox.

18 Q   What did that letter say?

19 A   Well, the letter had a lot of words. I don't remember that

20     exactly what it said. It's in one of these documents we

21     have.

22 Q   What was the gist of it, if you remember?

23 A   The gist was the street is public parking. The street is

24     public and he could park where he wanted and I think it

25     says something to the effect at the end, he would try not



Page 26

1  to park in front of my house, but if he did, then don't
2  ask him to move his car. That was the gist.
3  Q  Did you respond to that letter?
4  A  Yes.
5  Q  In writing?
6  A  Yes.
7  Q  What was the gist of that letter?
8  A  The gist, the gist of that letter was.
9  Q  Or if you remember the actual content.
10 A  I don't remember the contents. It was some time ago, but
11     the gist was, while I appreciate what you're saying, I'm
12     hoping that you can be a good neighbor and not park in
13     front of my home. That's the gist.
14 Q  Did he respond in writing to that letter?
15 A  Yes.
16 Q  Do you remember the gist of that letter?
17 A  I do not because that letter came from a gentleman by the
18     name of Kadaf Law Group.
19 Q  Okay. And what are the correspondence from the Kadaf Law
20     Group say?
21 A  I'm not sure.
22 Q  And you don't know what the gist of it was?
23 A  I'm not sure. I returned the letter.
24 Q  Did you read it?
25 A  No.

Page 27

1  Q  Okay. Going to paragraph four, bottom of page two. You
2     could read that out loud please.
3        MR. RANDOLPH: You want him to read the whole
4     paragraph?
5  BY MR. WAYNE:
6  Q  I'll let him know when just to stop.
7  A  Paragraph four. You said at the bottom or?
8  Q  At the bottom of page two?
9  A  Paragraph Four.
10 Q  Yes.
11 A  Oh, bottom page two.  May 23rd, 2023. Judge Gerou of
12     Michigan's 35th District Court dismissed the charge
13     against Edison. Finding that Edison's language was not
14     obscene, unfortunately for Mr. Edison, this dismissal came
15     after the unconstitutional actions against cause
16     significant and lasting damage. Mr. Edison has pecuniary
17     expenses and losses.
18 Q  Yes. If I could stop you there.
19 A  Okay.
20 Q  Okay. So, the pecuniary expenses and losses. So what are
21     those?
22 A  What are the pecuniary expenses and losses?
23 Q  Okay. Let's start with the pecuniary expenses. What are
24     those? Rather specifically, what are your expenses as
25     alleged?

Page 28

1  A  One, when this all began, I was working on a new book.
2     That was one, and I had to suspend that.
3  Q  Why'd you have to suspend it?
4  A  My creativity was put on hold.
5  Q  No one told you You couldn't continue writing your book;
6     is that correct?
7  A  That is correct.
8  Q  Okay. Do you have any other pecuniary expenses?
9  A  I was conducting, or about to put together a tour with my
10     children's book character and books and appearances. I was
11     under such stress from this, I decided to cancel it.
12 Q  Where was this tour going to take place?
13 A  Chicago.
14 Q  Okay. You said you were about to put together a tour. So
15     were there any plans already in place that you already
16     made reservations or received deposits, that sort of
17     thing?
18 A  Plans were in place with Chicago Public Schools, the
19     school district.
20 Q  Okay. Let's call that CPS Chicago Public Schools. Had
21     Chicago Public Schools already provided you with a down
22     payment? Had you signed a contract with Chicago Public
23     Schools regarding your plans to speak?
24 A  No.
25 Q  Okay. Had you made any non-refundable reservations of any

Page 29

1     kind associated with this tour?
2  A  I did not.
3  Q  Did you have to front any money or otherwise have any out-
4     of-pocket expenses that you lost as a result of this tour
5     not going through?
6  A  No.
7  Q  Okay. You mentioned you stopped writing a book. I know you
8     have at least one book before this, if you remember
9     exactly what number of book is that that you've authored
10     here? The one that you referenced just before the Chicago
11     Public Schools tour?
12 A  That would be my numbers are correct. Number 11 or 12,
13     depends on if you're counting workbooks included. So maybe
14     11 or 12.
15 Q  Is writing typically profitable for you?
16 A  Yes.
17 Q  Okay. The book before the one that you opted not to write
18     that we referenced here, how much money did that, has that
19     book made you to date? If you know, and if you don't,
20     ballpark.
21 A  I don't know exactly.  Ballpark, over a hundred thousand
22     dollars.
23 Q  Any other pecuniary expenses?
24 A  No.
25 Q  Okay. Losses. I know I already asked if you had any money



Page 30

1 that you'd advance that was non-refundable or deposits or
2 any out-of-pocket losses. So I just want to be clear, are
3 there, what losses, because it says Mr. Edison has
4 community expenses and losses. What, what losses are we
5 talking about here?
6 A **Well, the losses would be completing my book and then**
7 **selling that book.**
8 Q Okay. Is that the only loss?
9 A **No.**
10 Q Okay. Please tell me about any and all other losses.
11 A **The other losses were me having to pull out of**
12 **negotiations that I was having about the tour with my**
13 **character and the children's book.**
14 Q Those were the negotiations with CPS?
15 A **That is correct.**
16 Q Because like you said, you didn't have a contract with
17 him, you were just in the process of discussing this with
18 him.
19 A **That is correct.**
20 Q Okay. Any other losses?
21 A **No.**
22 Q Okay. The next sentence in that paragraph says that Mr.
23 Edison suffered embarrassment, humiliation, emotional
24 distress, and other harms and losses having been made a
25 criminal defendant and faced with jail including his

Page 31

1 reputation. So, we can talk about the embarrassment,
2 humiliation for a second. What does that stem from? I know
3 it says having been made a criminal defendant. But I can
4 tell you as somebody who's a prosecutor myself, when
5 somebody has made a criminal defendant, that can happen in
6 a variety of ways. Not necessarily something that's done
7 in public.
8 A **True.**
9 Q Right. Someone could be issued a citation. It could be a
10 police officer issued citation to someone, and no one else
11 else's presence. For example, so I'm just saying, merely
12 becoming a criminal defendant. So, the embarrassment,
13 humiliation you suffered in connection with being made a
14 criminal defendant as describing the complaint. Tell me
15 more about that, like in your own words.
16 A **Well, it initially began with if the Kadaf, I forget his**
17 **first name.**
18 Q Well then say, if I may, here there are, there are two
19 Kadaf s. I think it'd just be easier if we could, we'll
20 refer to them as Fadie and then Jeahad, just so we can
21 distinguish this to which one we're talking about.
22 A **Fadie.**
23 Q So we're talking about Fadie. Okay. So the embarrassment,
24 humiliation with respect to Fadie.
25 A **His son Noah, when this happened, went to school actually**

Page 32

1 **on the bus and started having conversation about this with**
2 **other students. And the conversation that I received or,**
3 **what I heard was him saying his, my daddy is going to put**
4 **Ava's daddy in jail.**
5 Q Whose daddy is this? You said this is your daughter?
6 A **This is what my daughter and her friends shared with me.**
7 Q Your daughter's name is what?
8 A **My daughter's name is Ava.**
9 Q Ava, I'm sorry. I thought you said Ada.
10 A **Oh, sorry.**
11 Q That's okay. So Ava rides the bus with Noah?
12 A **That is correct.**
13 Q And Ava came home and told you that this is what Fadie s
14 son was saying on the bus?
15 A **Correct.**
16 Q You didn't personally witness this?
17 A **I did not.**
18 Q Okay. So, this is just the account that your daughter gave
19 to you?
20 MR. RANDOLPH: Is that a yes?
21 **THE WITNESS: Yes. I'm sorry. Yes. Thank you.**
22 BY MR. WAYNE:
23 Q Okay. So I'm sorry, you were, you're saying, so Noah was
24 saying things to your daughter on the bus, along the lines
25 of that you were going to go to jail.

Page 33

1 A **Correct.**
2 Q Because of the incident with Fadie?
3 A **That is correct.**
4 Q Okay. Anything else with that embarrassing humiliation?
5 Anything that you personally witnessed that you can speak
6 to?
7 A **That I did not personally witness?**
8 MR. RANDOLPH: Okay. I'm sorry. Are you asking
9 him about his embarrassment?
10 MR. WAYNE: Yes.
11 MR. RANDOLPH: His humiliation, or are you asking
12 him about things that he witnessed?
13 BY MR. WAYNE:
14 Q I want to ask him what he personally witnessed that made
15 him embarrassed and humiliated.
16 A **Okay. What I've personally witnessed.**
17 Q Personally privy to or present for?
18 A **Well, I wasn't, I didn't witness that. That was something**
19 **that my daughter was involved in and.**
20 Q I'm sorry. That I understand. So I guess, I'm just asking,
21 was there, is there anything that you were physically
22 present for personally witnessed that caused this
23 embarrassment and humiliation alleged in the complaint?
24 A **Would that include having to go to court and stand before**
25 **the judge?**



Page 34

1 Q   Sounds like you were personally there for it, if that's
2     the case.
3 A   **Okay. Just wanted to be clear. So, that.**
4 Q   If we could go to that for a second. So that appearance in
5     court, so how did you find out that you were a criminal
6     defendant?
7 A   **There was a letter sent to my home.**
8 Q   Okay. And the letter came from?
9 A   **The court.**
10 Q   Which court would that be?
11 A   **I believe it's the 35th district, I believe.**
12 Q   Okay.
13 A   **I think, yeah.**
14 Q   And you'd never received anything from 35th District Court
15     before?
16 A   **No.**
17 Q   Okay. So you get a letter from a court and did you open
18     it?
19 A   **I did.**
20 Q   And what did the correspondence say?
21 A   **You are being charged with malicious annoyance by writing**
22     **and I was, said I needed to appear and if I didn't appear,**
23     **I would be arrested, and.**
24 Q   Did it actually say that you would be arrested?
25 A   **That's what I recall. It may not have. I can't, so I'm not**

Page 35

1     **going to say yes to that. But I would, it said, I would be**
2     **picked up or I would be detained. It said something about**
3     **if I don't show up, they're going to come and get me.**
4 Q   Okay. Who's going to come and get you?
5 A   **I would assume the police.**
6 Q   Okay. So what did you do after you read that
7     correspondence?
8 A   **I freaked out because.**
9 Q   Like you just said, you've never had any experience with
10     the court before?
11 A   **No.**
12 Q   So, okay. At some point did you contact Mr. Randolph?
13 A   **I did.**
14 Q   Prior to your appearance in court?
15 A   **Prior to my appearance, yes.**
16 Q   Okay. I don't want to get into attorney-client privilege,
17     but I mean you, did you ultimately decide to retain him?
18 A   **Yes, I did.**
19 Q   Did Mr. Randolph appear with you in court?
20 A   **Yes, he did.**
21 Q   When you were required to show up according to the
22     correspondence you received?
23 A   **Yes.**
24 Q   And to the best of your recollection, what happened at
25     that proceeding? Well, let's just get to the fact we know

Page 36

1     where it's your turn. Your name is presumably called at
2     some point; is that correct?
3 A   **That is correct.**
4 Q   What do you do?
5 A   **Honestly, I didn't do anything. I just, I had to stand**
6     **there.**
7 Q   Okay. Do you remember anything that the judge said?
8 A   **I do not.**
9 Q   Were you required to speak at all?
10 A   **No.**
11 Q   All right. Did Mr. Randolph do all the talking on your
12     behalf?
13 A   **Yes.**
14 Q   And I'm not asking you to say what he said, but that, the
15     gist of it. Do you remember along the lines of what Mr.
16     Randolph said when he appeared beside you?
17 A   **I think the thing that stuck out to me that, was Mr.**
18     **Edison is a good citizen. He's not a threat, he should,**
19     **and I'm just giving you what I'm processing, he should be**
20     **let just, he shouldn't be locked up or held over or**
21     **whatever that is in you guys' world. That's what I**
22     **remember. Because just kind of in a daze while this was**
23     **happening.**
24 Q   And again, without getting into attorney-client privilege,
25     as I'm sure he did at some point, did Mr. Randolph speak

Page 37

1     with you about your rights and protections under the US
2     Constitution?
3 A   **I want to say yes.**
4 Q   Same caveat goes without getting specifics. Did Mr.
5     Randolph advise you that as this is a criminal charge,
6     that you are absolutely innocent until proven guilty?
7            MR. RANDOLPH: I'm going to object. As harmless
8     as it may seem, I don't think my client should answer any
9     questions regarding his conversations with me. So, I'm
10     going to, based on privilege, I'm going to instruct my
11     client not to answer.
12           MR. WAYNE: I'm fine with that.
13           MR. RANDOLPH: This is harmless, but I don't want
14     to get in a situation where I'm waiving privilege.
15           MR. WAYNE: I understand. That's okay.
16           MR. RANDOLPH: Okay.
17 BY MR. WAYNE:
18 Q   Do you recall in court hearing anything along the lines of
19     you having an absolute presumption of innocence?
20 A   **I do not recall.**
21 Q   Okay. Are you personally aware, or were you personally
22     aware at the time that as a criminal defendant you were
23     entitled to a presumption of innocence?
24 A   **When you say personally aware, what do you mean?**
25 Q   Was that a, was that a belief that you have knew or



Page 38

1 accepted coming to court?
2 A That I was?
3 Q Innocent from the get go.
4 A That I was innocent from the Get go?
5 Q That you and any criminal defendant, I'm not trying to
6 catch trip trick you up here. I'm just going with what I
7 mean, we've all seen police procedurals and TV shows. Have
8 you ever heard that?
9 A I've heard the title I've heard on, on TV shows.
10 Q Okay.
11 A That's just not my belief though, if you are asking me
12 about my belief.
13 Q At that time. Did you believe you were entitled to a
14 presumption that you were innocent?
15 A Honestly, I don't understand that question. Because I
16 don't know if you're asking me what I personally believe
17 or if showing up the court. So, I can't really answer
18 that.
19 Q Let me put it this way. At that time somebody said, Mr.
20 Edison, is it true that criminal defendants including
21 yourself are entitled to a presumption of innocence until
22 proven guilty? Would you have said, yes, you believe that?
23 A It depends on what day it is.
24 Q That day.
25 A I did not believe it on that day.

Page 39

1 Q Okay. Do you believe it now?
2 A I still don't believe it.
3 Q Okay. Any other embarrassment, humiliation? Again, in the
4 context of paragraph four of the complaint.
5 MR. RANDOLPH: This is different than the
6 previous question when you asked about personally
7 witnessed.
8 MR. WAYNE: It is.
9 MR. RANDOLPH: Okay.
10 BY MR. WAYNE:
11 Q Correct.
12 A Yes. So having to explain to my children what was
13 happening.
14 Q And how did you come to do that? Explain to them like what
15 were the -- did you take it upon yourself to talk with
16 your kids? Was this in response to your daughter Ava,
17 telling you what was going on her bus? How did this come
18 to be?
19 A I was, well, there's a multitude of situations.
20 Q Okay. Please describe them.
21 A So one, I had to deal with the bus conversation, I'll just
22 call it that, her bringing, her, bringing me that home.
23 Matter of fact, she would come home with a few friends. I
24 don't remember who they're.
25 Q But I'm sorry to interrupt. Did your conversation, if you

Page 40

1 remember about what happened on the bus, did that happen
2 the same day that your daughter talked to you about this?
3 And describe what happened on the bus?
4 A Did what happened the same day?
5 Q Your conversation with her about what was going on?
6 A So if I'm understanding your question correctly, when she
7 got off the bus, I had that conversation with her.
8 Q Yeah. So the scenario I'm looking for is if I just
9 want to know what happened. But for example, did your
10 daughter get off the bus? She said, hi honey, how are you?
11 How was your day? And she said it was good. But on the
12 bus, on the way home or on the way to school, there was
13 the next-door neighbor was saying, you're going to go to
14 jail. Is that true, dad? And then you said, well, then you
15 went to explain that's what I'm looking for there, however
16 that went down. Okay. That was just an example.
17 A So she was inside already.
18 Q Okay.
19 A I was coming from wherever I was coming from and how that
20 would go. So the door opens, dad, I heard you going to
21 jail.
22 Q Okay.
23 A Noah said, You're going to jail. Noah said your dad, his
24 dad is putting you in jail.
25 Q I'm sorry. When she said Noah, did you know exactly who

Page 41

1 she was talking about?
2 A Oh, absolutely.
3 Q Okay.
4 A Absolutely. And then she's in tears about all of this. And
5 so now I'm having to explain to her about exactly what's
6 going on. So that then my son got home a little bit after
7 that and then having to, because now in our home, that's
8 the topic of conversation. So now I'm having to explain to
9 him as well about what has transpired and what's going on.
10 And their questions as children are you going to jail?
11 And, everybody's in the uproar about this whole thing. So
12 that's how that happened.
13 Q What did you, again, I know you don't know word for word.
14 How did you explain to your children what was happening?
15 A I initially tried to be a great dad and just kind of say,
16 Hey, everything's going to be okay. Everything's going to
17 be fine. But my daughter is super smart. The other boy,
18 not so much. But he's a smart kid. But and then I had to
19 just explain it. I did my best talking to a budding
20 teenager and a teenager of, of what was actually
21 happening, the best way that I could. Did I answer all
22 their questions? I don't think so. Because everybody was
23 still upset. My wife did her best to try to fill in the
24 spaces, but.
25 Q I want to stop you there for a second. So that's another



Page 42

1     question. So, once you received the correspondence from
2     35th District Court, did you share that with your wife?
3 A  **Oh, absolutely.**
4 Q  Same day?
5 A  **Same day.**
6 Q  Okay. To the best of your knowledge, was she, I mean, had
7     she been aware of what was going on with respect to the
8     notes that were being exchanged?
9 A  **Yes.**
10 Q  Between you and Fadie and the
11 A  **Yes.**
12 Q  And the cars being parked?
13 A  **Yes.**
14 Q  Okay. Okay. Anything else you wanted to add about what you
15     were just saying?
16 A  **I think one part that I may have missed is that my wife,**
17     **being included, not included, but having to her and then**
18     **the kids and trying to figure out, what the process is**
19     **because, as we've talked about, I speak for a living, I'm**
20     **not a lawyer. So when you have a situation where you get**
21     **something that's talking about jail and so what do we do?**
22     **Right? We go to our phone and we look it up and try to**
23     **figure it out, and now everybody's in an uproar. So that**
24     **is part of that embarrassment and humiliation that I was**
25     **speaking of.**

Page 43

1 Q  I could ask, because again, you said, I believe your
2     interrogatory said, you had a parking ticket. Parking
3     ticket or a minor traffic ticket, and that's your only,
4     that's your connection basically with the court system.
5 A  **Yeah.**
6 Q  So at that time, did you have the opinion that even
7     though, and you maintain except for a parking ticket, that
8     you have a clean record that you seriously faced?
9 A  **Yes.**
10 Q  Jail time for that violation.
11 A  **For which violation?**
12 Q  The misdemeanor that you were accused of.
13 A  **The malicious and all.**
14 Q  Yes.
15 A  **Can you ask that again?**
16 Q  You said you have a clean record basically, except for
17     like a minor traffic violation?
18 A  **Yes.**
19 Q  And this is a misdemeanor violation. You mentioned that a
20     possible penalty as jail time. Did you realistically
21     believe that as somebody with a clean record, that it was
22     possible that you would be jailed?
23 A  **Yes.**
24 Q  If found guilty for this offense?
25 A  **Yes.**

Page 44

1 Q  Okay. All right. If there's not anything else, talks about
2     you suffering other harms and losses, aside from what
3     you've just told me about the embarrassment and
4     humiliation, emotional distress, any other harms and
5     losses?
6 A  **So I just want to be clear, is that from the interrogatory**
7     **that I had?**
8 Q  No. This is still paragraph four of the complaint.
9 A  **Well, but I want to make sure that I'm clear. So I'm here**
10     **in paragraph four, and I did, I kind of explained all of**
11     **that end to interrogatory. So, is this something separate**
12     **from that or is this.**
13 Q  Okay. All right. I'm just going by, it's in the Yeah, it
14     is separate. I'm just going by what's in the complaint
15     right now.
16 A  **Okay.**
17 Q  I was just asking.
18 A  **So I guess my answer would be.**
19        MR. RANDOLPH: Hold on. You're not prohibited
20     from giving a full answer, even if you included the answer
21     in your interrogatories.
22        **THE WITNESS:  Okay. So, my answer to that would**
23     **be my answers in the interrogatories, if you say My harms**
24     **and losses and I listed all of them.**
25 BY MR. WAYNE:

Page 45

1 Q  Okay. Same sentence here. Mr. Edison. Separate
2     embarrassment, humiliation, emotional distress, and other
3     harms and losses having been made a criminal defendant and
4     faced with jail, including his reputation. Okay. How okay,
5     so the reputational, is there a harm and loss associated
6     with your reputation?
7 A  **Yes.**
8 Q  What is it and how were you able to calculate or judge
9     that harmed your reputation?
10 A  **One specifically is, Chicago Public Schools to any vendor**
11     **wants to do business with Chicago Public Schools, you have**
12     **to go through a screening. And that screening is a very**
13     **strenuous screening because, and it's just my opinion,**
14     **they've had some corruption in the past, so now they have**
15     **all these safeguards up and one of the things you have to**
16     **do is be fingerprinted. You have to go and turn into all**
17     **this documentation and do all these other things.**
18 Q  I'm sorry, so they make sure I understand. They just
19     submit to a background check. Is that a fair way to
20     characterize it?
21 A  **Yeah, it's a background check. But I would add to that and**
22     **say it is an extensive background check. Very extensive.**
23     **And one of the things that was shared with us as vendors**
24     **is that they are constantly checking to make sure that the**
25     **vendors that are going into the schools, working with**



Page 46

1     students, parents, teachers, administrators, are on the up
2     and up straight and narrow. They're straight arrows.
3 Q   Well, if I could, let's get exactly what that means there.
4     Were you specifically asked questions such as, have you
5     ever, do you have any criminal convictions?
6 A   **Absolutely.**
7 Q   Were you asked if you've ever been arrested?
8 A   **Absolutely.**
9 Q   Okay. And were you asked, have you ever received a
10     citation for anything?
11 A   **Not specifically. They didn't ask that.**
12 Q   Okay. I'm trying to get to how this ticket and this
13     charge, how that damaged your reputation with Chicago
14     Public Schools. What they would've asked or required of
15     you that you would've had to provide that answer?
16 A   **Well.**
17 Q   If you remember?
18 A   **One of the things that, so let me go back. Before I**
19     **contacted Mr. Randolph, I contacted several Attorneys, I**
20     **have even contacted a Chief Judge.**
21 Q   Chief Judge?
22 A   **Robert Colombo.**
23       MR. RANDOLPH: Formerly the Chief Judge. Wayne
24     County Circuit Court.
25       THE WITNESS: Yeah.

Page 47

1 BY MR. WAYNE:
2 Q   And he hasn't, so you know Mr. Colombo?
3 A   **Very well.**
4 Q   Okay.
5 A   **To give some recommendations on who, like what is**
6     **happening right now. And he was asking me certain**
7     **questions about where do I, what did I do? And I was like,**
8     **I didn't do anything, but neither here nor there. Once I**
9     **spoke with him about attorneys that were available or who**
10     **I could talk to, those attorneys that I met with shared**
11     **things like, hey, they're going to, part of this process.**
12     **That's what they were explaining to me is that, you have**
13     **to be fingerprinted, you have to be this and this is going**
14     **to happen. The judge can do this and all these things can**
15     **happen. So, now.**
16 Q   Regarding the 35th district court case, not your
17     employment or contract, which your --
18 A   **Correct.**
19 Q   The schools. Okay.
20 A   **Correct. So regarding that, so now in my mind, okay, so**
21     **this case and being charged punishable by jail, 93 days,**
22     **if I'm correct, jail is going to destroy everything that**
23     **I've worked for really hard for, by the way.**
24 Q   You're saying if you were convicted or pleaded to it,
25     possibly?

Page 48

1 A   **Possibly. And definitely. The other thing that.**
2 Q   But the death I'm looking for, what I'm saying is you knew
3     it was possible that if you were convicted or pleaded
4     guilty to that offense that you could receive jail time.
5     But you didn't know that you would for certain receive
6     jail time, you knew there was a possibility. Is that
7     correct?
8 A   **Well, according to what I read, it was saying jail. That's**
9     **all I saw. 93 days in jail. So possible or not possible, I**
10     **can't answer that. I knew that this said I could go to**
11     **jail.**
12 Q   Could. Okay. So we got that answer there. You could go to
13     jail.
14 A   **Right.**
15 Q   Not that you had to, or you would, could.
16 A   **Correct.**
17 Q   Okay, thank you. So again, harm the reputation. What
18     specifically, merely being accused of being a criminal
19     defendant, what about that in conjunction with Chicago
20     Public Schools? Questions for you? What exactly was merely
21     being a criminal defendant? How was that going to
22     disqualify you from employment?
23 A   **From employment?**
24 Q   Or entering into a contract or whatever. With Chicago
25     Public Schools?

Page 49

1 A   **Working within a school district, a government agency,**
2     **it's very strict. So them just being able to Google my**
3     **name as you probably have and see because all this is**
4     **public record, that he's a criminal defendant in a case**
5     **for some maybe, I don't know how much people research, but**
6     **that right there was something that I was really concerned**
7     **about.**
8 Q   Do you know the methods that Chicago Public Schools uses?
9 A   **I do not.**
10 Q   Let me finish, to verify information regarding
11     individual s backgrounds?
12 A   **The methods. I know of one method, I'm not sure about all**
13     **methods.**
14 Q   What's the one method you know about?
15 A   **The one that I had to do a FBI background check.**
16 Q   Okay.
17 A   **So I had to go travel to Chicago and participate in that**
18     **fingerprint, eye scan, everything but a blood test to**
19     **verify.**
20 Q   But back to that question. So did you ever see anything in
21     writing or were you, were you ever told by anybody point
22     blank that merely being criminal defendant was going to
23     disqualify you from employment or entering into a contract
24     with Chicago Public Schools?
25 A   **I do not recall that.**



Page 50

1  Q   Okay.  Thank you.

2  A   Can we take a quick break?

3  Q   Sure. Absolutely.

4  A   Okay.

5        (Off the record.)

6        (Back on the record.)

7  BY MR. WAYNE:

8  Q   All right. We jump to page seven of the complaint please.

9       Down to count one.

10 A   Seven. Count one.

11 Q   So paragraph 46 says, defendants Northville Township and

12      Sellenraad deprived plaintiff of the right to secure to

13      him by the United States Constitution. In your own words,

14      in the best of your ability, tell me what that means.

15 A   Can you read that again please?

16 Q   Yeah. Paragraph 46, defendants Northville Township and

17      Sellenraad deprived plaintiff of the rights secured to him

18      by the United States Constitution. So, like I said, in

19      your own words, as best you can, what does that mean?

20 A   Defendants Northville Township and Sellenraad deprived

21      plaintiff, the rights secured to him by the United States

22      Constitution? Well, in my own words, they did not follow

23      the law.

24 Q   Okay. And what was the law they didn't follow?

25 A   That I would have to refer to my attorney on. But

Page 51

1       essentially, I should have never been charged, ever. You

2       have a gentleman who is a sworn police officer. If my

3       memory is correct, he said he's been a police officer,

4       police seven, eight years. You have another gentleman who

5       is a prosecutor and attorney who is a prosecuting attorney

6       in two different cities or townships. He has a private

7       practice. He's been a lawyer over 20 years.

8  Q   And who is this individual?

9  A   Gregory Dimopoulos.

10 Q   Okay.

11 A   For over 20 years. According to his website, he's had over

12      500 cases. So I presume he's a pretty smart individual and

13      I guarantee you he knows the difference between obscene

14      and vulgar. So that's how I was deprived my rights under

15      the United States Constitution.

16 Q   Okay. The prosecutor and then the police officer?

17 A   Correct.

18 Q   Okay. Then we go to paragraph 50, that's on page eight.

19      Actually, well, paragraph 49, first it says, defendants

20      deprived plaintiff for the rights secured him by the

21      Michigan Constitution. And then paragraph 50 says that

22      defendants above described conduct violated plaintiff's

23      right to freedom of speech under Article one, section five

24      of the Michigan Constitution. So again, in your own words,

25      to the best of your ability, what does that mean?

Page 52

1  A   That you have a gentleman that is a police officer that is

2       sworn to his duties and understand what he does. Have

3       another gentleman, Gregory Demapoliss, who is a

4       prosecutor, was a very smart and well accomplished

5       individual. Who is familiar with this. I'm a citizen that

6       pays taxes, but I'm also an individual that believes in

7       the freedom of speech. And as my attorney very eloquently

8       shared in the courtroom when we went back the third or

9       fourth time, is that individual words are not criminal.

10      And my freedom of speech was violated because you can't

11      take individual words and criminalize them.

12         MR. RANDOLPH: I need to take a break real quick.

13      I'm sorry.

14         MR. WAYNE: Off the record.

15         (Off the record)

16         (Back on the record.)

17 BY MR. WAYNE:

18 Q   Going down the page. So under count three, malicious

19      prosecution against Ben Sellenraad, paragraph 52 says,

20      defendant insulted and initiated the allegations of

21      criminal activity against plaintiff without probable cause

22      and with malice. So again, in your own words, as best as

23      you can, tell me what that's about.

24 A   As an officer, he did something that he shouldn't have

25      done and especially if I have a conversation with him

Page 53

1       convers initially from over an hour about what has been

2       alleged.

3  Q   If I could stop you there for a second. So your

4       conversation with the defendant, police officer Ben

5       Sellenraad, how would you characterize Officer Sellenraad

6       when he was interacting with you?

7  A   He was awesome. He sounded like he knew what he was

8       talking about. He sounded, sounded fair. He sounded like a

9       great police officer. Sounded that way.

10 Q   Did you find him to be polite?

11 A   I would go so far as to say he was even polite.

12 Q   Did you find him to be professional in interacting with

13      you

14 A   During that phone call.

15 Q   At any point did you find him to be unprofessional in his

16      personal interaction with you?

17 A   In my personal interaction?

18 Q   Either in person or over the telephone?

19 A   yes, on one occasion.

20 Q   What occasion was that?

21 A   That was the second phone call.

22 Q   What did Officer Sellenraad do give you the impression

23      that he was unprofessional?

24 A   Without being obscene or vulgar, he essentially told me

25      that anybody can write anybody anything and not to call



Page 54

1   the police department anymore about my neighbor because my
2   complaint was, I feel like I'm being harassed. And his
3   response was, oh, well.
4   Q   And what specifically led to that second telephone
5   conversation, the one that you just described?
6   A   Because of the first conversation. His instruction to me
7   was, hey, everything has been discussed. Everything is
8   essentially over. Let's just go on about our lives. Let's
9   be good neighbors. But then I had another officer, Officer
10  Micik that came to my door and banged on my door like, I
11  had shot somebody. And when he came and scared my wife
12  because she works from home. She refused to open the door.
13  And then he came, I believe a second time and did it
14  again. And I was calling to police station to complain
15  about that. I was trying to figure out if this is over,
16  why is this officer at my door banging on my door like he
17  is. Like, we don't have a doorbell. And in my opinion,
18  trying to intimidate me or scare me.
19  Q   If I could stop you for a second, but that wasn t officer
20  Sellenraad?
21  A   No, I'm leading to that. So, after that happened, because
22  that was your question. What happened that led to that? I
23  called Northville Township police officer and that's when
24  our second conversation happened about everything that was
25  going on. And at that point, I believe, I can't speak for

Page 55

1   him that I was on his nerves at that point and they were,
2   and lack of better term kind of fed up with me at that
3   time.
4   Q   Also, in paragraph 52 it says defendant and this is a
5   reference to Sellenraad instituted and initiated the
6   allegations of criminal activity against plaintiff. It was
7   Fadie who initiated the allegations against you, isn't it?
8       MR. RANDOLPH: I'm going to object to foundation.
9   You can answer.
10      THE WITNESS:  I can answer. Instituted and
11  initiated the allegations. I'm not understanding that.
12  BY MR. WAYNE:
13  Q   Had Fadie not complained about you to the police officer
14  Sellenraad, I would not have interacted with you. Is that
15  correct?
16  A   Probably wouldn't have any reason to. I'm not sure because
17  I haven't done.
18  Q   So it was Fadie who initiated the allegations of criminal
19  activity then, wasn't it?
20  A   Well, if you think about the word initiated, the word
21  initiated to get something started, the allegations of
22  criminal activity, I think the complaint is the initiation
23  of criminal activity. So the criminal activity, because
24  that not only had to be signed by the prosecutor, I'm
25  sorry, by the officer, then the prosecutor has to sign it.

Page 56

1   So that is the initiator, he's the initiator of these
2   allegations that I broke the law. So in that context,
3   Fadie has nothing to do with this.
4   Q   Okay. Paragraph 53, it says, on information and belief
5   defendant, and again, this is reference to Sellenraad
6   instituted the investigation for personal reasons, which
7   include, but are not limited to the following fixation, to
8   cause damage to plaintiff's professional reputation and to
9   cause damage to plaintiff's community reputation. So, I've
10  got a couple questions out of this. So, personal reasons.
11  What makes you believe that Officer Sellenraad Institute
12  the investigation for personal reasons?
13  A   Because we went from being cordial to receiving a
14  complaint that will put me in jail. And there was no
15  reason for that. And when, here's what I believe, when I
16  called to complain and try to get some justice or try to
17  get some questions answered, then I became the agitator. I
18  became the angry black man. Oh man, here he goes. When I
19  was just trying to get some answers to everything going
20  on. And so, there's a term out in the world, that we are
21  familiar with.  It's called Taking a slave to the Whipping
22  Post. And essentially it is to, I'll shut you up by doing
23  this. And that's how I felt. Because again, he told me I
24  believe 13 times or I strike that he told Fadie, 13 times
25  or so, Mr. Edison did not break the law. He did not do

Page 57

1   anything wrong. There's nothing I can do about this. Then
2   one of his guys comes to my house and almost breaks the
3   door down. I get upset about it and to shut me up and or
4   took me to the whipping post to keep me quiet, I'll put a
5   charge on him and I'll stop everything in its tracks. And
6   that's what I know is what happened. So with that officer
7   Sellenraad also was aware that I speak in schools, I've
8   spoken in our local school, not just Chicago, all over the
9   world. So, he had all of that information. So, and I can't
10  speak for his set, state of mind, but if I want to stop
11  something, I'll threaten it to the place where if I do
12  something, and if he does one more thing, he's over the
13  edge. And that's where I was placed according to number
14  53.
15  Q   So I just want to make sure I understand you correctly. So
16  merely knowing of your occupation, then your mind is proof
17  that Officer Sellenraad,
18  A   Not merely knowing my occupation. There, you got to deal
19  with the first thing. Stopping everything in its tracks.
20  What's everything in its tracks me and my complaining. I'm
21  going to stop that in its tracks. I'm going to take you to
22  the whipping post and stop it. Now, if you go beyond my
23  stopping it, then you're going to have some other
24  consequences, which would be my professional reputation
25  and everything associated with that. As like an attorney,

1  all I have is time and my reputation. So if I'm being
2  charged with something or if I get charged and do 93 days
3  in jail, then my life is unraveled. So that's the word
4  vexation, knowing who I am and what I do.
5 Q  Anything else you want to add to that?
6 A  No.
7 Q  Okay. Can we go off the record for a second?
8         (Off the record.)
9         (back on the record)
10        (EX-B marked for identification)
11 BY MR. WAYNE:
12 Q  Pass that down, please. Take a moment. Familiarize
13    yourself. You had a chance to look at exhibit B?
14 A  Yes.
15 Q  So for the record, it's plaintiff's answers to defendant's
16    Northville Township and Police Officer Ben Sellenraad s
17    interrogatories to plaintiff pursuant to federal rule of
18    civil procedure 33. I'm going to jump to page five.
19 A  Okay.
20 Q  Maybe some overlap here. So again, we'll try to get
21    through this quickly here in your answer to interrogatory
22    number one. I just want to make sure that we have this
23    covered here. Under embarrassment, delving back into it,
24    you mentioned that your daughter was told on the bus by my
25    Fadi s,

1 A  Son.
2 Q  Son that dad was going to go to jail, dad being you. And,
3    but this of course led the whispers gossip and public
4    ridicule within my community, the public ridicule. Tell me
5    about that.
6 A  Northville Township is a very unique and small place.
7 Q  What do you mean by that?
8 A  If someone comes home, or if someone makes a statement in
9    Northville Township, it spreads like wildflower
10   especially, and we know about negative negativity and
11   negative words. Here's something a kid saying, my dad is
12   going to put Ava's dad in jail. Well, that started a
13   bonfire and one ridicule within my community. One of my
14   neighbors actually called me to have a conversation about
15   this. And my question initially was, how do like, what is,
16   and that started, so.
17 Q  I'm sorry. And how did that neighbor know?
18 A  She never told me. She wouldn't tell me.
19 Q  She wouldn't tell?
20 A  She wouldn't tell me.
21 Q  Do you have a theory?
22 A  Yes.
23 Q  What's that theory?
24 A  In addition to kids playing, you have a board in
25   Northville, which is the regulatory board.

1 Q  I'm sorry, what is this Board?
2 A  It's a HOA board, the Homeowners Association.
3 Q  Okay. So you live in a community that's governed by a
4    homeowners association?
5 A  Right.
6 Q  Okay.
7 A  And what I found out later is that Fadi's brother, I
8    forget his name.
9 Q  Jeahad?
10 A  Jeahad, sent letters to the board about me and this board,
11    they are the people that make up the board are residents
12    within the township.
13 Q  Okay.
14 A  So, he's firing off all these letters.
15 Q  I'm sorry. He being Fadie? Jeahad?
16 A  On behalf of Fadie.
17 Q  So, I want to make sure I got this straight. Jeahad is
18    sending letters on Fadi's behalf to the board of the HOA.
19 A  Correct.
20 Q  And how did you become privy to these letters?
21 A  Well, the board contacted me.
22 Q  Okay.
23 A  About what was happening. So to get back to this, within,
24    you're asking within my community and neighborhood. So now
25    that is the prevailing story. I get one call from a

1    neighbor. I get an email from the board asking me about
2    certain things. Then I'm getting all these questions from
3    multiple people. So that's what I mean by this, that now
4    I'm having to explain myself and give my side of the
5    story. And I should have never had to do that, ever had to
6    do that. As I shared with the board president, who's my
7    directly across the street neighbor. I've lived here for
8    12 years. I haven't had an issue one time in 12 years. My
9    kids have grown up here. We're good neighbors. I don't
10   bother people. I don't anything. And now I'm having all of
11   these issues. And the prevailing conversation is he and
12   Northville Township and everything that's included, I'm
13   going to jail. So now you have this charge put on me. And,
14   no one asked why. All they know is I'm going to jail.
15 Q  You said this president of the Homeowner Association who
16   lives across the street from you, he says something along
17   the lines that I heard, you're going to jail.
18 A  Essentially. I won't say, I won't quote that. But
19   essentially, I think the term was, I've been hearing
20   things. So I can't put words in his mouth.
21 Q  But you don't have anything, you don't have any evidence
22   that officer Sellenraad or someone from the township can
23   convey that information, do you?
24 A  I don't know what they did, honestly.
25 Q  So you don't have any evidence that they did; is that



1   correct?

2  A    **The only evidence that I have is that after I received**
3      **this, I don't know if you call it a notice or whatever**
4      **it's called after I received that, then this started**
5      **happening.**

6  Q    But again, I go back to the question. So that's when it
7      occurred in time. But you don't know that Officer
8      Sellenraad or anyone from the township was responsible for
9      giving any details or any information about the case to
10     anyone in your homeowner association?

11  A    **I can't speak to that.**

12  Q    Okay. We going to page six, please. So, under lack of
13     enjoyment, you indicated that you had to sleep downstairs
14     on the couch because you were nervous all day. So, your
15     wife made you sleep downstairs on the couch because you
16     couldn't sleep.

17  A    **Essentially.**

18  Q    Okay. Is that essentially, I mean, is that what happened?

19  A    **When I say essentially it was almost a mutual decision.**
20     **She was saying, hey, I need to get sleep and I know you're**
21     **nervous, so we need to come up with a compromise. So**
22     **essentially that's what I needed to do.**

23  Q    Okay. You already indicated you've not been treated for
24     nervousness or insomnia or anything.

25  A    **No.**

1  Q    Okay. So your relationship with your children, you said
2      you had no longer had the energy or stamina to care for
3      them. What were you certain, what were you doing for them?
4      How were you caring for them prior to this incident?

5  A    **What I do allows me to almost be a stay-at-home Dad.**
6      **Because everything is scheduled out. And during that time,**
7      **I just couldn't do it. I didn't have the energy to do it,**
8      **so.**

9  Q    Okay. I'm sorry, but what things for were you doing for
10     them?

11  A    **picking up and dropping off at school.**

12  Q    Taking, I'm sorry. They took the bus.

13  A    **Well, one takes the bus, one drive or gets driven.**

14  Q    Okay.

15  A    **Then you have the daily with kids, right. You have after**
16     **school activities, sports, practice. you just kind, it's**
17     **like, if I showed you our family calendar, it's like all**
18     **over the place. So those things that I normally do were**
19     **normally did. I just wasn't able to do it.**

20  Q    And then again, just to make sure we're clear, it says I
21     was in a constant depress state of being, but like you
22     said, you haven't been treated for any condition, you
23     haven't been treated for depression, you haven't been
24     describing prescribed medication for depression. Is that
25     correct?

1  A    **That is correct.**

2  Q    Okay. Sleep deprivation. Below there says I was in a
3      constant state of disbelief, worry, and fear, and the
4      sleep deprived for five months until it was resolved. I
5      was so stressed out that I could not sleep for more than
6      two to three hours a day and became an insomniac because
7      of it. Again, not to, I know we've gone over this, but you
8      have not been diagnosed with insomnia or, and again,
9      you've not been treated for any of the conditions that you
10     just described. That's correct?

11  A    **That is correct.**

12  Q    Okay. Is it fair same for the weight loss that you,
13     haven't been treated for anything in connection with that
14     weight loss. Is that correct?

15  A    **That is correct.**

16  Q    The digesting the food, the appetite, I can't really give
17     you sympathy on this one with the hair falling.

18  A    **Right.**

19  Q    Just kidding.

20  A    **No, no.**

21  Q    But the hair, again, that's something that you didn't take
22     it to your physician and say like, Hey, my hair is --

23  A    **No.**

24  Q    Falling out. I mean, I noticed now, just for the record, I
25     mean, you appear to have hair, I mean, what can you show

1      me or just point to where you were losing hair?

2  A    **Around this section? What you can't see is my barber's**
3      **very good. So she has what they called fillers in the side**
4      **of my hair to keep the appearance that it's one level of**
5      **hair. She put the fillers in there when she cuts my hair.**

6  Q    So, but it's a cosmetic thing like this, obviously because
7      it's a hair loss.

8  A    **Right.**

9  Q    But I'm saying, but it's a cosmetic solution to it, I'm
10     saying provided by a barber as opposed to like a medical
11     treatment?

12  A    **Correct.**

13  Q    Okay. Then again, with depression, you said you felt like,
14     committing suicide because of the crippling anguish that
15     you were experiencing. How often were you feeling like
16     that? When did that start?

17  A    **I would say a couple weeks in. Part of that is, I've**
18     **worked really hard. I've worked extremely hard on my life.**
19     **There's a individual that comes to the mind by the name of**
20     **Horatio Alger, and he talks about pulling yourself up by**
21     **your bootstraps. And if you rewind the tape on everything**
22     **that I shared with you to now being homeless, losing my**
23     **grandmother until that day of working extremely hard to do**
24     **all the right things and to now have it in my mind, I**
25     **can't speak for anything else destroyed and have**



Page 66

1 everything unravel. Because what happens when you're under
2 stress, your mind starts to build different scenarios and
3 trying to figure out like, the uncertainty of this whole
4 thing. So, I would say a week in, I don't believe I
5 contacted my attorney yet. I was trying to figure that
6 out. And after that is when it started happening. The
7 frequency, couple times a day, I don't know where it
8 flashes through your mind.
9 Q   If I could, during this time, we're talking about after
10 the filing of the charge against you. And then during this
11 time, are you continuing to work in any capacity? Are you
12 writing anything for your book? Are you contemplating
13 travels, whatever, any other aspects of your business?
14 A   I stopped writing.
15 Q   How long did you stop writing?
16 A   Interesting. It was once he called me and said, hey man, I
17 got some great news.
18 Q   I'm sorry. I'm sorry. He being?
19 A   I m sorry. My attorney.
20 Q   I'm sorry. Just to be clear, Mr. Randolph?
21 A   Mr. Randolph called and said, hey man, I've got some great
22 news. The case has been dismissed. And that's when I
23 started to say, okay, now I can take this energy and start
24 writing again. As far as travel, I had I think maybe two
25 events. I can't a hundred percent recall that I have to go

Page 67

1 back and check that were pre-booked six, seven months
2 prior that I completed. I flew in, did the speech, came
3 back home during that time.
4 Q   Okay. So you did continue to work, but not in the same
5 capacity as,
6 A   Correct.
7 Q   Okay. The stress drinking that you're referring to in
8 self-medicating, I understand to the consuming alcohol
9 that the self-medicating. Is there anything else outside
10 the excessive drinking that is referenced? Again, when so
11 page six under excessive stress drinking where it says
12 self-medicating. Other than the consumption of alcohol, is
13 that reference to self-medicating? Is there something
14 else?
15 A   Yes, that's the reference to that.
16 Q   Okay. Self-medicating. So the one and the same?
17         MR. RANDOLPH: I'm sorry. Make sure you let him
18 finish this question.
19         THE WITNESSES: I'm sorry.
20         MR. RANDOLPH: Before you answer this is for the
21 court reporter. So can get everything down.
22 BY MR. WAYNE:
23 Q   Then starting at the bottom of page six and then going on
24 to seven, you referenced PTSD. Actually, we can jump back
25 for a second to the excessive stress drinking. And again,

Page 68

1 just so we're clear here, this is excessive drinking based
2 on, is it fair to say this is based on your previous
3 history with alcohol consumption, responsible or not? Just
4 what you've had that you felt that your alcohol
5 consumption increased. Is that correct?
6 A   I'm going to say no. I'm going to say this was in relation
7 to the uncertainty of my freedom.
8 Q   Well, I guess what I'm saying is did you consume alcohol
9 at all before this incident?
10 A   Okay. So that's a better question. On occasion.
11 Q   On occasion. So you increased your, is it fair to say you
12 increased your alcohol consumption during once the charge
13 is filed against you? Is that what you're saying?
14 A   Yes.
15 Q   Okay. And how much would you drink before and what would
16 you drink?
17 A   I would say,
18 Q   And when would you drink?
19 A   Once every two weeks. Maybe a couple glasses of champagne
20 and or a vodka, martini. Every couple of weeks.
21 Q   Okay. And then how did your alcohol consumption change
22 during the course of the charge against you?
23 A   I was essentially drinking three to four days a week.
24 Q   Okay. And when you would drink on average, what would you
25 drink and how much would you drink?

Page 69

1 A   I think, if my memory is right, it was Tito's.
2 Q   Okay. So vodka?
3 A   Vodka, and whatever the splash was that was available,
4 lemonade, iced tea is just something that.
5 Q   And then how much vodka would you drink? Like on average
6 or how many units, like we're talking about one ounce
7 being a serving if you will, of vodka. Like how much vodka
8 would you say? If you had to guess.
9 A   One ounce being a serving? I would say 10 servings, 12
10 servings, depending on the day, depending on my mood.
11 Q   Okay. Jumping down to the PTSD there. It says, based upon
12 the previous actions of Northville Township Police
13 Department, prosecuting attorney's office of Northville
14 and Officer Ben Sellenraad, I no longer feel safe from the
15 people that have sworn to uphold and oath to serve and
16 protect. I have lived in Northville Township for over 13
17 years without incident. Without incident. Meaning is that
18 any contact with the legal system?
19 A   Correct.
20 Q   Okay. Any contact with the court, that kind of thing?
21 A   Correct.
22 Q   Okay. And now I have developed a deep fear of what might
23 or might not happen from the police department. If you can
24 expand upon that, what exactly do you mean might or may
25 not happen from the police department?



1 A    I'll give you a really good example.

2 Q    Okay.

3 A    About a month ago, I was, oh, let me go back. Let me
4      answer your question first before I give you an example.
5      What might or might not happen because it's very clear to
6      me and I'm not an attorney, that these charges are
7      fraudulent charges brought by the prosecutor.

8 Q    I'm sorry, we're talking about one charge. Correct?

9 A    The charge.  I apologize. The charge. The charge.

10 Q   Okay. Just want to make sure there wasn't anything else.

11 A   The charge and Officer Ben Sellenraad and Northville
12     Township, I'm afraid of what else they might do. And most
13     people can't understand that. I've done everything right
14     as far as I know to try to be a good citizen out in the
15     world. And now I feel like, man, every time I cross over
16     from Livonia back to where I've lived for over a decade,
17     who knows what might happen. I can't tell you how many of
18     my friends called and said, Hey man, don't speed out there
19     because you got this whole thing going on. Be careful, be
20     careful. But that's the plight of being an African
21     American man in the United States. It is a constant
22     reminder of who's in control. So that's how I feel. That's
23     what I mean by PTSD, that my wife doesn't even feel safe
24     calling the police now because if you'll put a charge on
25     me for something like this, what else might you do? Might

1      you not plant a gun under my steps? Might you not go in my
2      backyard and say, hey, we just found cocaine. I don't
3      know. I had a situation where my car, it went down the
4      driveway, it was like a commercial and it hit the Amazon
5      driver. It's like a freak accident.

6 Q    Were you operating the car?

7 A    No. She was dropping off a package. I was like, oh, I
8      looked in the rear view. Oh, let me jump out and grab the
9      package. I come around to open the garage, the car just
10     rolls down. Boom. Okay. I call State Farm. I said, do
11     I need to follow a police report? She says, no, we'll just
12     come and take care of it. While she was driving her own
13     personal vehicle through Amazon. And Amazon said, you have
14     to file a police report. And I said, oh, I'll call the
15     police. I called the police that officer Micik showed up
16     and, it was just a real uncomfortable situation when it
17     should have been something really, really smooth. And, but
18     that's what I'm talking about now. I don't even want to
19     call them for anything. So that is what I mean by that.
20     Like, I just don't feel safe.

21 Q   Just to be clear, nobody, officer Sellenraad nor anyone
22     from the township has actually threatened you or
23     communicated to you orally or in writing that you should
24     not contact them more than anything else would befall you
25     if you did. Is that correct?

1 A    Not to my face, no.

2 Q    Okay. So you don't have any knowledge period then
3      regardless of this to your face. Is that correct?

4 A    I have no knowledge of that.

5 Q    Okay. Still on page seven, going down to reputation here.
6      I just want to make sure that this is the same one we
7      talked about before. This individual, it says my
8      reputation was destroyed. Because my neighbor called me a
9      week before I received the summons in the mail and told me
10     that I was about to have some legal problems and I should
11     meet with her about it. So, who is this?

12 A   That is my neighbor at the end of the block.

13 Q   And her name is?

14 A   Oh man, I can't think of it.

15 Q   What is her name? I'll get you. I can't recall her name
16     right now.

17 Q   Had you spoken with her much before, what you described in
18     this paragraph?

19 A   No, not, not recently. Our kids grew up in the
20     neighborhood. They all were elementary kids together.

21 Q   Do you, do you remember how she happened to have a
22     telephone number for you?

23 A   She actually, because I had not spoken to her in sometime.
24     She actually called my wife. Well, I take that back. She
25     texted my wife and said, Hey, can you give me Jonathan's

1      number? And several minutes after that, maybe an hour, she
2      texts my office line and she said, hey, we need to have a
3      conversation. And when I replied, she said, I'll call you
4      when I leave wherever she was. And then she called me on
5      the phone.

6 Q    Okay.

7 A    And her initial response was, I heard all this stuff is
8      going on and you're about to have some legal problems.
9      Esther is her first name Esther? Her last name will come
10     up in a second.

11 Q   Is how, old approximately Esther?

12 A   Esther 40-ish.

13 Q   Careful.

14 A   Yeah. Right. Ish. Right.

15 Q   White, black, Asian?

16 A   She is actually Indian.

17 Q   Indian?

18 A   Yes.

19 Q   Like Indian is from India as opposed to Native American?

20 A   Correct.

21 Q   All right. Then under same page, page seven, kind your
22     expenses and losses. You mentioned this cancel, the cancel
23     this 10-City tour. So this is different from the Chicago
24     Public Schools?

25 A   Same.



1 Q    Okay. This is 10-city tour.

2 A    **Oh, I apologize. It shouldn't say city. It should say**
3      **school.**

4 Q    10-school tour.

5 A    **Correct.**

6 Q    Okay. And again, these are schools all within Chicago
7      public schools?

8 A    **That is correct.**

9 Q    Okay. Book sales appearances. Below that, it mentions,
10     being in not being able to complete a book. I was in the
11     middle of editing process and I lost my deposit because I
12     didn't complete it. Earlier you said you weren't out of
13     pocket for anything, but I mean, this is, but it looks
14     like here you are asked you earlier. I'm not trying to
15     play gotcha.

16 A   **Sure.**

17 Q   I'm just saying, I'm just trying to make sure that I got
18     this correct here. Like, do you remember that earlier
19     when, when I asked if you were out of pocket or anything,
20     non-refundable and you had said no, but here I just want
21     to make sure it says I lost my deposit because I didn't
22     complete it. So you did lose a deposit.

23 A   **I apologize. I misstated or I didn't recall that I lost**
24     **the deposit. So, this is accurate. Yes.**

25 Q   Okay. How much, I mean, what was that deposit?

1 A    **I believe it was like $3,000. I would have to get the**
2      **receipt for it somewhere around $3,000.**

3 Q    Okay. Would you be able to get a receipt for that?

4 A    **Absolutely.**

5 Q    Okay.

6 A    **Yeah.**

7 Q    Now, next, so number two, at the bottom of page seven,
8      the, the interrogatory is please describe in detail and
9      the specificity, the damages you are seeking in this
10     action itemizing each specific category of damages sought.
11     And for each itemized category, identify all facts and
12     documents relating to your itemization of damages. The
13     answer you gave was plaintiff is still in the process of
14     calculating damages. So, we start here, we have that
15     $3,000 that deposit. Are you still in the process of
16     calculating damages?

17 A   **That is correct.**

18 Q   Okay. And how are you going about that process effecting
19     your damages?

20 A   **I guess I'm trying to gather as much information about**
21     **what or how to calculate it. I guess I should say that I'm**
22     **trying to figure out how to calculate if you are charged**
23     **with something that you should have never been charged**
24     **with.**

25 Q   Okay. And that would go under pecuniary expenses or

1      losses?

2 A    **I'm not sure yet, honestly.**

3 Q    Okay. So for three, I think we pretty much covered
4      everything there. It says, please state each and every
5      fact you rely upon, charge of malicious annoyance by
6      writing. The charge is dismissed. You've been a resident
7      of Northville Township for 15 years, author and speaker.
8      Okay. Again, number four, we've already gone over this,
9      accepting the instant proceedings. Please state the case
10     number caption disposition, a summary regarding any
11     criminal, civil or administrative proceedings which you
12     have been or are a party. As you've indicated, you have no
13     criminal record or civil or administrative proceedings.
14     You have a speeding ticket from about 12 years ago that I
15     can remember, right?

16 A   **Correct.**

17 Q   Then five. You are currently employed, and again, you are
18     the owner of Brain Works training and that you have been
19     for the past 10 years; is that correct?

20 A   **That is also correct.**

21 Q   Okay. If we jump to page 12, please, paragraph nine
22     rather, interrogatory number nine one and the same. In
23     your own words, in as much detail as possible, please
24     state why you agreed to dismiss defendant's Fadie Jamil
25     Kadaf and Jeahad Kadaf from the instant action. And then

1      you responded, other defendants were dismissed to focus on
2      the strongest portions of my case. What exactly does that
3      mean?

4 A    **On that because I'm not a lawyer, I have to refer to my**
5      **attorney on this one.**

6 Q    I'm sorry, did you answer that?

7 A    **Did I answer it?**

8 Q    Yes. Because it did say in your own words in as much
9      detail as possible.

10 A   **I answered it.**

11 Q   I guess what I'm asking is, if you were the individual who
12     asked this, I'm merely asking you to expound upon your own
13     words. So I don't think that referring to your attorney
14     here is appropriate. I think that you'd have to answer
15     this because they are your own words.

16 A   **Correct.**

17 Q   And right. And you could have answered that however you
18     want to. That's where I'm coming from on this. But you
19     chose to use the words that you did, so I'd like you to
20     please explain that.

21 A   **Well, I had a conversation with my attorney about**
22     **everything that has been going on, and once we had that**
23     **consultation it just felt like, okay, the other defendants**
24     **were dismissed to focus on the strongest portions of my**
25     **case. And my case right now, from what I understand, is**



1   against Northville Township and Officer Sellenraad.
2   Q   Is there anything that prompted you to be okay with Fadie
3       and Jeahad being dismissed from your case?
4   A   **That prompted me, a conversation with my attorney.**
5   Q   Okay. Do you believe it was correct to include them as
6       defendants in the first place?
7   A   **Do I believe it was correct? I believe it was correct.**
8   Q   Do you believe they acted wrongfully toward you?
9   A   **Wrongfully is subjective, but I,**
10  Q   Take however you'd like.
11  A   **I believe that they should have been a part of it. Again,**
12      **not being an attorney, I just believed that that's what I**
13      **believed.**
14  Q   Okay. Jumping down to 10 then, in your own words, in as
15      much detail as possible, please, how you please explain
16      how you came to form the belief that as alleged in
17      paragraph 53 of the complaint, you asserted that on
18      information and belief, defendant instituted the
19      investigation for personal reasons. But jumping down to
20      that in your answer, you have, according to the US Census
21      Bureau, Northville Township's black population is 1.5.%.
22      Please explain how that's relevant to interrogatory number
23      10.
24  A   **I am going to read it again, if that's okay.**
25  Q   Absolutely.

1   Q   In your own words, in much detail, please explain how you
2       come from the belief that alleged complaint asserted
3       information and belief vexation, include not limited
4       vexation cause of damages.
5           It goes back to my statement of the whipping post. It
6       was even brought up by the judge during the trial. I don't
7       know if that was a trial. I don't want to misspeak when,
8       when I had to show up, when, Mr. Randolph was defending me
9       that he was attempting to get the flavor of what was going
10      on and who I was, and that even the judge mentioned, oh,
11      wow. I don't want to quote essentially that it's not a lot
12      of African American people that live in that neighborhood.
13      So for me, if you drive down my block and it's been that
14      way for the last decade, we're the only black family that
15      live on that block. And we've been the only black family
16      that live around there. And now you have a situation
17      where, to me, and that's what I want to make clear that
18      now it feels like the establishment is coming down on me.
19      And I haven't done anything. I've been a model citizen. I
20      speak at the elementary school around the corner. My kids
21      have gone to school there, done everything right. I cut my
22      grass timely. And this is to show that, and I couldn't say
23      that, I'm a bit of a researcher, so I couldn't say it, I'm
24      the only black family that live over there. But I can say,
25      according to the census, just look at the numbers and look

1   at what's happening right now. And what's happening right
2   now is that I am becoming the bad guy. And all I was doing
3   was attempting to do what I thought was right, which was
4   ask someone nicely not to park in front of my home.
5   Q   Directly below that says Sellenraad signed a complaint
6       based upon a 1930 statute that according to the 35th
7       District Court, has never been utilized in a prosecution
8       by Northville Township. Where'd you get that information?
9   A   **Internet.**
10  Q   Okay. How exactly?
11  A   **Google.**
12  Q   And what did you Google?
13  A   **I googled the statute itself. So, if you google malicious**
14      **annoyance by writing, Michigan is the only state that has**
15      **it. And then it gives you who actually wrote it when it**
16      **was written, the year it was written, and how many times**
17      **it has been used. All that's on Google.**
18  Q   You lost me here. So you're saying on Google, by Googling
19      that you were able to tell that 35th District Court has
20      only been, has never utilized the prosecution by
21      Northville Township for that statute?
22  A   **No, that's not what I said.**
23  Q   What'd you say?
24  A   **I said that you said, how do I know about the statute?**
25  Q   No, no, that's not what I said.

1   A   **Okay.**
2   Q   Sellenraad signed a complaint based upon a statute that
3       according to the 35th District Court, has never been
4       utilized in the prosecution by Northville Township. So
5       it's not so much about what the statute is. How do you
6       know by doing whatever you did at 35th District Court, you
7       know, it says according to 35th District Court. So there
8       was something, ascribed to 35th District Court or on his
9       website indicating that it's never been used in a
10      prosecution by Northville Township. That's what I'm trying
11      to get at. So it's not so much the statute, it could have
12      been any law.
13  A   **I understand. After the case, I was curious to what has**
14      **transpired or what had transpired. Because I was very**
15      **curious about the whole process.**
16  Q   Okay.
17  A   **And I reached out to my attorney, Mr. Randolph, and I**
18      **said, Hey man, is there a way that I can like, look at**
19      **what we just experienced? He said, sure, you can contact**
20      **the court and get a printout. I think, you can go to the**
21      **clerk and have the clerk, what is it called? Oh, it's**
22      **upstairs. Have her type out what happened in the court.**
23  Q   Register of actions.
24  A   **Thank You.**
25  Q   Okay.



1  A    Because I was curious, I'm still curious about this whole

2       process. And in there my attorney mentioned that Officer

3       Sellenraad signed a complaint based upon the statute,

4       according to the 35th District Court that had never been

5       utilized, that's in that printout. So I use some of that

6       data and research to answer these questions.

7  Q    Okay. And then says, please state what proof you have if

8       Northville defendants were aware of your occupation, your

9       purported professional reputation, your purported

10      community reputation. This one, I'm just going to be

11      honest with, kind of just threw me. It says, Kadaf

12      complained that Edison has a weapon and quote goes into

13      schools unquote. These quote facts were.

14  A    Before you, before you finish, I'm going to, I drank too

15      much water. I want to go to the restroom. Two seconds.

16  Q    Go ahead. Absolutely go.

17         (Off the record.)

18         (Back on the record.)

19  BY MR. WAYNE:

20  Q    So I started to say, so interrogatory on page 12 of the

21      Northville defendant's interrogatories says, please state

22      what proof you have. The Northville defendants were aware

23      of your occupation, your purported professional

24      reputation, your purported community reputation. And I was

25      saying like, your answer here just kind of threw me.

1       Because it says Kadaf complained that Edison has a weapon

2       and quote goes into schools unquote. These open facts were

3       presented by Kadaf as if there was something sinister or

4       illegal about my conduct. So much so he complained to the

5       ATF about it.

6          A reasonable police officer would at least take a

7       preliminary look at the accused party to determine what

8       business he has going into school as Mr. Edison as a

9       public figure who's working schools as an author and

10      public speaker is discoverable with a simple web search

11      school like this going into school, Kadaf, what does, I

12      mean, what does that have to do with the reputation and

13      whatever? I'm just trying to put this together. Oh, this

14      seems kind of like in here, unless I'm missing something.

15  A    And maybe I read the question wrong.

16  Q    Okay.

17  A    When I answered it. But essentially what I'm saying here

18      is, when Mr. Kadaf went into the police station to

19      complain,

20  Q    I'm saying just for a point of clarity, this is Fadie

21      Kadaf.

22  A    Correct. Fadie Kadaf.

23  Q    Okay. So when Fadie goes here to complain?

24  A    These are some of the things that were mentioned that he's

25      a -- he goes into schools and he speaks, and that's on

1       video, body camera footage. He has guns at his house. He

2       has all these other, he's done this, he's done that. I

3       don't know it verbatim, but you know that there's

4       documentation for that. So that is the seed that he

5       planted with Officer Sellenraad that he's trying to start

6       with, Hey, this dude's a menace. He's this, he's that. He

7       works in schools. He shouldn't be able to work in schools

8       and he has guns. That's, and so Officer Sellenraad is

9       taking note of all of that. So now that's planted into his

10      subconscious, the type of individual I am.

11  Q    So you're saying that Fadie is trying to smear you here

12      and try to paint you as a dangerous individual?

13  A    I'm not sure what he was trying to do. All I know was

14      that's what he shared with the police. And then, let's

15      see, A responsible police officer would at least take a

16      preliminary look at the accused party to determine what

17      business he's going into school is Mr. Edison's public

18      figure. So when you start making, so when this all

19      happened, when I received a phone call from officer

20      Sellenraad, the initial call was a pleasant call. The next

21      call was the bad call. And it was essentially, hey, people

22      can do what they want. And then the next thing I know, I

23      get the charge. So, what I was attempting to say here is

24      that it's well known that what I do for a living and who I

25      am. And that's why I said, with a simple web search, you

1       can find that stuff out.

2  Q    This is a good time to break.

3          (Off the record)

4          (Back on the record)

5          (EX-C marked for identification)

6  BY MR. WAYNE:

7  Q    I'm going to jump to page 4. This is Exhibit C.  This is

8       Plaintiff's Response to Defendant's Northville Township

9       and Police Officer Ben Sellenraad's First Request for

10      Production of Documents to the Plaintiff pursuant to

11      Federal Rule of Civil Procedure 34.  Request 11 asks

12      Plaintiff produce copies of his forms 1040 US Individual

13      Tax Return for the tax periods ending 12/31/2022 and

14      12/31/2021 and if we could jump to those because those are

15      attached.  So we should be looking at a form 1040 Schedule

16      C for the tax period of 2021, profit and loss from

17      business for a sole proprietorship.

18         MR. RANDOPH:  Just for the purposes of the

19      record, would you have a problem with as far as the court

20      reporter copy of this that the attachments be left off and

21      we can stipulate to what those attachments are, but I just

22      want to make sure my client s tax returns are secure and

23      don t leave your office or my office.

24         MR. WAYNE:  We can do that as -- yeah, we re on

25      the record so we will stipulate that the attachments --

Page 86

1  the attachments are already part of the record, the
2  Schedule C for example for the two tax periods that I just
3  listed and any other tax information.  Those will not be
4  published as an exhibit, but we re acknowledging what
5  those are and we re agreeing that s a profit and loss from
6  Plaintiff s 1040 for 2021.  The face of his Michigan
7  income tax return for 2021 -- and this, by the way, just
8  for a point here, this is what specifically I was looking
9  for with regards to the federal return.
10         MR. RANDOLPH:  Yeah, I understand.
11         MR. WAYNE:  All right.  Other exhibits included
12  and other attachments to this exhibit also include the
13  Schedule C for the profit and loss for business 2022 and
14  then again, the 2022 Michigan individual income tax
15  return.  So those are the documents.  Again, just for the
16  record that are attached to this Exhibit C but will not be
17  included.
18 BY MR. WAYNE:
19 Q   So, Mr. Edison, what are we looking at here, this first
20     attachment, profit and loss?
21 A   That s my Schedule C.
22 Q   Okay.  The instructions are for sole proprietorship.  Does
23     have your Brainworks Training, LLC.  So how does that work
24     here?  Does it have its -- so there is an EIN I see that
25     is -- it s been redacted.  Are you the only member of this

Page 87

1     LLC?
2 A   That s correct.
3 Q   Okay.  Is it -- if you know, and I take it you would --
4     this is a member-managed LLC?
5 A   Correct.
6 Q   So -- and I'm requesting this information here because
7     we re trying to get an accurate picture of the losses that
8     you alleged in the complaint.  So what's going on here
9     with this profit and loss basically it's telling about
10     your -- the 2021 tax year with respect to how your
11     business did.
12 A   It was COVID year, so it didn't do very much.
13 Q   Okay.  Normally, okay, in a non-COVID year, I take it
14     there would have been a lot more travel?
15 A   A lot more everything.
16 Q   But you did some work I presume remotely?
17 A   I want to say yes.  I don't recall what this is for.
18 Q   And that was a little over $6,000 in travel?  Does that
19     sound about right?
20 A   Yes.
21 Q   Okay.  Then we flip the page here, the statement of profit
22     and loss.  So it looks like the net income loss, and
23     that's the bottom of the first column, a little under
24     $17,000.  Does that sound about right?
25 A   It s 2021, yes.  Yes.

Page 88

1 Q   Okay.  And then you flip over to State return.  We'll go
2     to the profit and loss from the 2022 return.  So I notice
3     that gross income, it looks like, for Brainworks Training,
4     $254,726.  Does that sound about right?
5 A   Well, 296, I believe.
6 Q   Well, 7 is gross income -- line 7 under part one for
7     income?
8 A   Oh, I apologize.  That's correct.
9 Q   Okay.  Then looks like you have total expenses though,
10     line 28 which is part of part two of $272,547.  You got an
11     office expense looks like over $51,000 in travel, $61,000
12     in advertising.  Tell me about that.
13 A   It's a pie diagram of advertising.  So you have mailing,
14     you have mailers, you have people that do independent work
15     for advertising, you'd have email database advertising.
16     It's about 10 different things that make up that cost.
17 Q   And legal and professional services, that's under part
18     two, expenses, line 17, 13,000.
19 A   Mm-hmm.
20 Q   What would that have gone towards?  I mean, clearly
21     something legal, but professional services, what does that
22     entail?
23 A   That is hiring people to do different things like help
24     coordinate shipments, office work, graphics work.  So it's
25     professional people doing professional stuff.

Page 89

1 Q   Okay.  And when exactly was this return filed if you know?
2 A   Should be on there.  Let's see.
3 Q   Trust me.  It's not always the middle of April.
4 A   All right.  Let s see.  So I can't tell by this, but I use
5     the same guy every year from H&R Block so I can find out
6     exactly when it was filed.
7 Q   Based on the income and expenses here, is this fairly
8     representative of -- not factoring in -- not including
9     2020 and 2021.  Is this fairly representative of how your
10     business, you know, the profits that it generates, the
11     income and expenses?  Is this in line with your
12     expectations?
13 A   It is.  With some expectations to do even more, but yes.
14 Q   All right.  Where are you, if you know, and when I say
15     you, I mean Brainworks Training, wherein which by
16     extension, you know, imputes to your tax return year, but
17     where are you this year with respect to last year, in
18     comparison with last year?
19 A   Off the top of my head, I couldn't answer that.  I would
20     have to go back and kind of line everything up.  I'm not
21     sure.
22 Q   Do you usually take a -- compensate yourself, are you a
23     wage earner or do you take a draw?
24 A   In the past, it was I was wage and that was some time ago.
25     And now I was advised to take a draw.



Page 90

1  Q   So even trying to just compare what you're getting on a
2      monthly basis, you're not really able to tell how the
3      information on this return differs from 2023 year to date;
4      is that correct?
5  A   No.  That's correct.
6  Q   So you'd have to produce that information?
7  A   Yeah.
8  Q   Are you willing to do that?
9  A   Do I have to?
10 Q   I suppose that'd be up to your attorney, but --
11         MR. RANDOLPH:  I don't know what you're
12     requesting.  I mean, I know for me, it's a lot of
13     documents.  You want him to produce just raw data, a bunch
14     of receipts in a box of stuff so you all can recreate is
15     if you want to do his taxes?  I don't know what you're
16     asking for.
17         MR. WAYNE:  Well, he's alleging losses and
18     damages stemming from the allegations in his complaint.
19     There is information for year to date, for example, you
20     know, showing a demonstrable difference between the
21     previous year and this one.  That would speak to his
22     damages, proving them.  In fact, it's pretty much the only
23     way.
24         MR. RANDOLPH:  I think it depends on the
25     specific request.  I mean, you know, you can ask him.

Page 91

1      He's here.  I mean, he can testify to what he knows, but
2      to expect him to get everything to you that he would give
3      to his accountant to kind of assemble a picture of his
4      income, I think that's not reasonable, but I think we can
5      come to an understanding.  I'm not trying to withhold
6      information from you.  Obviously, we want to establish his
7      damages, but he testified that -- what happened in 2022 is
8      in line with his expectations.
9          MR. WAYNE:  But question was when.
10         MR. RUDOLPH:  That was the end of '21, wasn't
11     it?
12         THE WITNESS:  Yeah.  End of '21.  October, late
13     October, '21.  Wait.  20.  I don't know.  It's here
14     somewhere I'm pretty sure.
15         MR. RANDOLPH:  Why don't you let me know
16     specifically what you're requesting, and we'll see if we
17     can comply.  Certainly want to try to help create that
18     picture.
19 BY MR. WAYNE:
20 Q   Okay.  And let's just go back for a second just for a
21     point of reference.  So going to return to Exhibit A.
22     Looks like the allegations are that Plaintiff was charged
23     on or about October 21st of 2022.
24 A   Okay.  October 1st, 2020 --
25 Q   21st.

Page 92

1  A   21st. 2022.  Right.  Right.
2  Q   And including expenses here, or expenses, do you
3      administer and develop your own website?
4  A   Yes.
5  Q   Okay.  And what are the costs associated with that as
6      you're the one doing a lot of the work.
7  A   Oh, wait.  Let me go back.  I want to make sure I m
8      answering this correctly.  You said do I administer and --
9      to my own website.  What --
10 Q   Administer -- I'm not sure.  What word did I use.  Can we
11     get a --
12         (Reporter read back the requested portion.)
13         THE WITNESS:  I use a service for that.  And in
14     addition to that, I use contract labor for a lot of things
15     through different, what do you call it, websites that have
16     people that provide you service.
17 BY MR. WAYNE:
18 Q   Well, seeing as how it looks like I need some more
19     information, I think we can move on from Exhibit C.
20         (EX-D marked for identification.)
21 BY MR. WAYNE:
22 Q   This is Exhibit D.  Take a second to familiarize yourself
23     with that.  Just let me know when you're ready, please.
24 A   I'm ready.
25 Q   All right.  This is Exhibit D.  This is Register of

Page 93

1      Actions for 35th District Court case No. 13B4519GC,
2      American Express Centurion Bank versus Jonathan Edison.
3      Did you have a chance to look this over?
4  A   Yes.
5  Q   You know what this is?
6  A   Yes.
7  Q   What is this?
8  A   This is a ten-year-old bill from American Express.
9  Q   This is a bill?
10 A   Well, you said what is it.  So --
11 Q   Looks like a lawsuit.  Is it a lawsuit?
12 A   I can't answer if it's a lawsuit.  I'm not sure if it's a
13     lawsuit.  Go ahead.  I apologize.
14 Q   You see here it says Plaintiff.
15 A   Okay.
16 Q   Who's the plaintiff?
17 A   American Express.
18 Q   Centurion Bank?
19 A   Yes.
20 Q   All right.  Who's the defendant?
21 A   It says me.
22 Q   Do you acknowledge that that is you?
23 A   That is me.
24 Q   Okay.  So you'd never seen this before you said?
25 A   No.



Page 94

1  Q   Are you aware that American Express had a lawsuit against
2      you?
3  A   I am not aware.
4  Q   Okay.
5  A   I can speak to why I'm not aware is because I received a
6      letter from American Express, a settlement letter and that
7      was last year I want to say and there's a -- there was a
8      number on the settlement letter that said, hey, if you
9      want to settle this amount, you can, give us a call and we
10     will reactivate your American Express accounts. And I
11     took the settlement from that settlement letter and paid
12     it off and I've got all of my accounts through American
13     Express reopened.
14 Q   Okay. On the second page, maybe you can take your time.
15     Looks like there's one on November 17th of 2014, a writ of
16     garnishment against income tax. Have you ever had any of
17     your income tax refunds seized?
18 A   I cannot recall.
19 Q   Okay. You said -- could you explain to me again -- so you
20     received a correspondence, and this is in reference to the
21     last page of this exhibit. You received correspondence
22     from American Express and what was the substance of the
23     correspondence?
24 A   It was a letter in the mail that said, hey, we are
25     essentially representatives of Centurion Bank or American

Page 95

1      Express and we want to give you an opportunity to settle
2      your debt is the word they used.
3  Q   Did you know what they were talking about when you read
4      that?
5  A   Yes. I knew -- well, let me say this: Let me add to the
6      yes. I knew that I had a American Express card that was
7      canceled for non-payment a decade ago.
8  Q   Okay.
9  A   And the letter I received was to settle that debt and the
10     offer that they made came to an agreement and I settled
11     that debt. But I was unaware that it was an actual
12     lawsuit.
13         (EX-E marked for identification.)
14 BY MR. WAYNE:
15 Q   This is Exhibit E. So the court reporter has this, this
16     is Exhibit E. This is case details for 35th District
17     Court case No. 2014-14V03448A-0A, 2014-14N00566A-01, 2012-
18     12V01886B-01, 2012-12V01886A-01 and 2012-12N00213A-01.
19     Give yourself a second to familiarize yourself with this.
20     Let me know when you are ready.
21 A   I am ready.
22 Q   Do any of these look familiar to you?
23 A   Let's see. So this was 10 years ago. I think I
24     referenced this. Impeding traffic. Yep. Yes.
25 Q   And second page?

Page 96

1  A   Let's see. Plate violation. Honestly, I don't remember,
2      but it says I have ten-year-old plate violation so okay.
3  Q   And the third page, that ring a bell?
4  A   No proof of insurance. No, it was 2012. Honestly, I do
5      not remember, but.
6  Q   Go on to page 4.
7  A   All right. And plate violation. Looks like the same
8      thing. Again, I don't remember, but I was --
9  Q   Page 5. Do you agree that the defendant in each of these
10     registers of action, was that you?
11 A   Yes.
12 Q   Okay. You indicated previously that you never received
13     correspondence from 35th District Court. You've never
14     been a party to a legal action, civil or criminal.
15 A   That I can remember.
16 Q   You didn't say that you could remember. You told me no.
17     But regardless, do you remember receiving correspondence
18     for any of these tickets, any of these matters?
19 A   This is almost ten years ago. Honestly, I don't remember.
20     That's a long time ago. I didn't remember. Even when I
21     spoke to my attorney about the questions, my question was
22     what if I don't remember. So I didn't remember.
23 Q   Right now -- and you don't have to go into specifics. You
24     know, as a result allegedly of what transpired, are you
25     having financial difficulties?

Page 97

1  A   I'm sorry?
2  Q   As a result of the allegations in your complaint, are you
3      experiencing financial difficulties?
4  A   As a result of the complaint.
5  Q   The allegations in the complaint.
6  A   I want to make sure I'm answering that right. The charge?
7      Is that what you're asking?
8  Q   Everything that you've, you know, alleged, including the
9      charge and you've alleged that you've -- business has
10     dropped off. You're unable to continue writing your book
11     for example and I'm saying so as a result of that, are you
12     having any financial difficulties? Do you have any
13     financial difficulties stemming from the allegations in
14     the complaint?
15 A   It slowed my business down.
16 Q   Okay. Slowed your business down?
17 A   Yes.
18 Q   Okay. But would you go so far as to say, and again, this
19     is subjective, to you are you having financial
20     difficulties because of the events in the alleged
21     complaints?
22 A   Well, these events took place over a year ago. So
23     initially I can say it did. Currently, I guess you would
24     have the residual effect of that, but I'm not sure how to
25     answer that.



1  Q   Other than the alcohol use that you described in your
2      interrogatories, do you use any other substances?
3  A   **No, sir.**
4  Q   And, again, it includes whether prescribed to you
5      prescription medication, marijuana, anything?
6  A   **No.**
7  Q   Okay.  Do you have any issues with gambling?
8  A   **No.**
9  Q   Do you gamble?
10 A   **No.**
11 Q   Have you gambled at all in the last two years?
12 A   **Two years?  No.  I don't think so.**
13 Q   Have you had any financial losses stemming from stocks,
14     bonds, the overall economy in the last two or three years?
15         MR. RANDOLPH:  I'm going to object that
16     question.  That's vague and overbroad.  I mean, a stock
17     ticks back, you know, half a percent, you know, one day,
18     that's a loss?  You know, I mean, what does that mean?
19     Loses value over one might and shoots up 30 percent the
20     net day.  Is that a loss?
21         MR. WAYNE:  I mean, they're all technically
22     losses.  I'll rephrase the question.
23 BY MR. WAYNE:
24 Q   Do you have you experienced any issues with losses,
25     however you want to interpret that, for financial

1      products, stocks, bonds, that have hurt you financially?
2  A   **Financial products, stocks or bonds?  No.**
3  Q   Okay.  Have you ever been subject to extortion?
4  A   **Have I been subject to extortion?  If I have, I do not**
5      **recall.**
6  Q   Commonly known as blackmail that somebody would threaten
7      to divulge information about you if you did not do
8      something?
9  A   **I can't recall.  I don't believe so, no.**
10 Q   Okay.  And have you ever had any issues with individuals
11     -- women asserting that you are the father of their
12     children?
13 A   **That I am the father of their children?**
14 Q   Other than your wife, of course.
15         MR. RANDOLPH:  I'm going to object to the
16     question.  I don t know if that's relevant.  I don't think
17     it's relevant and I don't even think it's reasonably
18     calculated to lead to admissible evidence.  I think it's
19     far out of bounds and I think it's phishing.
20         MR. WAYNE:  That said, you still have to answer.
21         THE WITNESS:  **Say what?**
22         MR. WAYNE:  You still have to answer.
23         MR. RANDOLPH:  You want to answer that question?
24         THE WITNESS:  **No.**
25         MR. RANDOLPH:  Well, then I'm going to -- he's

1      not going to answer.  If you want an answer, I guess you
2      got to ask the judge.
3          (EX-F marked for identification.)
4  BY MR. WAYNE:
5  Q   I'll pass out Exhibit F.  Familiarize yourself with that.
6  A   **2000 --**
7  Q   Exhibit F, this is a register of actions for 3rd Circuit
8      Court case No. 06018050401FH, State of Michigan versus
9      Jonathan Edison.  Do you know what this is, Mr. Edison?
10 A   **I do.**
11 Q   What is it?
12 A   **Looks like a register of action from 20 -- I'm sorry, 2005**
13     **for child support.**
14 Q   Are you the defendant?
15 A   **Looks like it, yes.**
16 Q   Okay.  Do you remember the events chronicled during the
17     register of action?
18 A   **I do not remember.**
19 Q   Do you know what this case is about?
20 A   **I know what it's about, yes.**
21 Q   Please describe to me in your own words what this is
22     about.
23 A   **My childhood sweetheart and I when we were in the 9th**
24     **grade had a child while I was in high school.**
25 Q   Okay.  It's your child?

1  A   **Yes.**
2  Q   Okay.  And what happened then?
3          MR. RANDOLPH:  What do you mean what happened
4      then?
5          MR. WAYNE:  I want to know how this came to
6      happen.
7          MR. RANDOLPH:  In 2006?
8          THE WITNESS:  **2005.**
9          MR. RANDOLPH:  2005.  You know what?  I'm going
10     to -- this has absolutely nothing to do with this case.
11         MR. WAYNE:  Let's go off the record for a
12     second, please.
13         (Off the record.)
14         (Back on the record.)
15         MR. RANDOLPH:  This has nothing to do with this
16     case.  It's not reasonably calculated to lead to
17     admissible evidence and it -- the only way that I can view
18     the purpose of this document is to harass, annoy -- harass
19     and annoy my client.  So unless counsel right here
20     establishes some connection of this information to this
21     case that didn't result in a conviction, I believe this
22     says case dismissed then I'm going to instruct him not to
23     answer and then you can file a motion in front of the
24     magistrate judge explaining why you are engaged in this
25     line of questioning.



1    MR. WAYNE:  I'll respond to the objection.  To
2  state the obvious, this goes directly to credibility and
3  contradicting the responses provided under oath by a
4  plaintiff in both written interrogatories and multiple
5  times today during this deposition.
6    MR. RANDOLPH:  The case was dismissed.  This
7  wasn't conviction.
8    MR. WAYNE:  I never asked if it was conviction.
9  The interrogatory -- the relevant interrogatory asked a
10  party to civil or criminal proceedings and, in fact, I
11  asked probably five, six, maybe even seven, eight times
12  today if that was the case regarding Plaintiff's record.
13  This is wholly relevant.
14    MR. RANDOLPH:  I don't think it is relevant.
15    MR. WAYNE:  Go off the record for a second?
16    (Off the record.)
17    (Back on the record.)
18    MR. RANDOLPH:  Defense counsel indicated that he
19  just has a few more questions about this document and then
20  we'll move on.
21    MR. WAYNE:  Yeah, we'll keep this brief.  This
22  is not intended to dig into your personal life here.
23  BY MR. WAYNE:
24  Q    So you had a child.  You didn't pay child support at a
25    certain time; is that correct?

1  A    As a child myself, I couldn't.
2  Q    And then from there, the mother of the child somehow got
3    this, you know, either complained to --
4  A    I can't answer that.
5  Q    You don't know, but you found yourself having to appear in
6    court?
7  A    Yeah.
8  Q    And if you do remember, I think you said maybe you had, so
9    this case says was dismissed.  How did that come about?
10  A    Honestly, this is 20 years ago.  I don't remember.
11    (EX-G marked for identification.)
12  BY MR. WAYNE:
13  Q    Okay.  This next one is Exhibit G.  Exhibit G, register of
14    actions for 3rd Circuit Court case No. 0800493301FH, State
15    of Michigan versus Jonathan Edison.  Take your time,
16    familiarize yourself with that.
17  A    I'm all set.
18  Q    You recognize this?
19  A    Yes.  No, wait.  I don't recognize it.  I can see it
20    though.
21  Q    Does this stem from the same child, mother of the child as
22    the previous case we discussed?
23  A    Looks like it.
24  Q    Okay.  This case was brought about in 2008, so how old
25    were you in 2008?

1  A    How old was I in 2008?  Let's see.  That's 12 and -- 35 or
2    so.  Somewhere around there.
3  Q    Okay.  And you don't remember this proceeding.  Is that
4    correct?
5  A    I don't.
6  Q    Nothing about it?
7    MR. RANDOLPH:  I'm going to object because the
8    question is vague.  Does he not remember the child?  Does
9    he not remember the mother?
10    MR. WAYNE:  The proceeding.
11    MR. RANDOLPH:  Or the court case?
12    MR. WAYNE:  The proceeding.
13    THE WITNESS:  I do not remember this.
14  BY MR. WAYNE:
15  Q    But the defendant here is you?
16  A    It's what it says, I'm the defendant, yes.
17    (EX-I marked for identification.)
18  BY MR. WAYNE:
19  Q    Okay.  Just going to -- last one, Exhibit I, register of
20    actions for 35th District court case, 22V2887, Township of
21    Northville versus Jonathan Edward Edison.
22    MR. RANDOLPH:  I can help you wheel all these
23    exhibits to your car when we're done.
24  BY MR. WAYNE:
25  Q    Mr. Edison, have you ever seen this, you're familiar with

1    it?
2  A    I am familiar with it.
3  Q    What is it?
4  A    Well, looks like a register of action and -- well, let me
5    go back.  I'm not a hundred percent certain what it is,
6    but I know my name is on it and it's related to the case.
7    So to that degree, I know that I'm involved in this case.
8  Q    You look at the second event, October 20th of last year.
9    If you would read out loud what that event is.
10  A    Authorization of complaint.  Is that the line that we're
11    talking about?
12  Q    It is.
13  A    Okay.
14  Q    And then below it it says --
15  A    Prosecutor Demopoulos, Gregory.
16  Q    D?
17  A    D.  Yes.
18  Q    All right.  At this time, no further questions.
19    EXAMINATION
20  BY MR. RANDOLPH:
21  Q    Okay.  How do you know Robert Colombo?
22  A    Me?
23  Q    Yes.
24  A    I was hired by him to work with the juvenile justice
25    department and if kids or parents of those kids or people



1    around those kids were having struggles with life, they
2    used my book and my curriculum to help get them on the
3    right path, on the right track.  And then after that, he
4    had me come in and speak to all the lawyers and all the
5    judges and all the students for this big program that they
6    do every year and generally, it's usually a lawyer, some
7    big lawyer that they have.  I think I was the first only
8    non-lawyer that they had.  So he had me come in and do
9    that.
10 Q    When was that?
11 A    Oh, man.
12 Q    Before the pandemic, right?
13 A    Before the pandemic.
14 Q    And was it --
15 A    Law Day.  That s what it 's called.  Law Day.
16 Q    Law Day.  And that was while Judge Colombo was still on
17    the bench?
18 A    That's correct.
19 Q    And he was Chief Judge?
20 A    Yes.
21 Q    And he invited you in to speak?
22 A    Absolutely.
23 Q    How many participants -- well, let me back up for a
24    second.  Was this in Detroit courthouse?
25 A    Yes.  Well, yeah, it was at the courthouse.  Where is the

1    courthouse?
2 Q    2 Woodward Avenue.
3 A    That one.  And it was in the big auditorium and Channel 4,
4    Channel 2, Channel 7 and all those guys were there.
5 Q    How many people would you estimate were there?
6 A    Maybe 500.
7 Q    Okay.  Did Judge Colombo ever serve in any role in any of
8    your organizations such as --
9 A    He was helping me with my non-profit.  He wasn't on the
10    board, but he was someone that I could rely on and talk to
11    and call about different things that I was trying to do.
12 Q    Okay.  When you testified on examination for brother
13    counsel about your PTSD and your worry, did your anxiety
14    come from a knowledge that you knew that you were going to
15    be convicted?
16 A    My anxiety came from the unknown and the way it
17    transpired, I just felt like I was going to be convicted.
18    I didn't know.  It just -- I felt that way.  So yeah.
19 Q    Okay.  What role did uncertainty play in your anxiety?
20 A    Well, you know, I got a teenage son now that's driving.
21    And, you know, we know what's, you know, without being
22    very graphic about it, we know what's going on in the
23    world with Louis and prosecutors and people and African
24    American men particularly.  So this uncertainty that here
25    I am attempting to do all the right things and now this

1    case is being brought, you know, where does that leave my
2    son?  Where does that leave my family?  So, like, we're in
3    the wind now because of this.  Now you have other
4    ethnicities that operate a different way in the United
5    States, but my experiences are different from anyone
6    else's experiences.  So my uncertainty and the anxiety of
7    it -- even to this day as I said, my wife doesn't want to
8    call the police.  I don't want to call them.  You know, I
9    don't want to have anything to do with them.  But I live
10    there and that's just what it is.  So, you know, it's just
11    a recurring type thing for me, personally.
12 Q    Is this the first time you sat for a deposition?
13 A    Yes.
14 Q    Have you ever been to law school?
15 A    No.
16 Q    All right.  I want to -- you to look at Exhibit B,
17    question No. 4, answer to question No. 4.  Page 8.
18 A    Page 8.  Okay.
19 Q    All right.  So did you answer these interrogatories to the
20    best of your ability?
21 A    I did.
22 Q    Okay.  I want to look at your answer.  Well, the question
23    is accepting the instant proceedings, please state the
24    case number, caption, disposition and a summary regarding
25    any criminal, civil, or administrative proceeding to which

1    you have been or are a party.  I'm going to focus on your
2    answer.  I have no criminal record.  I'm going to stop
3    there or pause there.  By criminal record, when you put
4    that there, did you mean a criminal conviction?  Do you
5    have any criminal convictions?
6 A    No, sir.
7 Q    Okay.
8 A    My response -- so not being a lawyer and trying to answer
9    this to the best of my ability --
10 Q    Well, let me stop you there because I just want to focus
11    on one thing.
12 A    Okay.
13 Q    You have no criminal convictions.
14 A    That is correct.
15 Q    Okay.  And so when you say I have no criminal record, just
16    to be specific, is another way of saying that you have no
17    criminal convictions?
18 A    Correct.
19 Q    Brother counsel brought out a lot of documents from Wayne
20    County Circuit Court, a civil case.  Did any of those
21    things that he talked about result in a criminal
22    conviction for you?
23 A    No.
24 Q    Okay.  So when you said I have no criminal record, is that
25    an honest answer?



Page 110

1  A   Yes.

2  Q   Okay.  You do have a -- you had a speeding -- when you say

3      I have a speeding ticket from about 12 years ago that I

4      can remember, was that accurate?

5  A   **That's what I can remember.**

6  Q   If you had other -- at the time you answered this

7      question, any other civil infractions that you had, civil

8      cases, or dismissed criminal cases, at the time that you

9      answered this interrogatory, could you remember those

10     things?

11 A   **No, I couldn't.**

12 Q   All right.  You understand that anytime a person is

13     involved in a civil case or a criminal case, a record is

14     produced, there's some documents somewhere evidencing

15     that?

16 A   **No.  Yes and no.  Like, again, I'm not an attorney.  So**

17     **I'll use the American Express for example.  What I**

18     **remember is hey, do you want to settle?  Yeah, let's**

19     **settle it.  Okay.  Settle it, send this in, send that in,**

20     **we'll send you a new American Express card.  I had no idea**

21     **it was a lawsuit.  Like, I don't -- so when he presented**

22     **that, I was unfamiliar with that.  So.**

23 Q   You never went to court on that American Express case?

24 A   **No, sir.**

25 Q   You never hired a lawyer for that American Express case?

Page 111

1  A   **No.**

2  Q   You never had to stand in front of a judge for that

3      American Express case?

4  A   **No.**

5  Q   It was a civil case, you were never placed in handcuffs or

6      got a mugshot as a result of that case.

7  A   **No.**

8  Q   Okay.  No other questions.

9          MR. WAYNE:  I have nothing on redirect.

10         (At 2:00 p.m. deposition concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1              CERTIFICATION

2  STATE OF MICHIGAN   )

3  COUNTY OF OAKLAND   )

4      I certify that this transcript, consisting of 112

5  pages, is a complete, true, and correct record of the

6  testimony of Jonathan Edison, taken in this case on

7  Wednesday, December 13, 2023.

8      I also certify that prior to taking this

9  deposition, Jonathan Edison was duly sworn to tell the

10 truth.

11     I also certify that I am not a relative of,

12 employee of, or an attorney for a party; nor am I

13 financially interested in the action.

14

15

16

17 Megan Price, CER 9296

18 Notary Public

19 Macomb County Michigan

20 My Commission Expires: 03/29/2026

21

22

23

24

25















HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100







HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100





















UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN EDISON,

      Case No.

      Plaintiff,

      Hon.

v.

NOTHVILLE TOWNSHIP, a municipal corporation,
POLICE OFFICER BEN SELLENRAAD, in his professional
and individual capacities, FADIE JAMIL KADAF, and
JEAHAD KADAF,

      Defendants.

_____/

THOMAS H. RANDOLPH, III (P53563)
RANDOLPH LAW GROUP, P.C.
Attorney for Plaintiff
6330 East Jefferson Avenue
Detroit, MI 48207
(248) 851-1222; Fax (248) 254-6534
thomas@randolphlawgroup.com
_____/

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff Jonathan Edison, by and through the undersigned counsel Randolph Law Group,

PC, sues Defendant BEN SELLENRAAD, in his official and individual capacity as Northville

Township Police Officer, NORTHVILLE TOWNSHIP, FADIE JAMIL KADAF and JEAHAD KADAF, and

alleges as follows:

### INTRODUCTION

1. This is a free-speech case on behalf of Plaintiff Jonathan Edison who is a Black resident of

Northville Township for 13 years, which based upon the 2020 United States Census, has a Black

population of 1.5%. On or about October 21, 2022 Edison was charged with violation Michigan

1

Compiled Laws 750.390, Malicious Annoyance by Writing, for writing letters to his next-door neighbor, Defendant Fadie Jamil Kadaf, listed in police documents as White, that contain profanity and other non-obscene words.

2. Defendant Northville Township's prosecution of Edison was prompted, in part, by persistent complaints by Defendant Fadie Jamil Kadaf, who made various untrue statements in furtherance of a quest to target Mr. Edison. Mr. Kadaf also initiated spurious complaints against Edison with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives and the Michigan Department of Natural Resources for completely legal behavior in a campaign of harassment and intimidation. Those bogus complaints were briefly investigated but abandoned when apparently found to be unmeritorious.

3. Before Edison was wrongfully prosecuted, Defendant Sellenraad informed Defendant Fadie Jamil Kadaf emphatically, more than a dozen times, that Edison, by writing letters to Kadaf about how cars are parked, had broken no laws and was within his rights to do so. Two of these exchanges between Kadaf and Sellenraad were captured on video and provided to Plaintiff. In spite of Sellenraad's articulated knowledge that Edison had broken no laws, Sellenraad signed the Complaint initiating the Malicious Annoyance by Writing charge against Edison.

4. On May 23, 2023 Judge Gerou of Michigan's 35th District Court dismissed the charge against Edison, finding that Edison's language was not obscene. Unfortunately for Mr. Edison, this dismissal came after the unconstitutional actions against caused significant and lasting damage. Mr. Edison has pecuniary expenses and losses. Mr. Edison suffered embarrassment, humiliation, emotional distress and other harms and losses having been made a criminal defendant and faced with jail, including his reputation. Mr. Edison is an author of children's

books and other publications with hundreds of thousands of books sold, a speaker to educators and administrators throughout the United States. A conviction of the crime for which he was charged would have destroyed his business, reputation, and income. The stress associated with the wrongful prosecution is tremendous and sustained.

## JURISDICTION AND VENUE

5. This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiff also brings state claims for violation of Article I, Section 5 of the Michigan Constitution and other state law claims.

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

7. This Court has authority to award the requested damages under 28 U.S.C. § 1343(a)(3), and costs and attorneys' fees under 42 U.S.C. § 1988.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all events underlying the claims in this Complaint occurred within the Eastern District of Michigan and all Defendants reside in this District.

9. Plaintiff demand a jury trial on the claims raised in this Complaint.

## PARTIES

10. Plaintiff Jonathan Edison is a resident of Wayne County, Michigan

11. Defendant Fadie Jamil Kadaf is a resident of Wayne County, Michigan

12. Defendant Jeahad Kadaf, upon information and belief, is a resident of Dearborn, Michigan.

3

13. Upon information and belief, Defendant Ben Sellenraad is a resident of Wayne County, Michigan and employed as a police officer by the Northville Township Police Department in Michigan. At all times relevant hereto, Defendant Sellenraad acted under color of state law. He is sued in his official and individual capacities.

14. Northville Township is a municipality in Michigan.

## COMMON ALLEGATIONS

15. This case arises out of a neighborhood dispute in the Steeple Chase subdivision. Jonathan Edison's next-door neighbor, Kadie Jamil Kadaf, or a member or guest of his household, apparently parked a vehicle or vehicles on the street in front of Edison's home.

16. Edison wrote a note to Kadaf asking him to "please park your cars in front of your house".

17. Kadaf responded with his own note, indicating that he may park in front of Edison's home and to not ask for the cars to be moved.

18. Edison then typed a letter to Kadaf, this time more pointed and direct, about on-street parking in front of the Edison home and asking that he not park there and utilizing common profanity words for emphasis without making any threats to person or property.

19. On Friday, September 23, 2022, Kadaf took the typed letter into the Northville Township police department and spoke with Defendant Officer Ben Sellenraad, who was equipped with an activated operable body-worn camera.

20. During this encounter, Kadaf described his previous interactions with Edison as "fairly cordial...most of the time, never had any real issues."

21. Kadaf tells Defendant Sellenraad that he feels threatened, although the letter contains no threats.

4

22. Kadaf complains that Edison is a gun owner – although there is no reported verbal or written threats, brandishing or menacing conduct with a weapon.

23. Kadaf complains of a "racial undertone" in the letter although race is not mentioned, nor do the letters contain any racial slurs or epithets.

24. Sellenraad, after reading the first two letters, tells Kadaf: "There's no threats to harm your property. There's nothing that would escalate to a criminal nature. Expletives and those kind of things are not enforceable from a legal standpoint or anything else."

25. Sellenraad, again, goes to the text of the letters, and reiterates: "there's nothing in there that constitutes any threat. He's basically saying -- you can interpret that however you want, but there's nothing in there that actually says, you will be damaged or you will be harmed."

26. Sellenraad goes on to say "from a prosecutable standpoint, there's nothing."

27. Sellenraad does not indicate that he finds the letter obscene or containing words banned by the government, and then says "So as I say, from an authority standpoint, there's nothing from a police in the purest sense of the word, a police law enforcement standpoint that there is to do."

28. Edison later receives notification that a letter has been directed to him by Defendant Fadie Kadaf's brother, Defendant Jeahad Kadaf.

29. Edison responded by issuing a third letter to Kadaf, containing first-amendment protected profanity, asking to be left alone and to not be contacted again.

30. On October 12, 2022 Fadie Kadaf returns to the Northville Township police lobby and spoke to Sellenraad, recorded by a body-worn camera complaining of the third letter.

5

31. Kadaf threatens to handle the situation in his own way and to contact the Northville City Attorney and Wayne County Prosecutor for what he described as "threatening letters", although the letters contain no threats of physical harm or property damage.

32. Defendant Sellenraad explained the legal restraint on the government preventing it from targeting a person for expressing ideas.

33. Defendant Sellenraad tells Kadaf "We can't do anything that we don't have the authority to do."

34. Defendant Sellenraad tells Kadaf "I cannot charge someone for noncriminal behavior."

35. Defendant Sellenraad tells Kadaf "But if we're not talking about a situation where there's a violation of law. Then I can't charge someone. I can't submit something that's not criminal in its nature to a prosecutor to review."

36. Defendant Sellenraad tells Kadaf "The cursing, he's allowed to use. "

37. Defendant Sellenraad tells Kadaf "Using certain terms or those kind of things in and of itself is not criminal."

38. Defendant Sellenraad tells Kadaf "And a letter, cursing or otherwise, all caps or otherwise, there are things that we use to communicate tone and that kind of stuff, but does not make it criminal."

39. Defendant Sellenraad tells Kadaf "I have told you there is nothing that constitutes a criminal threat."

40. Defendant Sellenraad tells Kadaf "I... he has not broken the law. He's cursed and he's asked you to leave him alone."

41. In spite of these repeated and very strenuous admonitions by Northville Township Police Officer Sellenraad to a determined Kadaf, Sellenraad was enlisted to sign a criminal Complaint charging Edison with violation of a 1931 statute Michigan statute MCL 750.390.

42. At an evidentiary hearing on February 27, 2023 demanded by Edison, the prosecution agreed to reveal exactly what words allegedly written by Edison are obscene. Northville Township municipal prosecutor Gregory Demopoulos identified the following words, and only the following words, as obscene pursuant to MCL 750.390:

> Fuck
> Fucking
> Motherfucker
> Pussy
> Douche
> Asshole

43. The prosecution also admitted that the portion of MCL 750.390 pertaining to "intent to extort or gain any money or property of any description belonging to another" is inapplicable to Mr. Edison.

44. Upon motion from Edison, the court determined that none of the letters from Edison to the Kadaf do not meet the definition of obscene language that is the contested element of the statute Defendant has been charged under.

### COUNT I - VIOLATION OF FIRST AMENDMENT, AS APPLIED TO THE STATES UNDER THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 (AGAINST DEFENDANTS NORTHVILLE TOWNSHIP AND BEN SELLENRAAD)

45. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this Complaint.

46. Defendants Northville Township and Sellenraad deprived Plaintiff of the rights secured to him by the United States Constitution.



47. In depriving Plaintiff of these rights, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

## COUNT II - VIOLATION OF ARTICLE I, SECTION 5 OF THE MICHIGAN CONSTITUTION
### (AGAINST DEFENDANTS NORTHVILLE TOWNSHIP AND BEN SELLENRAAD)

48. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this Complaint.

49. Defendants deprived Plaintiff of the rights secured to him by the Michigan Constitution.

50. Defendants' above-described conduct violated Plaintiff's right to freedom of speech under Article I, Section 5 of the Michigan Constitution.

## COUNT III - MALICIOUS PROSECUTION (AGAINST BEN SELLENRAAD)

51. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this Complaint.

52. Defendant instituted and initiated the allegations of criminal activity against Plaintiff without probable cause and with malice.

53. On information and belief, Defendant instituted the investigation for personal reasons, which include, but are not limited to, the following: vexation; to cause damage to Plaintiff's professional reputation, and to cause damage to Plaintiff's community reputation.

54. MCL 600.2907 provides for civil liability for every person who, for vexation or trouble or with malice, causes another to be arrested, attached, or in any way proceeded against by any process of civil or criminal action without that person's consent.

8

55. The criminal proceedings initiated against Plaintiff arising from Defendant Northville Townships prosecution of Plaintiff was resolved in Plaintiff's favor.

56. As a direct result of Defendant's malice in making allegations that initiated the criminal investigation, Plaintiff has suffered damage, including, but not limited to, harm to his professional reputation and his reputation in the community, and mental anguish.

57. PLAINTIFF REQUESTS that this court enter judgment against Defendants for damages consistent with the injuries suffered, costs, and attorney fees as the court deems proper.

## COUNT IV - CIVIL CONSPIRACY
## (AGAINST FADIE JAMIL KADAF AND JEAHAD KADAF)

58. Plaintiff incorporates by reference previous paragraphs.

59. Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of intimidating, silencing and inflicting emotional distress upon Edison.

60. Defendants, in combination, maliciously conspired to have unfounded criminal charges filed against Edison.

61. This conspiracy resulted in the illegal, unlawful, or tortious activity of having Plaintiff charged with a criminal offense, having unwarranted investigations by the Michigan Department of Natural Resources and the BATFE.

62. As a result of the conspiracy and Defendants' illegal, wrongful, or tortious acts, Plaintiff sustained damages.

## COUNT V - DEFAMATION (AGAINST FADIE JAMIL KADAF)

63. Plaintiff incorporates by reference previous paragraphs.

64. The accusations that Plaintiff threatened Fadie Jamil Kadaf are false.

9

65. The accusations that Plaintiff is mentally unstable are false.

66. The accusation that Edison is racist is untrue.

67. The accusation that the facts stated in Edison's letters to Kadaf are false is untrue.

68. Defendant published the remarks to third parties with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

69. The publication was not privileged.

70. The publication of these remarks has resulted in damage to Plaintiff's reputation in the community and economic loss, including, but not limited to, the following: emotional distress; humiliation, mortification, and embarrassment; sleeplessness and anxiety, and; other damages that may arise during the course of discovery and the course of this trial.

71. Defendant's accusations were defamation per se.

**WHEREFORE,** the Plaintiff, Jonathan Edison, demands judgment against the Defendants for:

a) Compensatory damages for all past and future economic losses and expenses incurred by the Plaintiff as a result of the Defendants' misconduct;

b) General damages for all past and future physical pain, mental suffering, and emotional distress suffered by the Plaintiff;

c) Punitive damages to the fullest extent permitted by law;

d) Pre-judgment and post-judgment interest;

e) Declare that the Defendants' acts, taken in their official capacities, as alleged above, violate the First Amendment to the United States Constitution;

f) Declare that the Defendants' acts, taken in their individual capacities, as alleged above, violate the First Amendment to the United States Constitution;

g) Order the Defendants to adopt and implement policies, training, accountability systems, and practices to remedy the constitutional and statutory violations described herein;

h) Costs incurred in this action and reasonable attorney fees under 42 U.S.C. §1988; and

i) Such other further specific and general relief as may become apparent from discovery as this matter matures for trial.

Respectfully submitted,

RANDOLPH LAW GROUP, P.C.

/s/ Thomas H. Randolph, III
THOMAS H. RANDOLPH, III (P53563)
Attorney for Plaintiff
6330 East Jefferson Avenue
Detroit, MI 48207
(248) 851-1222; Fax (248) 254-6534
Dated: July 19, 2023          thomas@randolphlawgroup.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN EDISON,                                    Case No.

        Plaintiff,                          Hon.

v.

NOTHVILLE TOWNSHIP, a municipal corporation,
POLICE OFFICER BEN SELLENRAAD, in his professional
and individual capacities, FADIE KADAF, and
JEAHAD KADAF,

        Defendants.
_____/

THOMAS H. RANDOLPH, III (P53563)
RANDOLPH LAW GROUP, P.C.
Attorney for Plaintiff
6330 East Jefferson Avenue
Detroit, MI 48207
(248) 851-1222; Fax (248) 254-6534
thomas@randolphlawgroup.com
_____/

### PLAINITFF'S DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, JONATHAN EDISON by and through his attorney, RANDOLPH LAW

GROUP, P.C., by THOMAS H. RANDOLPH, III, and hereby demands trial by jury in the above

entitled cause of action.

                Respectfully submitted,

                RANDOLPH LAW GROUP, P.C.

                /s/ Thomas H. Randolph, III_____
                THOMAS H. RANDOLPH, III (P53563)
                Attorney for Plaintiff
                6330 East Jefferson
                Detroit, MI 48207
                (248) 851-1222; (248) 254-6534 Fax
Dated: July 19, 2023        thomas@randolphlawgroup.com



DocuSign Envelope ID: E4517EE1-F22A-4025-87D6-16760DE54B59

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JONATHAN EDISON,

           Plaintiff,

v.

NORTHVILLE TOWNSHIP, a municipal corporation,
POLICE OFFICER BEN SELLENRAAD, in his
professional and individual capacities, FADIE JAMIL KADAF,
and JEAHAD KADAF,

           Defendants.

Case No. 23-cv-11741
Hon. Judith E. Levy

---

### PLAINTIFF'S ANSWERS TO DEFENDANTS NORTHVILLE TOWNSHIP AND POLICE OFFICER BEN SELLENRAAD'S INTERROGATORIES TO PLAINTIFF PURSUANT TO FED. R. CIV. P. 33

NOW COMES Plaintiff, Jonathan Edison, by and through his attorney, Randolph Law Group, P.C., and for answers to Defendants Northville Township and Police Officer Ben Sellenraad's Interrogatories to Plaintiff Pursuant to Fed. R. Civ. P. 33, state the following:

### INSTRUCTIONS

1.    For each document or other information that you assert is privileged or for any other reason excludable from discovery, please identify that document or other requested information. State the specific grounds for the claim of privilege or other ground for exclusion. Also, for each document, state the date of the document, the name, job title, and address of the person who prepared it; the name, address, and job title of the person to whom it was addressed or circulated or who saw it; the name, job title, and address of the person now in possession of the document; and a description of the subject matter of the document.

2.    For any requested information about a document that no longer exists or cannot be

located, identify the document, state how and when it disappeared. Also, identify each person having knowledge about the disposition or loss and identify each document evidencing the existence or nonexistence of each document that cannot be located.

3.      If objection is made, the reasons therefore shall be stated.

## DEFINITIONS

As used herein, the following terms shall have the following meanings, unless the context requires otherwise:

1.      **"Plaintiff"** or **"Edison"** means Plaintiff or Plaintiff's agents, representatives, and all other persons acting in concert with, or under control, whether directly or indirectly, excluding Plaintiff's attorney.

2.      **"Defendants"** means Defendants or Defendant's agents, representatives, and all other persons acting in concert with, or under control, whether directly or indirectly, excluding Defendant's attorney.

3.      **"The Township"** means Defendant Northville Township or its agents, representatives, and all other persons acting in concert with, or under control, whether directly or indirectly, excluding its attorney.

4.      **"Sellenraad"** means Defendant Police Officer Ben Sellenraad or his agents, representatives, and all other persons acting in concert with, or under control, whether directly or indirectly, excluding his attorney.

5.      **"The Northville Defendants"** means Defendants Northville Township and Police Officer Ben Sellenraad, collectively.

6.      **"You"** or **"your"** means **Plaintiff** or Plaintiff's successors, predecessors, divisions, subsidiaries, present and former officers, agents, employees, and all other persons acting on behalf

DocuSign Envelope ID: E4517EE1-F22A-4025-87D6-16760DE54B59

of Plaintiff, successors, predecessors, divisions, and subsidiaries.

7.     **"Document"** or **"Documents"** means all written, typed, or printed matter and all magnetic or other records or documentation of any kind or description (including, without limitation, letters, correspondence, telegrams, memoranda, notes, records, minutes, contracts, agreements, records, or notations of telephone or personal conversations, conferences, inter-office communications, E-mail, microfilm, bulletins, circulars, pamphlets, photographs, facsimiles, invoices, tape recordings, computer printouts and work sheets), including drafts and copies not identical to the originals, all photographs and graphic matter, however produced or reproduced, and all compilations of data from which information can be obtained, and any and all writings or recordings of any type or nature, in your actual possession, custody, or control, including those in the possession, custody, or control of any and all present or former directors, officers, employees, consultants, accountants, attorneys, or other agents, whether or not prepared by you.

8.     **"File"** means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

9.     **"Person"** means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

10.     **"Relating to"** and **"relates to"** mean, without limitation, embodying, mentioning, or concerning, directly or indirectly, the subject matter identified in the request.

11.     **"Concerning"** means, in whole or in part, directly or indirectly, referring to, relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, and constituting.

DocuSign Envelope ID: E4517EE1-F22A-4025-87D6-16760DE54B59

12.     **"Communication"** means any oral or written communication of which Plaintiff has knowledge, information, or belief.

13.     **"Date"** means the exact date, month, and year, if ascertainable, or, if not, the *best available approximation*.

14.     **"Describe"** or **"identify,"** when referring to a document, means you must state the following:

      a.      The nature (e.g., letter, handwritten note) of the document and/or communication;

      b.      The title or heading that appears on the document and/or communication;

      c.      The date of the document and/or communication and the date of each addendum, supplement, or other addition or change;

      d.      The identity of the author and of the signer of the document, and of the person on whose behalf or at whose request or direction the document was prepared or delivered;

      e.      The present location of the document, and the name, address, position or title, and telephone number of the person or persons having custody of the document.

15.     The word **"and"** means "and/or."

16.     The word **"or"** means "or/and."

17.     **"Incident"** refers to all the alleged violations of Plaintiff's constitutional rights, generally, as pleaded in Plaintiff's Complaint.

## INTERROGATORIES

**Please note if you reasonably claim any of the requested information in these Interrogatories is private, is a trade secret, proprietary, or otherwise protected, we will agree to a reasonable protective order prohibiting disclosure outside of this lawsuit or for other litigations.**

DocuSign Envelope ID: E4517EE1-F22A-4025-87D6-16760DE54B59

1.    In as much detail as possible, please state the legal and factual basis for your claims that the underlying criminal matter caused "significant and lasting damage," that you have "pecuniary expenses and losses," and that you "suffered embarrassment, humiliation, emotional distress and other harms and losses having been made a criminal defendant and faced with jail, including [your] reputation."

**ANSWER:**

**EMBARRASSMENT:**

My family was completely embarrassed because as soon as this charge was filed against me my neighbors kid went to school and told several of his classmates that his **dad "was sending me to jail"**. This devastated and embarrassed my family and my daughter tremendously. Not to mention the rumors to follow. Of course, you can only imagine how quickly this rumor spread throughout the school.

This of course led to whispers, gossip and public ridicule within my community and neighborhood without people knowing from our neighborhood knowing anything about the case or the facts surrounding it.

**HUMILIATION:**

When I received the summons, I immediately felt publicly criticized, ridiculed, and shamed by the Prosecutor, the Township and Police Department. I also felt de-valued as a human being. As an African American man, all my life I've been told to do the right things, stand up justice, stand up for the flag, be proud of your country, go to school and get a good education and become a productive member of society and you will enjoy the freedoms of this country because under the law all men and women are created equal. But, this summons quickly reminded me why I STILL CAN'T BREATH as a Black Man (metaphorically). This summons delivered by the Prosecuting Attorney and Officer Sellenraad destroyed my dignity, my self-worth as a human being, a man and a person of color. I felt like I was being taken to the "whipping post" by a cruel and mean MASTER who was upset with one of his slaves that go out of line on his plantation. Meanwhile, the prosecutor enjoys that benefits complete immunity no matter the outcome or who he hurt emotionally, psychologically, and spiritually in the process. This summons that was signed by Officer Sellenraad and executed by Prosecutor Demopoulos was an opportunity to publicly HUMILIATE me in front of (**Fadie Kadaf and Jehad Kadaf his brother and attorney**) and to show the world that he had the power to keep Black men that get out of line in Northville Township in check or they would be subject to a public lashing to discourage any other Black men from speaking boldly. The message that was conveyed says, regardless of what the law indicates, a white man in America has the authority to humiliate anyone he wants by bringing false charges on them to force them to defend themselves in a court of law WITH NO CONSEQUENCES!

**EMOTIONAL DISTRESS:**

**Lack of Enjoyment:** I was served this notice several days before Thanksgiving and during the Holiday Season and it sent me into an emotional downward spiral during a time that is supposed to be filled with love, joy and enjoyment and peace.

Sex Life with my spouse ruined: Before this event my wife and I would enjoy love making love 4-5 times a week. After I received that notice from the Prosecuting Attorneys Office and Northville Township our love making came to a complete halt! This charge destroyed our vibrant sex life and it destroyed our close intimate relationship as a couple. Because I couldn't sleep as I was nervous all the time my wife forced me to sleep downstairs on the couch.

Children: My relationship with my children suffered tremendously due to these events. I no longer had the energy or the stamina to care for them and be there for them like I normally did prior to this event. My mood was low, and I was in a constant depressed state of being.

**Sleep Deprivation:** After receiving the summons from the Prosecutors Office, I was in a constant state of disbelief, worry, fear and I was sleep deprived for 5 months until it was resolved. I was so stressed out that I could not sleep for more than 2-3 hours a day and I become an insomniac because of it. My mind was completely consumed with the idea that I was about to lose my freedom and how this would destroy my life, my family, and my business.

**Rapid Weight loss:** Because of the emotional stress and mental torment that was caused by this event I lost over 30 lbs during the months of December-February.
I couldn't digest food properly, I had no appetite and I could barely eat because of the stress of NOT KNOWING … what the future held because for the first time in my life I was being made a criminal defendant in a proceeding.
**Hair Loss:** Due to the stress of this event my hair began to fall out noticeably and has not grown back.

**Depression:** After being charged and made a criminal defendant I feel into a deep depression. I had a very low mood, I felt worthless, I felt like my world was coming to an end. I felt like committing suicide because of the crippling anguish that I was experiencing. I was irritable and restless all the time which made me withdraw from my family, my friends and my creativity as an Author and Creator of Curriculum.

**Excessive Stress Drinking**
The stress of this even drove me to excessive drinking and self-medicating.
I was in a constant brain fog caused by this event. The only way that I could calm my nerves would be to drink at night. Then when the reality set in on me that I was facing jail time it became too much for me to handle so I began drinking every day to numb the thoughts and images of being locked up behind bars.

**PTSD:** Based upon the previous actions of the Northville Township Police Department, the Prosecuting Attorney's Office of Northville and Officer Ben Sellenraad I no longer feel safe from

DocuSign Envelope ID: E4517EE1-F22A-4025-87D6-16760DE54B59

the people that have sworn to uphold an oath to serve and protect. I have lived in Northville Township for over 13 years without incident and now I have developed a deep fear of what might or might not happen from the Police Department. Every time, I drive into Northville Township from a neighboring suburb I experience mental anguish and my stomach sinks because I am immediately traumatized all over again with the haunting thought Northville is a small predominately white community and 95% of the their Police Force is white and what if Officer Sellenraad pulls me over? Is he going to try and retaliate against me? Or since the Prosecuting Attorney has full immunity what new fake charges might they come up with if Officer Sellenraad pulls me over. To say the least, I am fearful of the Northville Township Police Department and the Prosecuting Attorney's Office. The irony is through payment of my taxes I contribute to both of their salaries. So in essence I'm paying to be traumatized and to feel unsafe in a community that I've been living in for over 13 years.

**REPUTATION:**

My reputation was destroyed because my neighbor called me a week before I received the summons in the mail and told me that I was about to have some legal problems and that I should meet with her about it. I told her that I didn't have any legal problems or any problems at all in my life and then the following week I received the summons in the mail charging me with a crime. If my neighbor, who I hadn't spoken too in over 3 years knew about this BEFORE I DID, I can only imagine how many other people know about this incident which has destroyed my reputation with them for no reason.

**Pecuniary Expenses and Losses:**

But due this charge I was forced to cancel a very lucrative 10 City Tour that included book sales, appearances, and performances my children's book character John-John. I was too depressed to complete the tour.

Also: Because of the emotional distress I wasn't able to complete a new book that I was working on the 9 Pathways of Success. I was in the middle of the editing process, and I lost my deposit because I didn't complete it. I was too stressed to write and finish the work.

2.      Please describe in detail, and with specificity, the damages you are seeking in this action,

itemizing each specific category of damages sought, and for each itemized category identify all

facts and documents relating to your itemization of damages.

**ANSWER:**    Plaintiff is still in the process of calculating damages.

DocuSign Envelope ID: E4517EE1-F22A-4025-87D6-16760DE54B59

3.      Please state each and every fact you rely upon in support of the allegations within each

count of the Complaint in which the Township or Sellenraad are named or referenced.

**ANSWER:**

Regarding First Amendment Violations (Counts I & II):

- Fact: Jonathan Edison, the plaintiff, wrote letters to his neighbor containing profanity but not obscenities, exercising his First Amendment right.

- Fact: Despite being informed by Defendant Sellenraad that Edison's actions did not constitute a violation of the law, the Township proceeded with charges against Edison.

Regarding Malicious Prosecution (Count III):

- Fact: Edison was charged with Malicious Annoyance by Writing under Michigan Compiled Laws 750.390 despite the absence of any legal basis for such charges as indicated by Sellenraad's initial assessment and by case law.

- Fact: The charge was dismissed by Judge Gerou, indicating a lack of probable cause for the prosecution.

General Facts:

- Fact: Edison has been a resident of Northville Township for 13 years.

- Fact: Edison is an author and speaker, and the wrongful prosecution adversely affected his reputation and professional life.

- Fact: Officer Sellenraad, at various points, communicated to the complainant, Fadie Jamil Kadaf, that Edison's conduct was not criminal.

- Fact: Despite these communications, Sellenraad later signed a complaint initiating charges against Edison knowing the allegation to be false.

4.      Excepting the instant proceedings, please state the case number, caption, disposition, and

a summary regarding any criminal, civil, or administrative proceeding to which you have been or

are a party.

**ANSWER:** I have no criminal record or civil or administrative proceedings.  I have a speeding

ticket from about 12 years ago that I can remember.

5.      If you are currently employed, please provide all information regarding your current

employer, including start date, job title, and name of supervisor. If not employed, please provide

your most recent dates of employment and reason for leaving. To the extent you classify yourself

as working but not an employee of any business, please provide a detailed description of your working status, including the aforementioned information.

**ANSWER:** I am not "employed". I am the owner of Brain Works Training, LLC a motivational, training and development company. I have been the owner for the past 10 years.


6.      In your own words, please provide a detailed description of the events alleged in your Complaint.

**ANSWER:** This all began with me asking my neighbor to park his cars in front of his house and his driveway. I left a note on the rental car that was left in front of my house for nearly a week. He soon sent me a letter and told me that I was rude and that he could park in front of my home and if he parked in front of my house, to NOT ask him to move his cars because he could do what he wanted.      I took exception to his rudeness and responded with my own letter to him which Defendant possesses. After that letter, I was contacted by the Northville Police Department - Officer Sellenraad to be exact.

I spoke with Officer Sellenraad at length (over an hour by phone) about the situation and what was going on. He advised me to keep a cool head and I agreed. He also shared with me during that conversation that while my letter used profanity, all caps and some choice words that I had done nothing wrong in the eyes of the law.

He also shared with me that situations like this can easily get out of hand and that I should just let it go and try to be a good neighbor. I agreed with him because I shared with him that I was a pretty easy going person and a Motivational Speaker that travels across the world inspiring people to become their best selves. I also shared with him that I was on my way to the Michigan game and that me and son were sitting on the 50 yard line and that my life was pretty much perfect and I wasn't interested in any additional problems with my neighbor.

Before we got off the phone, he shared Fadie Kadaf's concerns with me, and he said that he told him to let it go and not to contact me again and it would soon die down. I replied ok I'm going to let it go and I don't have anything else to say about it, I just wanted to be left alone.

Several weeks later, just when I thought it was all over, I received a certified letter from a law firm from someone with the last name Kadaf. I refused the letter and immediately called the Northville Police to speak with officer Sellenraad at the Northville Police Department. When I spoke to him about what had happened, I asked him why was I still receiving anything from Kadaf because I thought it over. I told him that I felt like I was being harassed and because I did not want Kadaf contacting me by mail or in person. Officer Sellenraad's response was "Sorry Mr. Edison, Kadaf and his attorney did not break the law because in the United States of America anybody can send anybody ANTHING!" As long as it's non threating. I asked him if he could do anything about it

and he said no because he had a right to send me anything as long as I wasn't being threatened. I told him fine! If anybody can send anything and you're not going to do anything about it, I will send him another letter.

So I wrote a third letter demanding that Kadaf stop contacting me and leave me alone. He took that letter to the Northville Police Department and showed it to Officer Sellenraad and then I received a visit to my home by Officer Micek and then I received another call from Officer Micek and I told him that I didn't have anything else to say about the situation and I was demanding to be left alone. Several weeks went by and then I received a knock on my door from Officer Luther who worked for the DNR he said that he had received a complaint that I was poisoning the animals in Northville and raising livestock in my back yard. (Which was a complete LIE). In Officer Luther's findings he said that all I had was a bird feeder and that this was a civil matter. I explained to Officer Luther what was going on and he became very irritated because he said when people try to use government agencies to baselessly retaliate against someone it is the worst because there are animals out there that actual need help and assistance. Then several days later I received a call from an ATF Agent questioning if I was going up and down the street chasing kids with a firearm in broad day light (also false). At that point it became crystal clear to me that Kadaf and his brother were, come hell or high water, on a mission to take me down. Then I found out several days later that Kadaf's brother, the attorney, was harassing my HOA with letters making up allegations saying that I was in violation and demanding my personal records. Then a few weeks later my wife received a strange message from Attorney Esther Acosta requesting my contact information. She also went to my website and sent me a direct text asking me to contact her.

I received a phone call from Attorney Esther Acosta later that evening in saying "I heard about what's going on… you're about to have some serious legal problems" I told her that I didn't have any legal problems and I had done nothing wrong according to the First Amendment and Officer Sellenraad from the Northville Police Department. She asked me to come and see her at her office and I declined. She tried to explain to me that it was really serious and that I should listen to her and I declined. She asked me to stop by her house to discuss the situation that evening and I declined to do so.

Two weeks later I received a summons in the mail charging me with Malicious Annoyance by Writing, a crime that is punishable up 90 days in jail.

7.    In your own words, and in as much detail as possible, please state with particularity what

the Northville Defendants did to violate your rights as described in the Complaint, and what the

Township and Sellenraad should have done differently to avoid liability in the instant case.

**ANSWER:**

> Actions of Northville Defendants: The Northville Defendants, particularly Officer Ben Sellenraad, pursued criminal charges against me for exercising my right to free speech, which is protected under the First Amendment. Despite acknowledging that my letters to

my neighbor, Fadie Jamil Kadaf, contained no threats or criminal content, Officer Sellenraad proceeded to sign a complaint against me for Malicious Annoyance by Writing. This act was a knowing infringement upon my constitutional right to free expression.

Alternative Action to Avoid Liability: Officer Sellenraad and Northville Township should have refrained from initiating criminal proceedings given the non-criminal nature of my conduct as per Sellenraad's initial assessment. Although he is not an attorney, Sellenraad's assessment of my culpability, as captured on his body-worn camera, was correct. Respecting my right to free speech, especially after acknowledging the lack of any criminal threat or content in my communications, would have been in line with constitutional obligations.

The initiation of criminal proceedings against me was done without probable cause, as evidenced by the subsequent dismissal of the charge by Judge Gerou. There was no legal basis for the charge, and it was pursued with a disregard for my legal rights.

Alternative Action to Avoid Liability: The Township and Officer Sellenraad should have conducted a thorough and unbiased review of the complaint against me, properly considering his sage admonition to Kadaf that the content of my letters did not constitute a crime. Abstaining from pursuing baseless legal action would have avoided infringing on my rights and any subsequent potential liability.

General Considerations:
Overall Conduct: The actions of the Northville Defendants demonstrated a lack of due regard for my constitutional rights and a failure to uphold the standards expected of law enforcement and municipal authorities.
Recommendations for Alternative Conduct: The Township and Officer Sellenraad should have upheld the principles of fairness and justice by not pursuing charges where there was a clear lack of legal basis. Upholding constitutional rights and avoiding actions that constitute an abuse of power would have been the appropriate course of action.

This response reflects my understanding of the events and actions that led to the violation of my rights, as detailed in the complaint filed. It is my position that the actions of the Northville Defendants were unjust and in violation of my constitutional rights, and that alternative, lawful actions could have prevented this situation.

8. In your own words, and in as much detail as possible, please describe the Northville

Defendants' role in your prosecution and why they, not the prosecutor, is responsible for allegedly

violating your rights under the Michigan and U.S. Constitutions.

**ANSWER:** Objection, the question calls for a legal conclusion and is beyond Plaintiff's knowledge. Without waiving said objection the Sixth Circuit has established that for a municipal entity to be liable for a violation of § 1983, which includes the violation of constitutional right to

free speech, a Plaintiff must establish a deprivation of a constitutional right and that the municipal entity is responsible for that deprivation.

9. In your own words, and in as much detail as possible, please state why you agreed to dismiss Defendants Fadie Jamil Kadaf and Jeahad Kadaf from the instant action.

**ANSWER:** Other Defendants were dismissed to focus on the strongest portions of my case.

10. In your own words, and in as much detail as possible, please explain how you came to form the belief that, as alleged in Paragraph #53 of the Complaint, you asserted that "[o]n information and belief, Defendant instituted the investigation for personal reasons, which include, but are not limited to, the following: vexation; to cause damage to Plaintiff's professional reputation, and to cause damage to Plaintiff's community reputation.

**ANSWER:**

- Before signing the complaint against me, Sellenraad knew that I was a public speaker who works with children, as Kadaf informed him when Kadaf complained about the letters, as captured on video.
- Sellenraad knew that I had done nothing wrong, because he said so multiple times.
- According to the US Census Bureau, Northville Township's Black population is 1.5%.
- Sellenraad signed a Complaint based upon a 1930's statute that, according to the 35th District Court, has never been utilized in a prosecution by Northville Township.
- Based upon the foregoing, it must be presumed that those who chose to prosecute me did so with malice and ill-intent.

11. Please state what proof you have that the Northville Defendants were aware of your occupation, your purported professional reputation, and your purported community reputation.

**ANSWER:** Kadaf complained that Edison has a weapon and "goes into schools". These "facts' were presented by Kadaf as if there was something sinister or illegal about my conduct – so much so he even complained to the ATF about it. A responsible police officer would at least take a preliminary look at the accused party to determine what business he has going into schools. Mr. Edison is a public figure whose work in schools, as an author and public speaker, is discoverable with a simple web search.

I declare under the penalties of perjury that the statements above are true and complete to best of my information, knowledge, and belief.

**Jonathan Edison**

Respectfully submitted,

RANDOLPH LAW GROUP, P.C.

/s/ Thomas H. Randolph, III
THOMAS H. RANDOLPH, III (P53563)
Attorney for Plaintiff
6330 East Jefferson Avenue
Detroit, MI 48207
(248) 851-1222; (248) 254-6534 Fax
thomas@randolphlawgroup.com

DATED:  November 28, 2023

### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all counsel of record or parties appearing in pro per in the above matter at their respective addresses as disclosed on the pleadings of record on November 28, 2023 via:

___ First Class US Mail          ___ Facsimile Transmission          _x_ Email

____E-file using the court's electronic filing system

I declare that the statement above is true to the best of my information, knowledge and belief.

/s/Juanita Coe
Juanita Coe



EXHIBIT

C

12-13-23 J. Edison

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JONATHAN EDISON,

              Plaintiff,

v.

Case No. 23-cv-11741
Hon. Judith E. Levy

NORTHVILLE TOWNSHIP, a municipal corporation,
POLICE OFFICER BEN SELLENRAAD, in his
professional and individual capacities, FADIE JAMIL KADAF,
and JEAHAD KADAF,

              Defendants.

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS NORTHVILLE TOWNSHIP AND POLICE OFFICER BEN SELLENRAAD'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF PURSUANT TO FED. R. CIV. P. 34

NOW COMES Plaintiff, Jonathan Edison, by and through his attorney, Randolph Law Group, P.C., and for his responses to Defendants Northville Township and Police Officer Ben Selleraad's First Request for Production of Documents to Plaintiff Pursuant to Fed. R. Civ. P.34, state the following:

1.    Please produce a copy of any and all witness statements or affidavits in Plaintiff's possession or control related to the allegations in Plaintiff's Complaint.

**RESPONSE: None.**

2.    Please produce a copy of any photographs, videotapes, audiotapes, or diagrams depicting any matter relevant to Plaintiff's claims or damages.

**RESPONSE:   See videos/documents made available to the defense via a download link.**

3.    Please produce copies of any police reports, investigative reports, or similar documents in support of Plaintiff's claims or damages.

**RESPONSE:   See videos/documents made available to the defense via a download link.**

4.    Please produce copies of any and all reports, videos, photographs, or other documents or information created or obtained by any other individuals on behalf of Plaintiff.

**RESPONSE:  None.**

5.    Please produce copies of any and all video, photographs, articles, writings, opinions, reports, or other multimedia documents that Plaintiff intends to use to prove any or all of the allegations alleged in the Complaint.

**RESPONSE:   See videos/documents made available to the defense via a download link.**

6.  Please produce copies of any and all of Plaintiff's medical records or correspondence to or from medical treaters (including mental health treaters) related to any of Plaintiff's claims or damages alleged in the Complaint and execute the attached authorization for release of any and all medical records dating back ten (10) years prior to the date of the events alleged in the Complaint.

**RESPONSE: None.**

7.  Please produce any and all documents or records Plaintiff contends support his answers to the Northville Defendants' First Interrogatories to Plaintiff.

**RESPONSE:   See videos/documents made available to the defense via a download link.**

8.  Please produce any and all reports, documents, or other writings created by any expert witness regarding any issue related to this matter.

**RESPONSE:  None at this time.**

9.  Please produce any and all curriculum vitae for any expert witness who may testify to any issue related to this matter.

**RESPONSE:  Not applicable.**

10.     Please produce a copy of Plaintiff's operator's license (or, if applicable, state identification card) and social security card (with full social security number visible).

**RESPONSE:  see attached.**

11.     Please produce copies of Plaintiff's Forms 1040, *U.S. Individual Income Tax Return* for the tax periods ending 12/31/2022 and 12/31/2021.

**RESPONSE: see attached.**


12.     Please produce copies of Plaintiff's Forms MI-1040, *Individual Income Tax Return* for the tax periods ending 12/31/2022 and 12/31/2021.

**RESPONSE: see attached.**


13.     Please produce any and all evidence that Plaintiff believes supports any and all damages alleged in the Complaint.

**RESPONSE:  Objection. This request is vague.**


Respectfully submitted,

RANDOLPH LAW GROUP, P.C.

/s/ Thomas H. Randolph, III
THOMAS H. RANDOLPH, III (P53563)
Attorney for Plaintiff
6330 East Jefferson Avenue

Detroit, MI 48207
(248) 851-1222; (248) 254-6534 Fax
thomas@randolphlawgroup.com

DATED: November 28, 2023

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all counsel of record or parties appearing in pro per in the above matter at their respective addresses as disclosed on the pleadings of record on November 28, 2023 via:

___ First Class US Mail        ___ Facsimile Transmission        _x_ Email

____ E-file using the court's electronic filing system

I declare that the statement above is true to the best of my information, knowledge and belief.

_____/s/Juanita Coe_____
Juanita Coe

**09/23/2022**

1   Re:   35th District Court

2   Case No. 22-0002887

3   Northville Township v. Jonathan Edward Edison

4

5

6

7   Transcription of video conversation

8   between Officer Ben Sellenraad and

9   Fadie Jamil Kadaf on September 23, 2022.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

09/23/2022

Pages 2..5

Page 2

1 Northville Township
2 Police Department
3 Friday September 23, 2022
4 At Approximately 3:30 p.m.
5
6        OFFICER SELLENRAAD: Hi, sir. I'm Officer
7 Sellenraad. I understand you have some kind of an
8 issue with one of your neighbors; is that correct?
9        MR. KADAF: Yeah.
10        OFFICER SELLENRAAD: Okay. What can I help
11 you out with?
12        MR. KADAF: Well, it started off as something
13 very simple. I don't know what's going on with my
14 neighbor. It's actually a neighbor that we've been
15 fairly cordial with most of the time, never had any
16 real issues.
17        OFFICER SELLENRAAD: Okay.
18        MR. KADAF: I mean, you know, this is
19 somebody who, when we first moved in, their daughter
20 was over our house all the time with my son. You know,
21 when it snowed, I plowed their sidewalk and their
22 apron. They borrowed tools. Very normal neighborly
23 interactions. They left a note on my wife's car. It
24 said, you know, can you please park your car in front
25 of your own house. It was capitalized, underlined,

Page 3

1 like, upset.
2        OFFICER SELLENRAAD: Okay.
3        MR. KADAF: We live in a subdivision where
4 you can park only on one side. And then from time to
5 time, she just meant to go park there for a little bit
6 and then pull the car in. It's not like we do it
7 habitually. So I just wrote him a note and you can
8 read the note. It's very straight forward.
9        OFFICER SELLENRAAD: Okay. This is your
10 response?
11        MR. KADAF: This is my response, correct.
12 And then this is the letter I got in response which is
13 very -- you know, I feel threatened, I have to be
14 honest with you. I know he's a gun owner. My family
15 lives there. When you read the response, I think
16 you'll understand what I'm talking about. There seems
17 to be a little bit of what I think is a racial
18 undertone, as well.
19        OFFICER SELLENRAAD: So I take it this is
20 somebody who lives across the street from you?
21        MR. KADAF: No. They live just to the -- if
22 you're facing my home, they're to the left.
23        OFFICER SELLENRAAD: Okay.
24        MR. KADAF: There's no parking on the other
25 side of the street. It's a fire way. The only thing I

Page 4

1 wrote in there that was rude was I said the context was
2 rude.
3        OFFICER SELLENRAAD: Yeah.
4        MR. KADAF: And that's the response I
5 received from them left in my mailbox.
6        OFFICER SELLENRAAD: So it certainly is
7 something that when you read it, it has an aggressive
8 tone, but there's no threats in it. There's not
9 threats to harm you. There's no threats to harm your
10 property. There's nothing that would escalate to a
11 criminal nature. Expletives and those kind of things
12 are not enforceable from a legal standpoint or anything
13 else. Outside of making contact with the individual to
14 try to mediate, which may or may not exacerbate the
15 issue, there's not an enforcement issue for us to
16 address from a legal standpoint, if that's what you
17 were hoping.
18        So like I said, outside of just contacting --
19 outside of the just contacting the person to say, hey
20 they're gonna standby what they put in the note and be
21 respectful but there's nothing that prevents you guys
22 -- as you mentioned, there's nothing that prevents you
23 from being able to park in the street --
24        MR. KADAF: Yeah, I know that.
25        OFFICER SELLENRAAD: -- as long as it's not

Page 5

1 outside of any other laws or anything else.
2        MR. KADAF: We're not habitual in doing so.
3 It's not something we do all the time. I'll be honest
4 with you, most of the information that's in the
5 response is not correct, let alone -- there's a couple
6 things that really had me concerned. One of them is
7 here, you know: Maybe in Dearborn -- which that's
8 where we used to live -- you can do whatever the fuck
9 you want, but this isn't Dearborn and you're fucking
10 with the wrong one. Trust me.
11        Like to me, what else could that possibly
12 mean other than what's written. Although it doesn't
13 come out and say it. What would be the context of that
14 part of the letter?
15        OFFICER SELLENRAAD: Right. And I understand
16 that. But there's nothing in there that constitutes
17 any threat. He's basically saying -- you can interpret
18 that however you want, but there's nothing in there
19 that actually says, you will be damaged or you will be
20 harmed.
21        MR. KADAF: Okay.
22        OFFICER SELLENRAAD: So an overt thing of
23 don't mess with me, is nothing more than don't start an
24 issue with this.
25        MR. KADAF: I mean, I'm coming to you guys

09/23/2022

Pages 6..9

Page 6

1  because I honestly feel uncomfortable.  I feel like
2  this is a very -- although it doesn't come out and say
3  it in black and white, it's threatening by nature.  I
4  have kids and a wife that lives there.  From this
5  simple letter that's written to them, do you find this
6  in any way inappropriate?
7      OFFICER SELLENRAAD:  It's not for me to
8  interpret.  No more than anything else.  Could I
9  understand why someone might be insulted by that, I do.
10  I also don't see myself on either one of these --
11  everybody deals with stuff in their own way.
12      MR. KADAF:  Is this a warranted response?
13      OFFICER SELLENRAAD:  I would only be giving
14  you my opinion, which I'm not really here to do.  On
15  any of them --
16      MR. KADAF:  Okay.  I need to go on the record
17  saying that I came in here, and I feel threatened by
18  this person.  I need to go on the record --
19      OFFICER SELLENRAAD:  Which is fine.  But from
20  a prosecutable standpoint, there's nothing --
21      MR. KADAF:  I don't need anything to be
22  prosecuted.  I just want to be safe.  I need somebody
23  to go over there and talk to them and say, why did you
24  write this?  What's your intent here?  This is your
25  neighbor.  He feels threatened by you.  If a person

Page 7

1  wants to park on the street from time to time, he
2  shouldn't have to endure this type of threatening
3  behavior.  That's all I'm asking.  I know you can't go
4  over there and arrest the guy, I don't want him to be
5  arrested.
6      To be honest with you, I've never, ever, even
7  seen remotely this side of him.  We've never even had
8  an argument.  We've never even exchanged words that
9  were remotely heated or anything.  If anything, it's
10  been a very cordial relationship.  So, this is very
11  unhinged.  And this is very concerning.  I'm concerned
12  about his state of mind.  And I'm concerned about how
13  you go from looking at me smiling -- I keep my classic
14  car in the driveway -- telling me, hey you leave your
15  key in the car?  And I'm like, yeah, you can take it
16  whenever you want.  That type of relationship to
17  sending a letter this aggressive.
18      OFFICER SELLENRAAD:  Sure.
19      MR. KADAF:  It's very unhinged.  It's
20  extremely odd.  It doesn't make sense.  So that's why
21  I'm concerned if that makes any sense at all.
22      OFFICER SELLENRAAD:  I do understand.  Don't
23  get me wrong, I do understand.  My intention is to
24  communicate authority --
25      MR. KADAF:  Fair.

Page 8

1      OFFICER SELLENRAAD:  -- and make sure that
2  that's within the expectations of what you're seeking.
3      MR. KADAF:  I understand.
4      OFFICER SELLENRAAD:  So as I say, from an
5  authority standpoint, there's nothing from a police --
6  in the purest sense of the word, a police law
7  enforcement standpoint that there is to do.  From a
8  mediation, help dealing with neighbors and that kind of
9  stuff, there's nothing that prevents me from having a
10  conversation with him --
11      MR. KADAF:  Okay.
12      OFFICER SELLENRAAD:  -- but it's with the
13  expectation and understanding that other than me having
14  that conversation, there's no -- there's nothing that
15  goes beyond that.  There's no enforceable action or
16  anything else.
17      MR. KADAF:  I understand.
18      OFFICER SELLENRAAD:  So that's what we want
19  to make sure that everybody is on the same page there.
20      MR. KADAF:  That's fair.
21      OFFICER SELLENRAAD:  Your phone number?
22      MR. KADAF:  ███████.
23      OFFICER SELLENRAAD:  Okay.  And what's his
24  first name?
25      MR. KADAF:  Jonathan.  It's A-N.  Last name

Page 9

1  is Edison.  E-D-I-S-O-N.
2      OFFICER SELLENRAAD:  And do you know his
3  address?
4      MR. KADAF:  Yeah.  It's ████████
5  ████
6      OFFICER SELLENRAAD:  Okay.  Do you have a
7  phone number for him?
8      MR. KADAF:  No, I do not.
9      OFFICER SELLENRAAD:  Okay.  So I will see if
10  I can find a phone number for him.  And my reason for
11  having a phone call with him is sometimes having a car
12  out front, knocking and stuff, people react strongly to
13  that.
14      MR. KADAF:  Sure.
15      OFFICER SELLENRAAD:  So I'll try to make
16  contact with him via phone.
17      MR. KADAF:  Okay.
18      OFFICER SELLENRAAD:  If that doesn't work, do
19  you want me to go over and have a conversation with
20  him?  Or leave it alone to just --
21      MR. KADAF:  What I don't want this to do is
22  escalate, but I have some real concerns.
23      OFFICER SELLENRAAD:  Yeah.
24      MR. KADAF:  Only it makes zero sense that a
25  person, literally, not even a week ago is talking to

Page 10

1  me -- I maybe wrong. We were overseas for ten days.
2  But right before we left for overseas, standing in the
3  driveway, smiling, laughing, and talking about he's got
4  a classic car, you know, to this over parking in front
5  of their home over night. That's what really gets me
6  concerned now. I feel like he may not be mentally
7  stable perhaps. Or something along those lines.
8  Because this is not what happens from this.
9       At first, I thought I was over reacting and I
10  started having conversations with people that I know
11  without giving them the fine details and nobody -- I
12  was maybe trying to convince myself, am I over reacting
13  or is this person maybe having something going on here?
14       OFFICER SELLENRAAD: So, it may or may not
15  surprise you to hear we see this type of trajectory
16  with some frequency. And I don't mean from a mental
17  health standpoint or something like that. What I mean
18  is, people tend to get in this mode where they're just
19  operating in their norm, right? You have your normal
20  day-to-day, they have theirs. But there's something
21  underneath the surface that's a hot-button issue for
22  them and that one escalation, for whatever reason --
23  you know, you look at a couple of things in here and
24  he's talking about his wife consistently asking me why
25  they're parking in front of our house on the street.

Page 11

1  So, my assumption is that this is something that has
2  bothered him and/or her for sometime. Sure.
3       OFFICER SELLENRAAD: And for whatever reason,
4  bad day at work --
5       MR. KADAF: Sure. Maybe got --
6       OFFICER SELLENRAAD: -- got a traffic ticket,
7  whatever it was. He came home, here it is, the tipping
8  point, so leave the note. And in his mind, I left a
9  note. Would a lot of people look at that and think
10  this is kind of a passive aggressive thing, why not
11  just knock on the door and say, hey, it's been a thing
12  and I've always tried to ignore it.
13       MR. KADAF: Right.
14       OFFICER SELLENRAAD: You'd like to think so,
15  but if that would have led to a confrontation on either
16  your porch or his, probably not the best, right? So
17  for whatever reason he chose to write the note. And
18  then that's met with what you're saying in your voice
19  in your head was meant to be a -- you know, I'll do my
20  best --
21       MR. KADAF: You know, read my last line. I
22  said: Please don't ask us to move our cars and we will
23  also make an effort not to park in front of your home.
24       OFFICER SELLENRAAD: So this is the
25  unfortunate thing --

Page 12

1       MR. KADAF: I mean literally, he came over to
2  our house one time when the babysitter was home. We
3  had a four-year-old at the time. Roughly, like the
4  first year we moved in. And he made her leave the
5  house and go move the car. We're talking about a span
6  of 20 feet here. The difference between somebody
7  having to park in front of his house or mine.
8       OFFICER SELLENRAAD: So when you look at that
9  context, you know that this is something that bothers
10  him. Not saying that you know and you shouldn't have
11  been doing this, but that tells you that their
12  perception is that that's their space. And so their
13  functioning with that as their opinion of, for whatever
14  reason, it's unacceptable for their guests so have to
15  park 20 feet away in front of your house instead of
16  their house. And so that's telling in that it's an
17  issue for him and/or her.
18       MR. KADAF: Right.
19       OFFICER SELLENRAAD: So the response, well
20  intentioned as it might have been, was that they didn't
21  just heed it, they're gonna make this a thing. So now
22  there's the tete-a-tete of you sent me a letter, I sent
23  you a letter --
24       MR. KADAF: I mean, at this point, I'm not
25  responding to him directly in this way. There's a

Page 13

1  difference in context of this and there's an extreme
2  response here. And I don't care about anything else
3  other that just saying it out loud, because there's
4  been crazy things that happened, right? I'm just
5  saying it out loud. This doesn't -- this doesn't
6  constitute a response like this in any normal capacity
7  or is anybody I think is stable, personally.
8       I don't know, because you guys see this a lot
9  more than I do. But when I look at this, I think holy
10  shit, this guy's off the rocker. Because in no way, in
11  my sphere of influence or myself would ever respond to
12  something like that like this and so it makes me
13  nervous. That's all I'm saying. And you know, I live
14  next door to this person, so I can't be nervous, I have
15  family.
16       OFFICER SELLENRAAD: Like I said, I
17  understand the why and everything else.
18       MR. KADAF: I guess the question is, if you
19  can't get ahold of him -- you know, believe it or not,
20  he's a public speaker. You know, you can Google his
21  name, he comes up. He's an author. He's written like,
22  ten books. Based on what I can understand or what I
23  know of him, is he's always been a great person. So
24  that's what makes me really concerned. The other
25  thought is maybe he didn't write it. It's signed by

09/23/2022

Pages 14..17

Page 14

1  him, but maybe he didn't write it.
2      OFFICER SELLENRAAD:  And that's the thing.
3  You don't know.  It's more likely than not, but you
4  don't know for sure.
5      MR. KADAF:  I mean like maybe his wife.
6      OFFICER SELLENRAAD:  Right.  She could have.
7      MR. KADAF:  I don't know.  So if you can't
8  get ahold of him -- I'm pretty sure his number is
9  publicly available for the most part -- but if you
10  can't, I don't want it to escalate, but at the same
11  time, what happens then if you can't get ahold of him?
12      OFFICER SELLENRAAD:  I'll try to find a known
13  number and if I can't, I can go to the house and try to
14  knock on the door and just ask him what's going on and
15  what's the position and everything else.
16      MR. KADAF:  Which might make it worse.
17      OFFICER SELLENRAAD:  Right.
18      MR. KADAF:  And so, that's why I'm asking.
19  If you can't get ahold of his phone number, that's the
20  only option?  Is to go wrap at his door?  Maybe a
21  letter or not really?
22      OFFICER SELLENRAAD:  Not really because it's
23  more of an opportunity for that person to feel heard
24  and then have some understanding of what the position
25  is from either one of you or both of you at the end of

Page 15

1  it, right?  For me to have that conversation with him,
2  if he tries to explain on his end there's no intention
3  to do this to upset you.  You know, aside from what
4  you're telling me of having the babysitter once in the
5  past move her car, it's not something that's been
6  addressed and continued to be done.  And also the
7  reminder, outside of the fact that they might consider
8  it a courtesy that you don't park in front of your
9  neighbor's house.
10      MR. KADAF:  And that's fine --
11      OFFICER SELLENRAAD:  There's nothing --
12  there's nothing --
13      MR. KADAF:  I admitted to it.
14      OFFICER SELLENRAAD:  Right.  But my point is,
15  them taking of offense to an action that they haven't
16  asked you to stop, excluding that note from what you're
17  saying --
18      MR. KADAF:  That is true.
19      OFFICER SELLENRAAD:  Where you're not doing
20  anything from what they considered to be violating a
21  social norm.
22      MR. KADAF:  Right.
23      OFFICER SELLENRAAD:  I mean it's unfortunate
24  that it's something that is so unsettling to them.
25      MR. KADAF:  Like I said, at this point, I

Page 16

1  don't want to reconcile with them because, I mean, I
2  don't know what the next thing is and I don't want to
3  go down that road.
4      OFFICER SELLENRAAD:  It's not necessarily
5  pushing for reconciliation, it's a pushing for mutually
6  just leaving it alone is more what we're looking at.
7      MR. KADAF:  Right.
8      OFFICER SELLENRAAD:  This happened.  Leave it
9  alone.  Start fresh tomorrow.  You know how he feels
10  about it.  He needs to understand that if you park
11  there or you have guests there, there's no duty or
12  obligation to notify them.  Is it courteous, sure.
13  Regardless of where people are gonna be parking -- if
14  you're having a large gathering at your house, a common
15  courtesy to let neighbors know, hey, might be up a
16  little bit later than normal.  We might have guests out
17  in the backyard or whatever it is.  Just so you know,
18  it's for whatever event.  Okay, cool.  That's one of
19  those things that it is a courtesy that people take
20  into consideration when, hey it's a Saturday night,
21  it's getting kind of late, but they told us this is
22  what's going on and it's gonna be done by 11:30 we can
23  all accept this because it's their daughter's 16th
24  birthday or whatever it may be and we know that this
25  isn't gonna be a normal reoccurring issue.

Page 17

1      MR. KADAF:  But you nailed it.  First of all,
2  we're not habitual.  A lot of the information in this
3  response is just simply untrue and the other -- and
4  with the contractors, what he's talking about.  They
5  were parking close to there, but it wasn't for the
6  whole day or whatnot.  And the whole condom wrapper
7  thing is definitely not true, but --
8      OFFICER SELLENRAAD:  Regardless of any of
9  that --
10      MR. KADAF:  Somebody parked in front of my
11  house every day because they're working at the house
12  across the street.  Never once did I make a stink of
13  it.
14      OFFICER SELLENRAAD:  Like I say, regardless
15  of any of that, there's no violation there other than
16  them not liking it.
17      MR. KADAF:  I know.  And I try to be a good
18  neighbor, but it's not like I do it -- it's not a
19  habitual thing where there's a response.  Like I say,
20  I'm only concerned with the one thing and that is --
21      OFFICER SELLENRAAD:  The escalation.
22      MR. KADAF:  Yeah.  Why this heavy of an
23  escalation and if I feel nervous, that's a problem.  If
24  I feel nervous there's a problem.
25      OFFICER SELLENRAAD:  What was the date of

09/23/2022

Page 18

1  this first note, do you remember.
2       MR. KADAF:  My wife got into a car accident
3  so it was a rental car and we picked it up on Saturday.
4       OFFICER SELLENRAAD:  Okay.
5       MR. KADAF:  So we would have parked it, I
6  think it was the same day or the day after.  So it
7  would have been Sunday into Monday or Saturday into
8  Sunday that we parked the car.  So the next morning,
9  she received the note.  I believe it was Sunday into
10  money day that she parked the car.
11       OFFICER SELLENRAAD:  Okay.  Of this past
12  weekend?
13       MR. KADAF:  Actually, it was Saturday because
14  I was cutting the grass and that's why she moved the
15  car into the street.
16       OFFICER SELLENRAAD:  Okay.
17       MR. KADAF:  So she would have found to note
18  on Sunday morning.  I wrote a response that day and
19  gave it to him that evening.  Delivered it in the
20  evening.
21       OFFICER SELLENRAAD:  Okay.
22       MR. KADAF:  I don't know when they responded
23  back to me but I pulled this out of the mail last
24  night.  So sometime between Monday evening when I
25  dropped it off to them to Thursday evening, this

Page 19

1  response was given to me.  So I don't know when it was
2  dropped originally.
3       OFFICER SELLENRAAD:  Okay.  Do you not want
4  me to go to the house?  Because obviously there's our
5  intervention by calling him and having a conversation
6  or going to the house.
7       MR. KADAF:  Is it possible is that you try to
8  get ahold of him by phone and if you can't, you can
9  call me and I can tell you whether or not I feel it's a
10  good idea or maybe things have changed by then, I don't
11  know.
12       OFFICER SELLENRAAD:  Yeah.  There's the
13  ignore it, there's me calling and/or stopping by after
14  touching base with you, and then there's the third
15  option which is basically the note that says, I got
16  your message, didn't realize it was such a big deal.  I
17  understand the concern.  Like I said before we'll do
18  our best to not have them in front of the house or
19  leave them there.  And something along the lines of
20  hopefully we can just put this to bed and move forward.
21       MR. KADAF:  I need something -- it's
22  important for me that he understands that I feel
23  threatened by this.
24       OFFICER SELLENRAAD:  Sure.
25       MR. KADAF:  That's the most important part.

Page 20

1  I need to hear from him telling you --
2       OFFICER SELLENRAAD:  So here's --
3       MR. KADAF:  Like, hey, I'll tell you why I
4  wrote it this way.
5       OFFICER SELLENRAAD:  So here's the one thing
6  I will tell you.
7       MR. KADAF:  Okay.
8       OFFICER SELLENRAAD:  Placing the I need to
9  hear X, Y, or Z, is an expectation that we can't impose
10  on somebody else.  Because what they're willing or able
11  to respond with or anything like that, doesn't dictate
12  it.  It's either --
13       MR. KADAF:  But what is the intention to be
14  so aggressive?
15       OFFICER SELLENRAAD:  That's just it.  There's
16  no expectation or requirement for him to explain that.
17       MR. KADAF:  Okay.
18       OFFICER SELLENRAAD:  You know what I mean?
19  From a normal --
20       MR. KADAF:  If that's the case then I guess
21  try and get ahold of him and if you can't get ahold of
22  him, then fine, drive over there and talk to him.
23  Because I'm at the point where I think it goes beyond
24  parking in front of his car.  I think there's a level
25  of racism to be honest with you.  Because I've had

Page 21

1  other people read this letter.  Especially when it
2  comes to the whole Dearborn, this isn't Dearborn.
3  There's no purpose in writing that.  It has nothing to
4  do with anything other than they or he wants to make a
5  point to say that we're from Dearborn.
6       OFFICER SELLENRAAD:  For one thing, you're
7  making an assumption.
8       MR. KADAF:  I'm making a pretty good
9  assumption, but that's neither here nor there.  But my
10  out reach --
11       OFFICER SELLENRAAD:  And the second thing --
12       MR. KADAF:  My out reach is whatever I decide
13  to be my out reach.  I guess for right now, we stick to
14  placing the report.  You try and get ahold of him.  If
15  you can't get ahold of my phone, please, drive over
16  there.  And I guess we go from there.
17       OFFICER SELLENRAAD:  Okay.
18       MR. KADAF:  All right.  I appreciate you.
19  Thank you so much.
20       OFFICER SELLENRAAD:  Yeah, absolutely
21       (Conversation ended at 3:54 p.m.)
22
23
24
25



1                CERTIFICATE OF REPORTER

2

3    STATE OF MICHIGAN        )

4                             ) SS

5    COUNTY OF MACOMB         )

6

7

8            I HEREBY CERTIFY that I transcribed this

9    audio recording.  And that this is a full, true, complete and

10   correct transcription of said audio recording (to the best of

11   my ability to hear and understand said recording)

12

13

14               Kathryn DiMarzio,

15               Temp. CSR - 15685

16               Notary Public,

17               Macomb County, Michigan

18   My Commission expires:  August 24, 2028

19

20

21

22

23

24

25

09/23/2022

1

---

**1**

**11:30** 16:22
**16th** 16:23
**17951** 9:4

---

**2**

**20** 12:6,15
**2022** 2:3
**23** 2:3

---

**3**

**313-737-3994** 8:22
**3:30** 2:4
**3:54** 21:21

---

**A**

**A-N** 8:25
**absolutely** 21:20
**accept** 16:23
**accident** 18:2
**action** 8:15 15:15
**address** 4:16 9:3
**addressed** 15:6
**admitted** 15:13
**aggressive** 4:7 7:17 11:10 20:14
**ahold** 13:19 14:8,11,19 19:8
 20:21 21:14,15
**and/or** 11:2 12:17 19:13
**Approximately** 2:4
**apron** 2:22
**argument** 7:8
**arrest** 7:4
**arrested** 7:5

---

**assumption** 11:1 21:7,9
**author** 13:21
**authority** 7:24 8:5

---

**B**

**babysitter** 12:2 15:4
**back** 18:23
**backyard** 16:17
**bad** 11:4
**base** 19:14
**Based** 13:22
**basically** 5:17 19:15
**bed** 19:20
**behavior** 7:3
**big** 19:16
**birthday** 16:24
**bit** 3:5,17 16:16
**black** 6:3
**books** 13:22
**borrowed** 2:22
**bothered** 11:2
**bothers** 12:9

---

**C**

**call** 9:11 19:9
**calling** 19:5,13
**capacity** 13:6
**capitalized** 2:25
**car** 2:23,24 3:6 7:14,15 9:11 10:4
 12:5 15:5 18:2,3,8,10,15 20:24
**care** 13:2
**cars** 11:22
**case** 20:20
**changed** 19:10

---

**chose** 11:17
**classic** 7:13 10:4
**close** 17:5
**common** 16:14
**communicate** 7:24
**concern** 19:17
**concerned** 5:6 7:11,12,21 10:6
 13:24 17:20
**concerns** 9:22
**condom** 17:6
**confrontation** 11:15
**consideration** 16:20
**considered** 15:20
**consistently** 10:24
**constitute** 13:6
**constitutes** 5:16
**contact** 4:13 9:16
**contacting** 4:18,19
**context** 4:1 5:13 12:9 13:1
**continued** 15:6
**contractors** 17:4
**conversation** 8:10,14 9:19 15:1
 19:5 21:21
**conversations** 10:10
**convince** 10:12
**cool** 16:18
**cordial** 2:15 7:10
**correct** 2:8 3:11 5:5
**couple** 5:5 10:23
**courteous** 16:12
**courtesy** 15:8 16:15,19
**crazy** 13:4
**criminal** 4:11
**cutting** 18:14

---

**09/23/2022**                                                          2

---

**D**

---

**damaged** 5:19

**date** 17:25

**daughter** 2:19

**daughter's** 16:23

**day** 11:4 17:6,11 18:6,10,18

**day-to-day** 10:20

**days** 10:1

**deal** 19:16

**dealing** 8:8

**deals** 6:11

**Dearborn** 5:7,9 21:2,5

**decide** 21:12

**Delivered** 18:19

**Department** 2:2

**details** 10:11

**dictate** 20:11

**difference** 12:6 13:1

**directly** 12:25

**door** 11:11 13:14 14:14,20

**drive** 9:5 20:22 21:15

**driveway** 7:14 10:3

**dropped** 18:25 19:2

**duty** 16:11

---

**E**

---

**E-D-I-S-O-N** 9:1

**Edison** 9:1

**effort** 11:23

**end** 14:25 15:2

**ended** 21:21

**endure** 7:2

**enforceable** 4:12 8:15

**enforcement** 4:15 8:7

**escalate** 4:10 9:22 14:10

**escalation** 10:22 17:21,23

**evening** 18:19,20,24,25

**event** 16:18

**exacerbate** 4:14

**exchanged** 7:8

**excluding** 15:16

**expectation** 8:13 20:9,16

**expectations** 8:2

**explain** 15:2 20:16

**Expletives** 4:11

**extreme** 13:1

**extremely** 7:20

---

**F**

---

**facing** 3:22

**fact** 15:7

**fair** 7:25 8:20

**fairly** 2:15

**family** 3:14 13:15

**feel** 3:13 6:1,17 10:6 14:23 17:23, 24 19:9,22

**feels** 6:25 16:9

**feet** 12:6,15

**find** 6:5 9:10 14:12

**fine** 6:19 10:11 15:10 20:22

**fire** 3:25

**forward** 3:8 19:20

**found** 18:17

**four-year-old** 12:3

**frequency** 10:16

**fresh** 16:9

**Friday** 2:3

**front** 2:24 9:12 10:4,25 11:23 12:7,15 15:8 17:10 19:18 20:24

**fuck** 5:8

**fucking** 5:9

**functioning** 12:13

---

**G**

---

**gathering** 16:14

**gave** 18:19

**giving** 6:13 10:11

**good** 17:17 19:10 21:8

**Google** 13:20

**grass** 18:14

**great** 13:23

**guess** 13:18 20:20 21:13,16

**guests** 12:14 16:11,16

**gun** 3:14

**guy** 7:4

**guy's** 13:10

**guys** 4:21 5:25 13:8

---

**H**

---

**habitual** 5:2 17:2,19

**habitually** 3:7

**happened** 13:4 16:8

**harm** 4:9

**harmed** 5:20

**head** 11:19

**health** 10:17

**hear** 10:15 20:1,9

**heard** 14:23

**heated** 7:9

**heavy** 17:22

**heed** 12:21

**hey** 4:19 7:14 11:11 16:15,20 20:3

**holy** 13:9

**home** 3:22 10:5 11:7,23 12:2

**honest** 3:14 5:3 7:6 20:25

**honestly** 6:1

**hoping** 4:17

**hot-button** 10:21

**house** 2:20,25 10:25 12:2,5,7,15, 16 14:13 15:9 16:14 17:11 19:4, 6,18

---

### I

**idea** 19:10

**ignore** 11:12 19:13

**important** 19:22,25

**impose** 20:9

**inappropriate** 6:6

**individual** 4:13

**influence** 13:11

**information** 5:4 17:2

**insulted** 6:9

**intent** 6:24

**intention** 7:23 15:2 20:13

**intentioned** 12:20

**interactions** 2:23

**interpret** 5:17 6:8

**intervention** 19:5

**issue** 2:8 4:15 5:24 10:21 12:17 16:25

**issues** 2:16

---

### J

**Jonathan** 8:25

---

### K

**KADAF** 2:9,12,18 3:3,11,21,24 4:4,24 5:2,21,25 6:12,16,21 7:19,25 8:3,11,17,20,22,25 9:4, 8,14,17,21,24 11:5,13,21 12:1, 18,24 13:18 14:5,7,16,18 15:10, 13,18,22,25 16:7 17:1,10,17,22 18:2,5,13,17,22 19:7,21,25 20:3, 7,13,17,20 21:8,12,18

**key** 7:15

**kids** 6:4

**kind** 2:7 4:11 8:8 11:10 16:21

**knock** 11:11 14:14

**knocking** 9:12

---

### L

**large** 16:14

**late** 16:21

**laughing** 10:3

**law** 8:6

**laws** 5:1

**leave** 7:14 9:20 11:8 12:4 16:8 19:19

**leaving** 16:6

**led** 11:15

**left** 2:23 3:22 4:5 10:2 11:8

**legal** 4:12,16

**let alone** 5:5

**letter** 3:12 5:14 6:5 7:17 12:22,23 14:21 21:1

**level** 20:24

**liking** 17:16

**lines** 10:7 19:19

**literally** 9:25 12:1

**live** 3:3,21 5:8 13:13

**lives** 3:15,20 6:4

---

**long** 4:25

**lot** 11:9 13:8 17:2

**loud** 13:3,5

---

### M

**made** 12:4

**mail** 18:23

**mailbox** 4:5

**make** 7:20 8:1,19 9:15 11:23 12:21 14:16 17:12 21:4

**makes** 7:21 9:24 13:12,24

**making** 4:13 21:7,8

**meant** 3:5 11:19

**mediate** 4:14

**mediation** 8:8

**mental** 10:16

**mentally** 10:6

**mentioned** 4:22

**mess** 5:23

**message** 19:16

**met** 11:18

**mind** 7:12 11:8

**mine** 12:7

**mode** 10:18

**Monday** 18:7,24

**money** 18:10

**morning** 18:8,18

**move** 11:22 12:5 15:5 19:20

**moved** 2:19 12:4 18:14

**mutually** 16:5

---

### N

**nailed** 17:1

**nature** 4:11 6:3



09/23/2022

4

necessarily 16:4

neighbor 2:14 6:25 17:18

neighbor's 15:9

neighborly 2:22

neighbors 2:8 8:8 16:15

nervous 13:13,14 17:23,24

night 10:5 16:20 18:24

norm 10:19 15:21

normal 2:22 10:19 13:6 16:16,25 20:19

Northville 2:1

note 2:23 3:7,8 4:20 11:8,9,17 15:16 18:1,9,17 19:15

notify 16:12

number 8:21 9:7,10 14:8,13,19

**O**

obligation 16:12

odd 7:20

offense 15:15

Officer 2:6,10,17 3:2,9,19,23 4:3, 6,25 5:15,22 6:7,13,19 7:18,22 8:1,4,12,18,21,23 9:2,6,9,15,18, 23 10:14 11:3,6,14,24 12:8,19 13:16 14:2,6,12,17,22 15:11,14, 19,23 16:4,8 17:8,14,21,25 18:4, 11,16,21 19:3,12,24 20:2,5,8,15, 18 21:6,11,17,20

operating 10:19

opinion 6:14 12:13

opportunity 14:23

option 14:20 19:15

originally 19:2

overseas 10:1,2

overt 5:22

owner 3:14

**P**

p.m. 2:4 21:21

park 2:24 3:4,5 4:23 7:1 11:23 12:7,15 15:8 16:10

parked 17:10 18:5,8,10

parking 3:24 10:4,25 16:13 17:5 20:24

part 5:14 14:9 19:25

passive 11:10

past 15:5 18:11

people 9:12 10:10,18 11:9 16:13, 19 21:1

perception 12:12

person 4:19 6:18,25 9:25 10:13 13:14,23 14:23

personally 13:7

phone 8:21 9:7,10,11,16 14:19 19:8 21:15

picked 18:3

placing 20:8 21:14

plowed 2:21

point 11:8 12:24 15:14,25 20:23 21:5

police 2:2 8:5,6

porch 11:16

position 14:15,24

possibly 5:11

pretty 14:8 21:8

prevents 4:21,22 8:9

problem 17:23,24

property 4:10

prosecutable 6:20

prosecuted 6:22

public 13:20

publicly 14:9

pull 3:6

pulled 18:23

purest 8:6

purpose 21:3

pushing 16:5

put 4:20 19:20

**Q**

question 13:18

**R**

racial 3:17

racism 20:25

reach 21:10,12,13

react 9:12

reacting 10:9,12

read 3:8,15 4:7 11:21 21:1

real 2:16 9:22

realize 19:16

reason 9:10 10:22 11:3,17 12:14

received 4:5 18:9

reconcile 16:1

reconciliation 16:5

record 6:16,18

relationship 7:10,16

remember 18:1

reminder 15:7

remotely 7:7,9

rental 18:3

reoccurring 16:25

report 21:14

requirement 20:16

respectful 4:21

respond 13:11 20:11



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

09/23/2022                                    5

responded  18:22

responding  12:25

response  3:10,11,12,15 4:4 5:5
6:12 12:19 13:2,6 17:3,19 18:18
19:1

road  16:3

rocker  13:10

Roughly  12:3

rude  4:1,2

---
S
---

safe  6:22

Saturday  16:20 18:3,7,13

seeking  8:2

Sellenraad  2:6,7,10,17 3:2,9,19,
23 4:3,6,25 5:15,22 6:7,13,19
7:18,22 8:1,4,12,18,21,23 9:2,6,
9,15,18,23 10:14 11:3,6,14,24
12:8,19 13:16 14:2,6,12,17,22
15:11,14,19,23 16:4,8 17:8,14,
21,25 18:4,11,16,21 19:3,12,24
20:2,5,8,15,18 21:6,11,17,20

sending  7:17

sense  7:20,21 8:6 9:24

September  2:3

shit  13:10

side  3:4,25 7:7

sidewalk  2:21

signed  13:25

simple  2:13 6:5

simply  17:3

sir  2:6

smiling  7:13 10:3

snowed  2:21

social  15:21

son  2:20

space  12:12

span  12:5

speaker  13:20

sphere  13:11

stable  10:7 13:7

standby  4:20

standing  10:2

standpoint  4:12,16 6:20 8:5,7
10:17

start  5:23 16:9

started  2:12 10:10

state  7:12

stick  21:13

stink  17:12

stop  15:16

stopping  19:13

straight  3:8

street  3:20,25 4:23 7:1 10:25
17:12 18:15

strongly  9:12

stuff  6:11 8:9 9:12

subdivision  3:3

Sunday  18:7,8,9,18

surface  10:21

surprise  10:15

---
T
---

taking  15:15

talk  6:23 20:22

talking  3:16 9:25 10:3,24 12:5
17:4

telling  7:14 12:16 15:4 20:1

tells  12:11

ten  10:1 13:22

tend  10:18

tete-a-tete  12:22

thing  3:25 5:22 11:10,11,25
12:21 14:2 16:2 17:7,19,20 20:5
21:6,11

things  4:11 5:6 10:23 13:4 16:19
19:10

thought  10:9 13:25

threat  5:17

threatened  3:13 6:17,25 19:23

threatening  6:3 7:2

threats  4:8,9

Thursday  18:25

ticket  11:6

time  2:15,20 3:4,5 5:3 7:1 12:2,3
14:11

tipping  11:7

told  16:21

tomorrow  16:9

tone  4:8

tools  2:22

touching  19:14

Township  2:1

traffic  11:6

trajectory  10:15

true  15:18 17:7

Trust  5:10

type  7:2,16 10:15

---
U
---

unacceptable  12:14

uncomfortable  6:1

underlined  2:25

underneath  10:21

understand  2:7 3:16 5:15 6:9
7:22,23 8:3,17 13:17,22 16:10
19:17

understanding  8:13 14:24

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

09/23/2022

6

understands 19:22

undertone 3:18

unfortunate 11:25 15:23

unhinged 7:11,19

unsettling 15:24

untrue 17:3

upset 3:1 15:3

| V |
|---|

violating 15:20

violation 17:15

voice 11:18

| W |
|---|

warranted 6:12

week 9:25

weekend 18:12

whatnot 17:6

white 6:3

wife 6:4 10:24 14:5 18:2

wife's 2:23

Wildflower 9:4

word 8:6

words 7:8

work 9:18 11:4

working 17:11

worse 14:16

wrap 14:20

wrapper 17:6

write 6:24 11:17 13:25 14:1

writing 21:3

written 5:12 6:5 13:21

wrong 5:10 7:23 10:1

wrote 3:7 4:1 18:18 20:4

| Y |
|---|

year 12:4



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**10/12/2022**

1  Re:  35th District Court

2  Case No. 22-0002887

3  Northville Township v. Jonathan Edward Edison

4

5

6

7  Transcription of video conversation

8  between Officer Ben Sellenraad and

9  Fadie Jamil Kadaf on October 12, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

10/12/2022

Pages 2..5

**Page 2**

1  Northville Township
2  Police Department
3  Wednesday October 12, 2022
4  At approximately 4:05 p.m.
5
6       MR. KADAF:  How's it going?
7       OFFICER SELLENRAAD:  Good.  What can I help
8  you with?
9       MR. KADAF:  Well, I don't know.  I'd like you
10  to read that from my neighbor, Mr. Edison, please.
11       OFFICER SELLENRAAD:  When was this received?
12       MR. KADAF:  It had to be within the last four
13  days.
14       OFFICER SELLENRAAD:  Were you out of town?
15       MR. KADAF:  Yeah.  I was traveling.  I came
16  back today.  My wife found it in the mailbox.  She sent
17  me a picture of it.  I was out of town yesterday.  And
18  then last week I was out of town.  I remember we read
19  the mail, it was about four days, maybe five days, max.
20  I mean, we haven't communicated or done a word.  The
21  only thing we've done, which I made you aware of.  Is
22  we received a package for his daughter at our house and
23  I had my son take it over their house and leave it on
24  their porch.
25       OFFICER SELLENRAAD:  That might have been

**Page 3**

1  somebody else.
2       MR. KADAF:  Oh.  I'm sorry.  It was probably
3  somebody else.
4       OFFICER SELLENRAAD:  That's this?
5       MR. KADAF:  That is from the letter that my
6  brother sent them.  But you and I were both aware of
7  it.
8       OFFICER SELLENRAAD:  Okay this was --
9       MR. KADAF:  That was the letter my brother --
10  I assume that's the receipt from my brother's --
11       OFFICER SELLENRAAD:  Showing signature
12  required.
13       MR. KADAF:  Yeah, that came from attorney,
14  which is my brother's office.
15       OFFICER SELLENRAAD:  Okay.
16       MR. KADAF:  And then, you know, back on the
17  29th it looks like it was delivered.  That was the
18  letter that was discussed.  That was the letter that
19  was going out, you know?
20       OFFICER SELLENRAAD:  It says:  Missed
21  delivery.  So there was an attempted delivery.
22       MR. KADAF:  Oh, okay.  I don't know if he
23  actually received it or whatnot.  But I mean, you know,
24  at this point, I've never said a word to him.  I
25  haven't done anything.  This person is really being

**Page 4**

1  threatening at this point.  I don't know what to say to
2  you guys anymore.  You can beat around the brush all
3  you want, but he keeps dropping letters like this in my
4  mailbox.  It's very uncomfortable.  Something needs to
5  be done.
6       OFFICER SELLENRAAD:  So this is the only
7  interaction since those other letters?
8       MR. KADAF:  Without any question.
9       OFFICER SELLENRAAD:  I mean from either side.
10  You have the letter that was mailed to him and then
11  there's this.
12       MR. KADAF:  That letter that was mailed to
13  him was far before this.  They probably attempted
14  delivery a couple times and was not able to.  But this
15  was in my mailbox within the last 4 or 5 days.
16       OFFICER SELLENRAAD:  And you received this?
17       MR. KADAF:  He attached it.
18       OFFICER SELLENRAAD:  Oh.  He attached it.
19  Okay.
20       MR. KADAF:  I mean the context of the letter.
21  The things that he -- he says Dearborn again.  I wish
22  you would have stayed in Dearborn.  Like, what are
23  we -- what am I supposed to?  At this point, if this is
24  not something that you guys are gonna start taking
25  serious and visit this person and have a conversation

**Page 5**

1  to I don't know what.  Then the next thing my attorney,
2  who's my brother, said we're gonna contact the city
3  attorney and the Wayne County Prosecutor's Office.
4  Because we cannot live next door to somebody who keeps
5  sending threatening letters.  It's not normal.  It is
6  not normal Officer Sellenraad.
7       OFFICER SELLENRAAD:  So I'm not gonna make an
8  argument one way or the other.  What I'm gonna tell you
9  is what we were dealing with before.  I explained to
10  you at that time what was within the authority or scope
11  of what the police department could do because no laws
12  had been broken, okay?
13       MR. KADAF:  Fair.
14       OFFICER SELLENRAAD:  We can't do anything
15  that we don't have the authority to do.
16       MR. KADAF:  Okay.
17       OFFICER SELLENRAAD:  I do not have the power
18  that a judge has.  I cannot make a no contact order.  I
19  cannot charge someone for noncriminal behavior.  I can
20  have a conversation with them.  Beyond that, if they
21  choose to heed the advice or change the lens of their
22  perspective on the situation or whatever the case may
23  be, that's their decision.  But if we're not talking
24  about a situation where there's a violation of law.
25  Then I can't charge someone.  I can't submit something

Page 6

1  that's not criminal in it's nature to a prosecutor to
2  review.  If there's something that falls under a
3  violation of law, I can submit that to them and they
4  can make a determination as to whether or not they
5  think it's prosecutable.  They have their own criteria
6  for that.  And it goes beyond just whether or not a
7  violation of law occurred.  It's whether or not there's
8  enough evidence to substantiate that and who's
9  responsible for it and those kind of things.  But
10  that's the rules that we play within.  I can't go
11  outside of those.
12      MR. KADAF:  But at this point.
13      OFFICER SELLENRAAD:  Again, this is him
14  telling you to leave him alone.  The tone speaks for
15  itself.  The cursing, he's allowed to use.  Again, as I
16  explained or hopefully was able to communicate the last
17  time, use of, in your interpretation, him making
18  mention of the city of your previous residence,
19  Dearborn.
20      MR. KADAF:  Mm-hmm.
21      OFFICER SELLENRAAD:  You take that as your
22  interpretation of being along the lines of in some way,
23  shape, or form, racially motive ed or derogatory or in
24  that vain.  Using certain terms or those kind of things
25  in and of itself is not criminal.  If I commit a crime

Page 7

1  against you, if my motivation is one based on a
2  protective class, that can then be an enhancement in
3  charging it.  But it doesn't make a noncriminal
4  behavior, criminal.
5      MR. KADAF:  Okay.
6      OFFICER SELLENRAAD:  So frustrating as that
7  might be, and I can understand why that is --
8      MR. KADAF:  My wife is scared.  You know,
9  what am I supposed to do?  What am I supposed to tell
10  her?  Don't be scared?  This is very normal?  This is
11  normal conversation you should have with your neighbor
12  or normal letters you receive from your neighbor?  No.
13  The answer is no.
14      OFFICER SELLENRAAD:  And again, I'm not gonna
15  make an argument either for or against because
16  everybody's opinion of how one should conduct
17  themselves is it's own.  It's is it or is it not
18  lawful?  And a letter, cursing or otherwise, all caps
19  or otherwise, there's are things that we use to
20  communicate tone and that kind of stuff, but does not
21  make it criminal.  I will absolutely attach this.  And
22  make a nation of it's date of receipt.  And I will --
23      MR. KADAF:  Well, my brother asked that we
24  write up a new police report, if that's okay?
25  Regarding --

Page 8

1      OFFICER SELLENRAAD:  It can be a new number,
2  it can.  Yes.
3      MR. KADAF:  All right.
4      OFFICER SELLENRAAD:  And that's not an issue
5  from us, from our standpoint to have a secondary number
6  that shows additional things and stuff like that.  And
7  I understand why he would be making that request.
8  Because he's wanting to show continued behaviors and
9  those kind of things.
10      MR. KADAF:  Yeah.  It would be to have a no
11  contact, protection order.
12      OFFICER SELLENRAAD:  Right.
13      MR. KADAF:  And that's probably what would be
14  submitted to the courts.
15      OFFICER SELLENRAAD:  What he would be trying
16  to use as support for that argument.  So let me go make
17  a photocopy of this or scan it and this as well and
18  then I will get you a new number for that.  You said
19  within the last 4 or 5 days?
20      MR. KADAF:  Right.
21      OFFICER SELLENRAAD:  It was discovered today
22  or --
23      MR. KADAF:  Today.
24      OFFICER SELLENRAAD:  Today.  Okay.  Be right
25  back with you, okay?

Page 9

1      MR. KADAF:  Okay.
2      OFFICER SELLENRAAD:  So that is what this one
3  will be documented under.
4      MR. KADAF:  Okay.
5      OFFICER SELLENRAAD:  Here's your copies back.
6  I mean the only thing I can tell you is he's obviously
7  upset and doesn't want anything to do with anything
8  anymore and the best advice I can give you is to leave
9  him alone.
10      MR. KADAF:  I mean all the letter stated from
11  the first one is to leave us alone.  Obviously it was
12  undeliverable so he never even received anything.
13      OFFICER SELLENRAAD:  Yes.  I understand.  But
14  my point is through his statements, any additional or
15  further contact or attempts to have contact or anything
16  else are upsetting him just as much as the tone of this
17  letter is upsetting you.  And that's what I was trying
18  to communicate to both of you after the last set of
19  correspondences.  To let the waters calm down and leave
20  it be.  And obviously if there's an unprovoked
21  escalation or continuation or anything like that, that
22  can potential change what we're looking at.  But him
23  sending a letter saying leave me alone, don't have
24  anymore contact --
25      MR. KADAF:  I have left him alone.

Page 10

1   OFFICER SELLENRAAD:  In response to that
2   attempted notice.  That was very early on.  That was
3   before -- I mean the attempt was attempted very early
4   on.  And to be honest with you his letter to me and his
5   attitude towards me, the letter from my attorney simply
6   told him or was stating to just leave us alone.
7       OFFICER SELLENRAAD:  I understand.  My point
8   is without any further communication, if you both
9   respect that, which he's expressing his intention to
10  do, the hope --
11      MR. KADAF:  So you think a man that writes
12  like this, that's really his intention?  I mean, you're
13  pressing a thought that is an opinion.  Just like you
14  talked to me about the opinion of how you dictate the
15  letter.  Now you're pressing an opinion on how he
16  thinks.  This is not a man who's normal.  This is not a
17  normal response to your neighbor.  This is -- it wasn't
18  the first time a normal response.  I'm gonna do what I
19  need to do protect my family.  And I'm gonna do
20  everything I can to make sure this person doesn't come
21  near me, doesn't do anything.  And if I need to do
22  things to make sure that of what you can do
23  here, I'm gonna do that.  I'm gonna go all the way with
24  this person.  I'm gonna do everything I can to make
25  sure that he understands that you are not to just push

Page 11

1   me around and we're gonna be okay with it.  Don't make
2   threats to me and my family.  This is very serious to
3   me.  It may not be serious to you, but it's serious to
4   me.
5       OFFICER SELLENRAAD:  I have not once said
6   that I don't understand why you are upset by this
7   situation or uncomfortable.  I have told you there is
8   nothing that constitutes a criminal threat --
9       MR. KADAF:  I've heard you say that four
10  times over, but you're trying to tell me to just kind
11  of leave the guy alone.  I'll do what I need to do.
12  Just do what I'm asking and that's it.  And I'll do
13  things on my end.  At this point, I'm gonna handle this
14  my way.  With help with you guys, help with county,
15  help with whoever wants to help.  But this is a man who
16  goes into schools.  This is a man who's a gun owner.
17  This is not the type of things you write if you work
18  with children and you own a gun.  You guys are taking
19  this really, really lightly.
20      OFFICER SELLENRAAD:  Because he has not
21  broken the law.  He's cursed and he's asked you to
22  lever him alone.
23      MR. KADAF:  Okay.  All right.
24      OFFICER SELLENRAAD:  I'm not saying that your
25  reaction is right or wrong.  I'm not saying his

Page 12

1   reaction is right or wrong.  I'm saying the letter --
2       MR. KADAF:  A car was left in front of his
3   house over night.
4       OFFICER SELLENRAAD:  I have not justified any
5   of either of your actions.  What I have said is his
6   request is to be left alone.  And the best advice I can
7   give you is to do so.
8       MR. KADAF:  Okay.  Fair enough.
9       OFFICER SELLENRAAD:  That is all that I am
10  telling you.  I'm not telling you that anything you
11  choose to do within the rights of the law or anything
12  else, is wrong.  I'm saying the best advice I can give
13  you is to leave it alone.
14      MR. KADAF:  Thank you.  I appreciate it.
15  When will this report be available?
16      OFFICER SELLENRAAD:  Generally it's within 3
17  to 5 days.
18      MR. KADAF:  Thank you.
19      (Conversation ended at 4:25 p.m.)
20
21
22
23
24
25

Page 13

1           CERTIFICATE OF REPORTER
2
3   STATE OF MICHIGAN          )
4                             ) SS
5   COUNTY OF MACOMB           )
6
7
8           I HEREBY CERTIFY that I transcribed this
9   audio recording.  And that this is a full, true, complete and
10  correct transcription of said audio recording (to the best of
11  my ability to hear and understand said recording)
12
13          Kathryn DiMarzio
14          Kathryn DiMarzio,
15          Temp. CSR - 15685
16          Notary Public,
17          Macomb County, Michigan
18  My Commission expires:  August 24, 2028
19
20
21
22
23
24
25

10/12/2022

1

**1**

**12** 2:3

**2**

**2022** 2:3

**29th** 3:17

**3**

**3** 12:16

**4**

**4** 4:15 8:19

**4:05** 2:4

**4:25** 12:19

**5**

**5** 4:15 8:19 12:17

**A**

**absolutely** 7:21

**actions** 12:5

**additional** 8:6 9:14

**advice** 5:21 9:8 12:6,12

**allowed** 6:15

**anymore** 4:2 9:8,24

**approximately** 2:4

**argument** 5:8 7:15 8:16

**assume** 3:10

**attach** 7:21

**attached** 4:17,18

**attempt** 10:3

**attempted** 3:21 4:13 10:2,3

**attempts** 9:15

**attitude** 10:5

**attorney** 3:13 5:1,3 10:5

**authority** 5:10,15

**aware** 2:21 3:6

**B**

**back** 2:16 3:16 8:25 9:5

**based** 7:1

**beat** 4:2

**behavior** 5:19 7:4

**behaviors** 8:8

**broken** 5:12 11:21

**brother** 3:6,9 5:2 7:23

**brother's** 3:10,14

**brush** 4:2

**C**

**calm** 9:19

**caps** 7:18

**car** 12:2

**case** 5:22

**change** 5:21 9:22

**charge** 5:19,25

**charging** 7:3

**children** 11:18

**choose** 5:21 12:11

**city** 5:2 6:18

**class** 7:2

**commit** 6:25

**communicate** 6:16 7:20 9:18

**communicated** 2:20

**communication** 10:8

**conduct** 7:16

**constitutes** 11:8

**contact** 5:2,18 8:11 9:15,24

**context** 4:20

**continuation** 9:21

**continued** 8:8

**conversation** 4:25 5:20 7:11 12:19

**copies** 9:5

**correspondences** 9:19

**county** 5:3 11:14

**couple** 4:14

**courts** 8:14

**crime** 6:25

**criminal** 6:1,25 7:4,21 11:8

**criteria** 6:5

**cursed** 11:21

**cursing** 6:15 7:18

**D**

**date** 7:22

**daughter** 2:22

**days** 2:13,19 4:15 8:19 12:17

**dealing** 5:9

**Dearborn** 4:21,22 6:19

**decision** 5:23

**delivered** 3:17

**delivery** 3:21 4:14

**department** 2:2 5:11

**derogatory** 6:23

**determination** 6:4

**dictate** 10:14

**discovered** 8:21

**discussed** 3:18

**documented** 9:3

**door** 5:4

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

10/12/2022

2

dropping 4:3

**E**

early 10:2,3

ed 6:23

Edison 2:10

end 11:13

ended 12:19

enhancement 7:2

escalation 9:21

everybody's 7:16

evidence 6:8

explained 5:9 6:16

expressing 10:9

**F**

Fair 5:13 12:8

falls 6:2

family 10:19 11:2

form 6:23

found 2:16

front 12:2

frustrating 7:6

**G**

Generally 12:16

give 9:8 12:7,12

Good 2:7

gun 11:16,18

guy 11:11

guys 4:2,24 11:14,18

**H**

handle 11:13

heard 11:9

heed 5:21

honest 10:4

hope 10:10

house 2:22,23 12:3

How's 2:6

**I**

intention 10:9,12

interaction 4:7

interpretation 6:17,22

issue 8:4

**J**

judge 5:18

justified 12:4

**K**

KADAF 2:6,9,12,15 3:2,5,9,13,
16,22 4:8,12,17,20 5:13,16 6:12,
20 7:5,8,23 8:3,10,13,20,23 9:1,
4,10,25 10:11 11:9,23 12:2,8,14,
18

kind 6:9,24 7:20 8:9 11:10

**L**

law 5:24 6:3,7 11:21 12:11

lawful 7:18

laws 5:11

leave 2:23 6:14 9:8,11,19,23 10:6
11:11 12:13

left 9:25 12:2,6

lens 5:21

letter 3:5,9,18 4:10,12,20 7:18
9:10,17,23 10:4,5,15 12:1

letters 4:3,7 5:5 7:12

lever 11:22

lightly 11:19

lines 6:22

live 5:4

**M**

made 2:21

mail 2:19

mailbox 2:16 4:4,15

mailed 4:10,12

make 5:7,18 6:4 7:3,15,21,22
8:16 10:20,22,24 11:1

making 6:17 8:7

man 10:11,16 11:15,16

max 2:19

mention 6:18

Missed 3:20

Mm-hmm 6:20

motivation 7:1

motive 6:23

**N**

nation 7:22

nature 6:1

neighbor 2:10 7:11,12 10:17

night 12:3

noncriminal 5:19 7:3

normal 5:5,6 7:10,11,12 10:16,
17,18

Northville 2:1

notice 10:2

number 8:1,5,18

**O**

occurred 6:7

10/12/2022

3

October 2:3

office 3:14 5:3

Officer 2:7,11,14,25 3:4,8,11,15, 20 4:6,9,16,18 5:6,7,14,17 6:13, 21 7:6,14 8:1,4,12,15,21,24 9:2, 5,13 10:1,7 11:5,20,24 12:4,9,16

opinion 7:16 10:13,14,15

order 5:18 8:11

owner 11:16

**P**

p.m. 2:4 12:19

package 2:22

person 3:25 4:25 10:20,24

perspective 5:22

photocopy 8:17

picture 2:17

play 6:10

point 3:24 4:1,23 6:12 9:14 10:7 11:13

police 2:2 5:11 7:24

porch 2:24

potential 9:22

power 5:17

pressing 10:13,15

previous 6:18

prosecutable 6:5

prosecutor 6:1

Prosecutor's 5:3

protect 10:19

protection 8:11

protective 7:2

push 10:25

**Q**

question 4:8

**R**

racially 6:23

reaction 11:25 12:1

read 2:10,18

receipt 3:10 7:22

receive 7:12

received 2:11,22 3:23 4:16 9:12

remember 2:18

report 7:24 12:15

request 8:7 12:6

required 3:12

residence 6:18

respect 10:9

response 10:1,17,18

responsible 6:9

review 6:2

rights 12:11

rules 6:10

**S**

scan 8:17

scared 7:8,10

schools 11:16

scope 5:10

secondary 8:5

Sellenraad 2:7,11,14,25 3:4,8,11, 15,20 4:6,9,16,18 5:6,7,14,17 6:13,21 7:6,14 8:1,4,12,15,21,24 9:2,5,13 10:1,7 11:5,20,24 12:4, 9,16

sending 5:5 9:23

set 9:18

shape 6:23

show 8:8

Showing 3:11

shows 8:6

side 4:9

signature 3:11

simply 10:5

situation 5:22,24 11:7

son 2:23

speaks 6:14

standpoint 8:5

start 4:24

stated 9:10

statements 9:14

stating 10:6

stayed 4:22

stuff 7:20 8:6

submit 5:25 6:3

submitted 8:14

substantiate 6:8

support 8:16

supposed 4:23 7:9

**T**

taking 4:24 11:18

talked 10:14

talking 5:23

telling 6:14 12:10

terms 6:24

thing 2:21 5:1 9:6

things 4:21 6:9,24 7:19 8:6,9 10:22 11:13,17

thinks 10:16

| STATE OF MICHIGAN<br>35TH JUDICIAL DISTRICT | REGISTER OF ACTIONS | CASE NO: **13V4519GC**   GC<br>STATUS: CLSD |
|---|---|---|

Court Address 660 PLYMOUTH ROAD
　　　　　　　　PLYMOUTH　　　　MI　48170

Court Telephone
(734) 459-4740

JUDGE OF RECORD: PLAKAS,JAMES A.,　　　　　　P-52722

P01　PLAINTIFF　　　　　　　　　　(CLSD)
**AMERICAN EXPRESS CENTURION BANK//**

Attorney
P-71362
TAYLOR,TRACI LYNNE,
STE 100
320 E BIG BEAVER RD
TROY　　　　　　　　　MI 48083
(248) 743-0882

D01　DEFENDANT　　　　　　　　　(CLSD)
**EDISON/JONATHAN/**
(AKA ████████████████████

**EXHIBIT**
**D**
12-13-23 J. Edison

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | | INITIALS |
|---|---|---|---|
| 09/20/13<br>P01 | SUMM & COMP FILED<br>FILING FEE PAID　　$65.00　RCPT # D790304<br>CHECK TENDERED 462901 | TAYLOR,TRACI LYN P-71362 | KAM<br>CIV<br>CIV |
| 10/03/13<br>D01 | SUMM & COMP TO USE OWN PROCESS SRVER ISSUED | $19,612.10 | KAM |
| 11/25/13 | CHECK SENT FOR FILING FEE WAS FOR A DIFFERENT<br>PARTY (NOT OUR CASE) AND THE WRONG AMOUNT;<br>AFTER SPEAKING W/MARY ANN D, THEY WILL SEND US<br>THE DIFFERENCE ASAP; CHECK SHOULD BE SENT TO<br>MY ATTENTION; SPOKE W/HANNAH AT PLTF ATTY'S<br>OFFICE | | PLW<br>PLW<br>PLW<br>PLW<br>PLW<br>PLW |
| 11/26/13 | MOTION FEE PAID　　$20.00　RCPT # D793561<br>CHECK TENDERED 472619<br>2ND SUMMS/ALT SRV | | CIV<br>CIV<br>CIV |
| 12/04/13 | SPOKE W/HANNAH FROM PLTF ATTY'S OFFICE; SHE<br>WILL BE MAILING THE CHECK FOR $85 (DIFFERENCE<br>IN FILING FEE) TODAY | | PLW<br>PLW<br>PLW |
| D01 | ORDER TO EXTEND TIME FOR SERV ENTERED (ATTY　　)<br>　　　　　　　　　　02/17/14 | | KAM |
| D01 | ORDER FOR SUBSTITUTED SERVICE ENTERED (ATTY　　) | | KAM |
| 12/06/13 | COSTS ASSESS PAID　　$85.00　RCPT # D793945<br>CHECK TENDERED 474335 | | CIV<br>CIV |
| 12/20/13<br>D01 | SUMM & COMP FOR SUBSTITUTED SERVICE SERVED<br>　(1STCLAS) | | KAM |
| D01 | SUMM & COMP FOR SUBSTITUTED SERVICE SERVED<br>　(CERMAIL) | | KAM |

RICAN EXPRESS CENTU v  EDISON/JONATHAN/          CASE#: 13V4519GC    PAGE:  2

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | INITIALS |
|------|--------------------------------|----------|

01/12/14
D01       SUMM & COMP FOR SUBSTITUTED SERVICE SERVED                    KAM
            (TACKING)

02/24/14
D01       JUDGMENT BY DEFAULT ENTERED (JAP      )          $19,828.10   KAM

11/17/14
            GARN FEE PAID            $15.00  RCPT # D706839             CIV
            CHECK TENDERED 517424                                       CIV
D01     1 WRIT OF GARN-INCOME TAX ISSUED                  $15.00        KM
            GARN-DEFN# 01 MICHIGAN DEPARTMENT OF TREASURY (EXPIRES: 10/31/15)  KM

10/14/15
            GARN FEE PAID            $15.00  RCPT # D720708             CIV
            CHECK TENDERED 573632                                       CIV
D01     2 WRIT OF GARN-INCOME TAX ISSUED                  $15.00        KM
            GARN-DEFN# 02 MICHIGAN DEPARTMENT OF TREASURY (EXPIRES: 10/31/16)  KM

11/02/15
          D01 GAR# 01-INCM TAX-CLSD 10/31 EXP

10/31/16                                                                CIV
            GARN FEE PAID            $15.00  RCPT # D736171             CIV
            CHECK TENDERED 622813                                       
11/01/16                                                       $15.00   KM
D01     3 WRIT OF GARN-INCOME TAX ISSUED                                KM
            GARN-DEFN# 03 MICHIGAN DEPARTMENT OF TREASURY (EXPIRES: 10/31/17)

11/03/16
          D01 GAR# 02-INCM TAX-CLSD 10/31 EXP                          KAM

01/17/17
          D01 GAR# 03-INCM TAX-CLOSED: RELEASE LIABILITY               CIV

10/02/17                                                                CIV
            GARN FEE PAID            $15.00  RCPT # D747947
            CHECK TENDERED 677210
10/18/17                                                       $15.00   KM
D01     4 WRIT OF GARN-INCOME TAX ISSUED          (EXPIRES: 10/31/18)   KM
            GARN-DEFN# 04 MICHIGAN DEPARTMENT OF TREASURY              JMV

11/01/17                                                                JMV
          D01 GAR# 04 DEFENDANT SERVICE DATE: 11/01/17                  JMV
D01     4 WRIT OF GARN-INCOME TAX SERVED
            GARN-DEFN# 04 MICHIGAN DEPARTMENT OF TREASURY

02/01/18                                                                JMV
          D01 GAR# 04 POS TSD 2/1                                       JMV
          D01 GAR# 04 POS TSD 1/31

08/21/18                                                                CIV
            GARN FEE PAID            $15.00  RCPT # D760057             CIV
            CHECK TENDERED 726384
10/02/18                                                       $15.00   JRK
D01     5 WRIT OF GARN-INCOME TAX ISSUED          (EXPIRES: 10/31/19)   JRK
            GARN-DEFN# 05 MICHIGAN DEPT OF TREASURY//

11/05/18
          D01 GAR# 04-INCM TAX-CLSD 10/31 EXP                          CIV

08/27/19                                                                CIV
            GARN FEE PAID            $15.00  RCPT # D774686
            CHECK TENDERED 779913
09/13/19                                                       $15.00   KMW
D01     6 WRIT OF GARN-INCOME TAX ISSUED          (EXPIRES: 10/31/20)   KMW
            GARN-DEFN# 06 MICHIGAN DEPT OF TREASURY//

RICAN EXPRESS CENTU v  EDISON/JONATHAN/          CASE#: 13V4519GC   PAGE:  3

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | INITIALS |
|------|-------------------------------|----------|

11/06/19
      D01 GAR# 05-INCM TAX-CLSD 10/31 EXP

12/01/20
      D01 GAR# 06-INCM TAX-CLSD 10/31 EXP

12/15/22                                                          JKM
  D01   JUDGMENT SATISFIED

12/20/22                                                          JKM
  P01   SATISFACTION FILED

01/27/23                                                          JKM
  ALL   SATISFACTION MAILED

***** END OF REGISTER OF ACTIONS ***** 12/11/23 12:53

**EXHIBIT**

E

12-13-23. J Edison

# Case Details

**Case ID**

2014-14V03448A-OI

**Court Location**

35th District Court - Plymouth

**Case Entitlement**

TOWNSHIP OF NORTHVILLE V EDISON

**Judge of Record**

**Date Filed**

10/13/2014

**Case Status**

CLOSED

**Closed Date**

10/24/2014

**Balance**

## Parties (1)

**Party Name**

EDISON/JONATHAN/EDWARD

**Party Type/Number**

DEFENDANT - 1

**Age**

████████

**Attorney Name**

**Alternate Name(s)**

## Charges (1)

**Count**

1

**Offense Date**

10/10/2014

**Current Charge**

IMPEDED TRAFFIC (0 POINTS) (2670)

**Original Charge**

IMPEDED TRAFFIC (0 POINTS) (2670)

# Case Details

Additional Resources ▾

**Case ID**
2014-14N00566A-OI

**Court Location**
35th District Court - Plymouth

**Case Entitlement**
CITY OF NORTHVILLE V EDISON

**Judge of Record**

**Date Filed**
06/13/2014

**Case Status**
CLOSED

**Closed Date**
07/10/2014

**Balance**

## Parties (1)

**Party Name**
EDISON/JONATHAN/EDWARD

**Party Type/Number**
DEFENDANT - 1

**Age**

**Attorney Name**

**Alternate Name(s)**

## Charges (1)

**Count**
1

**Offense Date**
06/10/2014

**Current Charge**
PLATE VIOLATION (CI) - EXPIRED PLATE (3500E1)

**Original Charge**
PLATE VIOLATION (CI) - EXPIRED PLATE (3500E1)

# Case Details

Additional Resources ▼

**Case ID**
2012-12V01886B-OI

**Court Location**
35th District Court - Plymouth

**Case Entitlement**
TOWNSHIP OF NORTHVILLE V EDISON

**Judge of Record**

**Date Filed**
05/16/2012

**Case Status**
CLOSED

**Closed Date**
07/13/2012

**Balance**

## Parties (1)

**Party Name**
EDISON/JONATHAN/EDWARD

**Party Type/Number**
DEFENDANT - 1

**Age**
██████████

**Attorney Name**

**Alternate Name(s)**

## Charges (1)

**Count**
1

**Offense Date**
05/14/2012

**Current Charge**
NO PROOF OF INSURANCE (3100)

**Original Charge**
NO PROOF OF INSURANCE (3100)

# Case Details

Additional Resources ▾

**Case ID**
2012-12V01886A-OI

**Court Location**
35th District Court - Plymouth

**Case Entitlement**
TOWNSHIP OF NORTHVILLE V EDISON

**Judge of Record**

**Date Filed**
05/16/2012

**Case Status**
CLOSED

**Closed Date**
07/13/2012

**Balance**

## Parties (1)

**Party Name**
EDISON/JONATHAN/EDWARD

**Party Type/Number**
DEFENDANT - 1

**Age**
█████

**Attorney Name**

**Alternate Name(s)**

## Charges (1)

**Offense Date**
05/14/2012

**Count**
1

**Current Charge**
PLATE VIOLATION (CI) - EXPIRED PLATE (3500E1)

**Original Charge**
PLATE VIOLATION (CI) - EXPIRED PLATE (3500E1)

# Case Details

Additional Resources ▾

**Case ID**
2012-12N00213A-OI

**Court Location**
35th District Court - Plymouth

**Case Entitlement**
CITY OF NORTHVILLE V EDISON

**Judge of Record**

**Date Filed**
03/19/2012

**Case Status**
CLOSED

**Closed Date**
07/13/2012

**Balance**

## Parties (1)

**Party Type/Number**
DEFENDANT - 1

**Party Name**
EDISON/JONATHAN/EDWARD

**Age**
██████

**Attorney Name**

**Alternate Name(s)**

## Charges (1)

**Offense Date**
03/17/2012

**Count**
1

**Current Charge**
PLATE VIOLATION (CI) - EXPIRED PLATE (3500E1)

**Original Charge**
PLATE VIOLATION (CI) - EXPIRED PLATE (3500E1)

Skip to Main Content Logout My Account Search Menu New Case Search Refine Search Back   Location : Criminal Cases

# REGISTER OF ACTIONS
## CASE NO. 06-018054-01-FH



EXHIBIT

F

Dec 13th 23 J. Edison

| PARTY INFORMATION | |
|---|---|

| | | Attorneys |
|---|---|---|
| **Defendant** | **Edison, Jonathan** | **Kristi I. Glenn**<br>*Court Appointed*<br>(313) 477-8149(W) |
| **Plaintiff** | **State of Michigan** | **Teresa Ariaina Smith**<br>(313) 943-2320(W) |

| CHARGE INFORMATION | | | |
|---|---|---|---|

| | Statute | Level | Date |
|---|---|---|---|
| **Charges: Edison, Jonathan**<br>1. Child Support - Failing to Pay | 750165 | . | 11/23/2005 |

| EVENTS & ORDERS OF THE COURT | |
|---|---|

**DISPOSITIONS**

01/24/2006  **Plea (Judicial Officer: Costello, Robert K.)**
    1. Child Support - Failing to Pay
        Defendant Stand Mute: Plea of Not Guilty Entered by Court

01/05/2007  **Disposition (Judicial Officer: McCarthy, Kathleen M.)**
    1. Child Support - Failing to Pay
        Dismissed

**OTHER EVENTS AND HEARINGS**

11/23/2005  **Recommendation for Warrant**
01/05/2006  **Warrant Signed**
01/24/2006  **Arraignment On Warrant  (9:00 AM) (Judicial Officer Costello, Robert K.)**
    <u>Parties Present</u>
    Result: Held
01/24/2006  **Interim Condition for Edison, Jonathan**
    - Personal Bond (Own Recognizance)
      $5,000.00
01/31/2006  **Motion To Assign Counsel Filed/Signed**
01/31/2006  **Bound Over**
01/31/2006  **Plea of Guilty Accepted**
01/31/2006  **Arraignment On Information  (9:00 AM) (Judicial Officer Popke, Lita Masini)**
    <u>Parties Present</u>
    Result: Held
01/31/2006  **Disposition Conference  (9:05 AM) (Judicial Officer Popke, Lita Masini)**
    <u>Parties Present</u>
    Result: Held
01/31/2006  **Preliminary Exam  (9:35 AM) (Judicial Officer Non-Support Docket, Felony)**
    <u>Parties Present</u>
    Result: Waived/Bound Over
01/31/2006  **Sentencing  (10:05 AM) (Judicial Officer Popke, Lita Masini)**
    <u>Parties Present</u>
    Result: Adjourned:Sentencing Delayed Per Mcla 771.7
01/31/2006  **Interim Condition for Edison, Jonathan**
    - Personal Bond (Own Recognizance)
      $5,000.00
02/09/2006  **Original Blind Draw Judge**
02/09/2006  **AOI Docket**
02/09/2006  **Case Assignment to AOI Docket**
05/02/2006  **Review Date  (9:00 AM) (Judicial Officer Brown, Helen E.)**
    <u>Parties Present</u>
    Result: Held
08/01/2006  **Review Date  (9:00 AM) (Judicial Officer Skutt, Richard M.)**
    <u>Parties Present</u>
    Result: Held
01/05/2007  **Return Of Fingerprints & Arrest Records Granted - Order S/F**
01/05/2007  **Signed And Filed**
01/05/2007  **Sentencing  (9:00 AM) (Judicial Officer McCarthy, Kathleen M.)**
    <u>Parties Present</u>
    Result: Case Was Dismissed
04/01/2013  **Case Reassigned**



Skip to Main Content Logout My Account Search Menu New Case Search Refine Search Back    Location : Criminal Courts

## REGISTER OF ACTIONS
### CASE NO. 08-004933-01-FH

| | PARTY INFORMATION | |
|---|---|---|
| | | **Attorneys** |
| **Defendant** | **Edison, Jonathan** | Duane R. Johnson |
| | | *Court Appointed* |
| | | (248) 851-9400(W) |
| | | |
| | | **Attorney Unreported** |
| | | *Retained* |
| | | |
| **Plaintiff** | **State of Michigan** | Nancy A. Neff |
| | | (586) 731-0990(W) |
| | | |
| | | Judith A. McNair |
| | | (313) 967-2226(W) |

| CHARGE INFORMATION | | | |
|---|---|---|---|
| | **Statute** | **Level** | **Date** |
| **Charges: Edison, Jonathan** | 750165 | . | 02/01/2007 |
| 1. Child Support - Failing to Pay | | | |

### EVENTS & ORDERS OF THE COURT

|  |  |
|---|---|
| | **DISPOSITIONS** |
| 03/25/2008 | **Plea (Judicial Officer: Lockhart, Steve)** |
| | 1. Child Support - Failing to Pay |
| |     Defendant Stand Mute: Plea of Not Guilty Entered by Court |
| | |
| | **OTHER EVENTS AND HEARINGS** |
| 12/18/2007 | **Recommendation for Warrant** |
| 01/16/2008 | **Warrant Signed** |
| 03/25/2008 | **Interim Condition for Edison, Jonathan** |
| |   - 10% |
| |     $5,000.00 |
| 03/25/2008 | **Arraignment on Warrant**  (9:00 AM) (Judicial Officer Lockhart, Steve) |
| |   <u>Parties Present</u> |
| | Result: Defendant Stands Mute; Plea Of Not Guilty Entered By Court |
| 03/28/2008 | **Attorney Appointed Order, S/F** |
| 04/01/2008 | **Preliminary Examination**  (9:00 AM) (Judicial Officer Callahan, Bill) |
| |   <u>Parties Present</u> |
| | Result: Waived/Bound Over |
| 04/01/2008 | **Motion to Assign Counsel Filed/Signed** |
| 04/01/2008 | **Bound Over** |
| 04/01/2008 | **Arraignment On Information**  (9:00 AM) (Judicial Officer Callahan, Bill) |
| |   <u>Parties Present</u> |
| |     *04/01/2008 Reset by Court to 04/01/2008* |
| | Result: Held |
| 04/01/2008 | **Disposition Conference**  (9:00 AM) (Judicial Officer Callahan, Bill) |
| |   <u>Parties Present</u> |
| | Result: Held |
| 04/01/2008 | **Interim Condition for Edison, Jonathan** |
| |   - 10% |
| |     $5,000.00 |
| 05/13/2008 | **Pre-Trial**  (9:00 AM) (Judicial Officer Callahan, Bill) |
| | Result: Adjourned at the Request of the Court |
| 06/25/2008 | **Pre-Trial**  (9:00 AM) (Judicial Officer Callahan, Bill) |
| |   <u>Parties Present</u> |
| | Result: Case Was Dismissed |
| 06/25/2008 | **Case Dismissed - Order Signed and Filed** (Judicial Officer: Callahan, Bill ) |
| 06/25/2008 | **Return Of Fingerprints & Arrest Records Granted - Order S/F** (Judicial Officer: Callahan, Bill ) |
| 04/01/2013 | **Case Reassigned** |

| FINANCIAL INFORMATION |
|---|

Total Financial Assessment

Balance Due as of 12/08/2023

04/01/2008 | Transaction Assessment

$0.00
$0.00
0.00

$0.00

| STATE OF MICHIGAN 35TH JUDICIAL DISTRICT ORI820055J PIN: 220002887 | **REGISTER OF ACTIONS** | CASE NO: **22V2887**   D01 OM X-REFERENCE #: 220002887 STATUS: CLSD          05/24/23 |
|---|---|---|

JUDGE OF RECORD: GEROU,MICHAEL J.,   P-38777
         JUDGE: GEROU,MICHAEL J.,   P-38777

TOWNSHIP OF NORTHVILLE v

   EDISON/JONATHAN/EDWARD

**EXHIBIT**

12-13-23 J.Edison

CTN:
TCN:
SID: 3089016L
ENTRY DATE: 11/09/22
OFFENSE DATE: 09/23/22 1200 AM
ARREST DATE:

VEHICLE TYPE:                          VPN:
DOB: ##########  SEX: M  RACE: B  DLN: ###############  CDL: N
VEH YR:          VEH MAKE:        VIN:                          PAPER PLATE:

| DEFENSE ATTORNEY ADDRESS RANDOLPH,THOMAS H.,III 6330 E JEFFERSON AVE DETROIT         MI 48207 | BAR NO. P-53563 Telephone No. (313) 264-0820 |
|---|---|
| OFFICER: SELLENRAAD,BENJAMIN PROSECUTOR: DEMOPOULOS,GREGORY VICTIM/DESC: | DEPT: NORTHVILLE TWP POLICE DEP BAR#: P-41622 VENUE: TOWNSHIP OF NORTHVILLE |

CNT: 01 C/M/F: M  258D                   PACC#92.LESS
**MALICIOUS ANNOYANCE BY WRITING**
ARRAIGNMENT DATE:  12/19/22   PLEA:   MUTE & NGBC   PLEA DATE: 12/19/22
FINDINGS:  DISM BY PTY  DISPOSITION DATE: 05/24/23
SENTENCING DATE:

| FINE | COST ST.COST | CON | MISC. | REST | TOT FINE | TOT DUE |
|---|---|---|---|---|---|---|
| 0.00 | 0.00     0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

     JAIL SENTENCE:           PROBATION:
VEH IMMOB START DATE:        NUMBER OF DAYS:        VEH FORFEITURE:

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | | INITIALS |
|---|---|---|---|
| 09/23/22 | | | |
| 01  ORIGINAL CHARGE | MAL WRITING | | AF |
| 10/20/22 | | | |
| 01  AUTHORIZATION OF COMPLAINT DATE | | | AF |
|     PROS DEMOPOULOS,GREGORY D., | | P-41622 | AF |
| 10/21/22 | | | |
| 01  COMPLAINT ISSUANCE DATE | | | AF |
|     JDG  GEROU,MICHAEL J., | | P-38777 | AF |
|     MISCELLANEOUS ACTION | ALL COUNTS | | AF |
|     SCHEDULED FOR ARRAIGNMENT/PRE-TRIAL | | | AF |
|  | 121922  830A  PLAKAS,JAMES A., | P-52722 | AF |
|     CRIMINAL SUMMONS ISSUED | | | AF |
| 11/09/22 | | | |
|     FILING DATE | 102122 | | AF |
| 12/07/22 | | | |
|     MISCELLANEOUS ACTION | ALL COUNTS | | ADF |

NAME: EDISON/JONATHAN/EDWARD          CASE NO: 22V2887          PAGE    2

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | | INITIALS |
|------|-------------------------------|--|----------|

12/07/22                                                      P-53563    ADF
   ATT   RANDOLPH,THOMAS H.,III                            ADF
   ATTORNEY APPEARANCE FILED

12/09/22                                                                 ADF
   NOTICE TO APPEAR GENERATED                               ADF
            ALL COUNTS                          ADF
   JUANITA @ DEF ATTY OFFICE PHONED/LEFT VM                 ADF
   ASKING FOR AN EVIDENT. MOTION HEARING DATE-               ADF
   I RETURNED HER CALL/LEFT VM STATING THEY                 ADF
   MAY WAIT & GET MOTION DATE AT TIME OF AR/PT               ADF
   ON THE 19TH & TO RETURN MY CALL NEXT WEEK.

12/12/22                                                                 KR
  01   MISCELLANEOUS ACTION        MAL WRITING                  KR
     JUDGE OF RECORD/MAGISTRATE CHANGED                   KR
      FROM: 52722 PLAKAS,JAMES A.,                     KR
       TO: 38777 GEROU,MICHAEL J.,                   KR
     REMOVED FROM CALENDAR      121922  830A  PLAKAS,JAMES A.,   P-52722   KR
     SCHEDULED FOR ARRAIGNMENT/PRE-TRIAL                  KR
           121922  830A  GEROU,MICHAEL J.,   P-38777   KR
     FILE SCHEDULED WITH JAP IN ERROR. SUMMONS            KR
     SIGNED BY MJG. NEW NOTICE TO DEFT AND ATTY           KR
     MISCELLANEOUS ACTION        MAL WRITING               KR
     SCHEDULED FOR ZOOM HEARING                           KR
           121922  830A  GEROU,MICHAEL J.,   P-38777   KR
     NOTICE TO APPEAR GENERATED                           KR
           MAL WRITING

12/13/22                                                                 KR
     MISCELLANEOUS ACTION        ALL COUNTS                KR
     REC ANSWER FROM PROS FOR DEFTS MOTION FOR             KR
     EVIDENTIARY HEARING. FILED.

12/19/22                                                                 JLW
     ARRAIGNMENT HELD        ALL COUNTS           P-38777   JLW
     JDG   GEROU,MICHAEL J.,                               JLW
     STOOD MUTE AND PLEA OF NOT GUILTY ENTERED BY COURT    JLW
     SCHEDULED FOR MOTION HEARING                         JLW
           013023  900A  GEROU,MICHAEL J.,   P-38777   JLW
     SCHEDULED FOR PRE-TRIAL  013023  900A  GEROU,MICHAEL J.,   P-38777   JLW
     SET FOR MOTION/EVIDENTIARY HEARING/PT WITH            JLW
     ATTY/OFC                                             JLW
     MISCELLANEOUS ACTION        ALL COUNTS                JLW
     REMOVED FROM CALENDAR      013023  900A  GEROU,MICHAEL J.,   P-38777   JLW
     REMOVED FROM CALENDAR      013023  900A  GEROU,MICHAEL J.,   P-38777   JLW
     MISCELLANEOUS ACTION        ALL COUNTS                JLW
     SCHEDULED FOR MOTION HEARING                         JLW
           113023 1100A  GEROU,MICHAEL J.,   P-38777   JLW
     SCHEDULED FOR PRE-TRIAL  113023 1100A  GEROU,MICHAEL J.,   P-38777   JLW
     NOTICE TO APPEAR GENERATED                           JLW
           ALL COUNTS                          JLW
     MISCELLANEOUS ACTION        ALL COUNTS                JLW
     DEF EDISON'S BOND MEMORANDUM FILED                   JLW
     MISCELLANEOUS ACTION        ALL COUNTS                JLW
     REMOVED FROM CALENDAR      113023 1100A  GEROU,MICHAEL J.,   P-38777   JLW
     REMOVED FROM CALENDAR      113023 1100A  GEROU,MICHAEL J.,   P-38777   JLW
     MISCELLANEOUS ACTION        ALL COUNTS                JLW
     SCHEDULED FOR MOTION HEARING

NAME: EDISON/JONATHAN/EDWARD

CASE NO: 22V2887     PAGE   3

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | | | INITIALS |
|---|---|---|---|---|

12/19/22

SCHEDULED FOR PRE-TRIAL       013023 1100A  GEROU,MICHAEL J.,   P-38777   JLW
CORRECTED DATE                013023 1100A  GEROU,MICHAEL J.,   P-38777   JLW
                                                                          JLW
NOTICE TO APPEAR GENERATED                                                JLW
                              ALL COUNTS                                   JLW
DEFENDANT ENROLLED IN ELECTRONIC NOTIFICATION (DNT)                       MTH
                    Auth PP-Form                                          MTH
ENROLLMENT CONFIRMATION TEXT MESSAGE SENT                                  MTH
DEFENDANT ENROLLED IN ELECTRONIC NOTIFICATION (DNT)                       MTH
                    Auth PP-Form                                          MTH

01/19/23

MISCELLANEOUS ACTION      ALL COUNTS                                      KR
REMOVED FROM CALENDAR     013023 1100A  GEROU,MICHAEL J.,   P-38777       KR
EVIDENTIARY HEARING SCHEDULED                                             KR
                          022723 1100A  GEROU,MICHAEL J.,   P-38777       KR
ADJOURNED. MJG NOT HERE ON 1/30                                           KR
MISCELLANEOUS ACTION      ALL COUNTS                                      KR
REMOVED FROM CALENDAR     013023 1100A  GEROU,MICHAEL J.,   P-38777       KR
SCHEDULED FOR MOTION HEARING                                              KR
                          022723 1100A  GEROU,MICHAEL J.,   P-38777       KR
NOTICE TO APPEAR GENERATED                                                KR
                          ALL COUNTS                                      KR

02/27/23

HEARING ON MOTION HELD    ALL COUNTS                                      KR
JDG  GEROU,MICHAEL J.,                              P-38777               KR
SCHEDULED FOR MOTION HEARING                                              KR
                          050123  100P  GEROU,MICHAEL J.,  P-38777        KR
KATELIN COMSTOCK - CER-9213                                               KR
MOTION HELD FOR CLARIFICATION OF WHAT WORDS                               KR
ARE OBSCENE. WORDS CLARIFIED ON RECORD. SET                              KR
NEW MOTION TO CHALLENGE CONST OF ORD ON                                   KR
5/1/23. DEFTS MOTION TO BE FILED BY 3/20/23                               KR
AND PROS RESPONSE BY 4/10/23.                                             KR
NOTICE TO APPEAR GENERATED                                                KR
                          ALL COUNTS                                      KR
NOTICE OF PRESENTMENT OF ORDER UNDER 7 DAY                                KC
RULE FILED BY DEF W/ PROPOSED ORDER.                                      KC

03/06/23

PROS DEMOPOULOS OBJECTION FILED.                                          KC
EMAILED BOTH PARTIES, WILL DISCUSS ON 5/1.                                KC
MISCELLANEOUS ACTION      ALL COUNTS                                      KR
DEFT'S MOTION FOR ENTRY OF ORDER RECEIVED.                                KR
FILED.                                                                    KR

03/20/23

01  MISCELLANEOUS ACTION      MAL WRITING                                 KR
DEFT'S MOTION TO DISMISS CHARGE DUE TO                                    KR
UNCONSTITUTIONALITY OF MCL 750.390 ON ITS                                 KR
FACE AND AS APPLIED TO DEFT RECEIVED. FILED                               KR

NAME: EDISON/JONATHAN/EDWARD

CASE NO: 22V2887    PAGE    4

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | INITIALS |
|---|---|---|

04/04/23

    MISCELLANEOUS ACTION          ALL COUNTS              KR
    PROS RESPONSE TO DEFT'S MOTION TO DISMISS      KR
    DUE TO ALLEGED UNCONSTITUTIONALITY OF         KR
    MCL 750.90. FILED. FILE TO MJG.               KR

04/24/23

 01  MISCELLANEOUS ACTION          MAL WRITING      KR
    DEFTS REPLY TO RESPONSE TO DEFTS MOTION TO      KR
    DISMISS CHARGE DUE TO UNCONSTITUTIONALITY      KR
    OF MCL 750.390 ON ITS FACE AND AS APPLIED      KR
    TO DEFENDANT. FILED.                  KR

05/01/23

    MOTION ON CONSTITUTIONALITY OF NORTHVILLE      KC
    TWP ORDINANCE HELD. DEF ATTY WAIVES MOTION      KC
    ON ENTRY OF PROPOSED ORDER. MJG TO ISSUE      KC
    WRITTEN OPINION/ORDER.                 KC

05/24/23

 01  MISCELLANEOUS ACTION          MAL WRITING      KR
    DISMISSED BY PARTY                   KR
    DISMISSED ON MOTION OF DEFENDANT         KR
    WRITTEN OPINION ISSUED BY MJG. MOTION TO      KR
    DISMISS IS GRANTED.                  KR
    CASE CLOSED                      KR
    ORDER OF ACQUITTAL/DISMISSAL GENERATED      KR
                     MAL WRITING      KR
    TRUE COPY OF WRITTEN OPINON AND ORDER TO      KR
    DISMISS EMAILED AND MAILED TO PARTIES.      KR

***** END OF REGISTER OF ACTIONS ***** 12/11/23 12:34